UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CORDIA FOSTER and CISLYN WRIGHT,           21-cv-11224

                   *Plaintiffs*,           **COMPLAINT**

       -against-

ELYSE DULA a/k/a ELYSE SNOW
and IAN K. SNOW,

                 *Defendants*.
--------------------------------------------------------X

       Plaintiffs Cordia Foster ("Foster") and Cislyn Wright ("Wright"), by their undersigned attorneys, allege as follows for their Complaint against Defendants Elyse Dula a/k/a Elyse Snow ("Dula") and Ian K. Snow ("Snow"):

## Introduction

       1.    This case involves racial harassment and discrimination, and retaliation, in violation of 42 U.S.C. § 1981 and the New York State Human Rights Law.

       2.    Plaintiffs are African-American women who worked in Defendants' homes raising Defendants' four children under extraordinarily difficult and stressful circumstances.

3. Defendants routinely stereotyped Plaintiffs due to their race and ethnicity, and for most of their employment Plaintiffs quietly accepted such stereotyping.

4. However, in early January 2020, Defendant Dula crossed a line. Upon hearing that Defendants' kitten ran outside, Dula angrily referred to Plaintiffs as "***those black bitches!***"

5. The normally soft-spoken Plaintiff Wright overheard this, and directly challenged Dula's racist outburst by shooting back loudly and confrontationally "*What did you say Elyse??*"

6. From that point on, Defendants, acting mainly through Dula, applied very different and far more troubling stereotypes to Plaintiffs.

7. Instead of seeing them as nonthreatening, nurturing, large-framed black women who exist solely to serve, as they had done up to that point, Defendants began treating them as disloyal trouble-makers who could be stealing from them.

8. Defendants' increased suspicion, hostility, and racial profiling put Plaintiffs in the no-win situation of having to disprove Dula's repeated and baseless insinuations that they were stealing.

2

9.      As Defendants were preparing to move their four children and Plaintiffs into a newly-built servants' quarters separate and apart from Defendants' main house in the Hamptons, Foster overheard Dula say "***I'm happy to be getting these dirty Jamaicans out of my house.***"

10.     Three days later, Defendants gratuitously papered over the kitchen window of the new servants' quarters so that Plaintiffs would not be able to see outside of it.

11.     Dula's racial profiling and insinuations of theft escalated, with Dula conducting periodic inspections of the servants' quarters and questioning Plaintiffs accusatorily as to the whereabouts of various sundries, e.g., baby wipes, diapers, soap, etc., that Dula claimed should still be there, but that in fact had been used up in the ordinary course of raising Defendants' four children who were living with Plaintiffs in the servants' quarters

12.     Three weeks after Dula referred to Plaintiffs as "*dirty Jamaicans*," and two-and-a-half weeks after Defendants gratuitously papered over the kitchen window of the new servants' quarters, Defendants cut Plaintiffs' collective pay by more than half.

13.     Plaintiffs protested the large pay reduction, but did not quit, hoping that the situation would stabilize.

3

14.     Ten days after cutting Plaintiffs' collective pay by more than half, Dula—who had no reason to suspect Foster of any wrongdoing— falsely accused Foster of trespassing in Defendants' guest house, and implied that she had done so for a nefarious purpose, to which Foster replied "*Do not tell any lies on me. This is a big accusation…*"

15.     Coupled with Wright's earlier challenge to Dula's racist outburst, Foster's act of directly opposing Dula's racial profiling further increased Dula's hostility, causing Dula to treat Plaintiffs with greater contempt (e.g., barely speaking to them or acknowledging their presence, slamming the door as they approached, humiliating them by dropping items for them to bend down and pick up, etc.) and continuing her racial profiling of Plaintiffs over the next several weeks until Plaintiffs were simultaneously terminated for no stated reason and replaced with one or more nonblack caregivers.

16.     Plaintiffs always raised Defendants' four children in a kind, loving, and nurturing manner, and did their best to protect them under difficult circumstances. And they always did their best to take Defendants' stereotyping in stride. But Dula was triggered when Wright directly challenged her racist outburst, and began treating Plaintiffs as if they really were suspicious "*black bitches!*" and "*dirty Jamaicans*" rather than kind, loving, and nurturing *individuals*.

17.     As for Defendant Ian K. Snow, among other things he allowed Dula to mistreat Plaintiffs, and, acting in conjunction with Dula, cut Plaintiffs' collective pay by more than half and thereafter fired both Plaintiffs simultaneously.

18.     For their racial harassment and discrimination, and retaliation, Defendants are liable to Plaintiffs under 42 U.S.C. § 1981 and the New York Human Rights Law for, *inter alia*, lost wages, compensatory damages, and punitive damages.

## The Parties

19.     Foster is an individual residing at 266 S. Fulton Ave., Apt. 18B, Mount Vernon, NY 10553.

20.     Wright is an individual residing at 4028 Baychester Ave., Bronx, NY 10466.

21.     Dula and Snow are residents of the State of New York whose principal residence is 302 Center Island Road, Oyster Bay, NY 11771.

22.     At all material times herein, Snow and Dula were agents of each other, and in doing the things alleged in this Complaint were acting within the course and scope of such agency.

## Jurisdiction & Venue

23.     This Court has subject matter jurisdiction over Plaintiff's federal claims under 42 U.S.C. § 1981 and 28 U.S.C. §§ 1331 and 1337.

24.     This Court has supplemental jurisdiction over Plaintiff's state claims under 28 U.S.C. § 1367, as Plaintiffs' claims arise from a common nucleus of operative facts.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) based on the location where much of Plaintiffs' work was performed and where many of the underlying events took place (i.e., Defendants' Manhattan home).

## Facts

26.     In or about July 2017, Defendants contacted a business known as "British American Household Staffing" in search of a baby nurse.

27.     "British American Household Staffing" referred Defendants to Foster.

28.     On or about August 1, 2017, Defendants, acting through Snow, hired Foster to work for Defendants as a live-in baby nurse for Defendants' second child beginning August 2, 2017 at their Manhattan residence.

29.     At the time she was hired, Foster's caregiver obligations did not extend to Defendants' first child, as that child was cared for by a full-time nanny named Liz, who was white.

30.     However, Liz quit a few days after Foster's employment began.

31.     With no one to care for Defendants' first child, Snow asked Foster to serve as nanny for their first child, in addition to her existing duties as baby nurse for their second child.

32.     Foster promptly agreed, and from that day until the date of her termination, Foster worked for Defendants as a live-in caregiver serving as a baby nurse, a nanny, or both.

33.     With a third child on the way, Defendants decided they needed another person to serve as a live-in caregiver.

34.     In early September 2018, Defendants, acting through Snow, hired Wright to work for Defendants at their Manhattan residence (and later, their home in the Hamptons) as a live-in caregiver serving as a baby nurse, a nanny, or both.

35.     Wright and Foster generally worked alternating one-week periods (and later, alternating two-week periods) for Defendants.

36.     Defendants periodically applied negative racial stereotypes to Plaintiffs throughout their employment and/or periodically treated them in a racially stereotyped fashion.

37.     By way of example, and not by way of limitation, both Defendants often conspicuously treated Plaintiffs as if they were "invisible"—for example, upon entering a room occupied by Foster or Wright and a non-black servant, Defendants would often greet, smile to, and talk with the nonblack worker while acting as if Foster or Wright did not exist.

38.     By way of further example, and not by way of limitation, Defendants hired a purported white "personal assistant" for Dula named Tamela who admitted to Foster that "*Elyse [Dula] hates you Jamaicans*" and "*Elyse [Dula] always tells me to spy on you guys*".

39.     Specifically, Defendants hired Tamela in or about December 2017 to work part-time at Defendant's Manhattan residence.

40.     Before long Tamela began periodically engaging in bizarre and harassing behavior, including showing up for work intoxicated and making threats, which Defendants knew about.

41.     That Defendants had such knowledge is evidenced by Dula's June 1, 2018 texts to Foster stating that "*[Tamela] is a criminal*"; "*[t]he next time [Tamela] tries to cause problems with us we will just go to the police. She is harassing us and it is not okay*"; and "*[jail is] where she is going to end up if she keeps making threats and problems for us. What she is doing is illegal. I will get restraining orders against her for everyone in the house.*"

42.     Nonetheless, Defendants continued employing Tamela, which made no sense until Tamela admitted to Foster in or about October 2018 that "*Elyse [Dula] always tells me to spy on you guys*" (i.e., Foster and Wright).

43.     Tamela also admitted to Foster in or about October 2018 that "*Elyse [Dula] hates you Jamaicans*" (i.e., Foster and Wright).

44.     In other words: (A) Defendants wanted someone to monitor Plaintiffs because their race and ethnicity allegedly made them suspect, and (B) Tamela, despite her periodically disturbing behavior, was asked to spy on Plaintiffs.

45.     Besides being discriminatory, Defendants' employment of Tamela to surveil two black caregivers potentially jeopardized Plaintiffs' safety.

46.     On the weekend of December 1-2, 2018, while Snow and Dula were away, Tamela lunged at Foster with a sharp object (a wooden bird) and began trying to kick in the door behind which the frightened housekeeper was hiding, triggering the involvement of the building's security staff, who begged Foster not to call the police, all of which led to Tamela's expulsion from the building. Tamela then disguised her identity to gain re-entry into the building, re-entered Defendants' Manhattan apartment, and caused the police to arrive there, leading to Tamela's re-expulsion from the building.

47.     Only after reviewing the security footage of Tamela trying to kick in the door—which could have resulted in further visits by the police and child protective services to one or more of Defendants' homes—did Defendants significantly diminish Tamela's role and access to their Manhattan residence.

48.     In other words, Defendants had entrusted a white person who they had already described in writing as a "criminal" to monitor two servants who they considered suspicious merely because of their race, and Defendants continued with that senseless, stereotype-driven surveillance arrangement until it led to a violent altercation and police involvement.

49.     For most of their employment, Plaintiffs quietly accepted the above-referenced stereotyping because they assumed Defendants were simply

behaving in the only way they knew how to behave given their particular life experiences and were either blind to their own hurtful behavior or couldn't help themselves.

50.     However, Defendant Dula crossed a line in or about early January 2020, about one to two months after Defendants acquired a kitten named "Scotty."

51.     At that time, the kitten escaped from the house and went under a parked car in the driveway.

52.     Wright promptly grabbed a broom, coaxed the kitten out from under the parked car, and back into the house.

53.     As Wright was returning the broom to the mud room, Defendants' first child was telling Dula that "Scotty" got outside and was under the parked car, whereupon Dula angrily exclaimed "***Those Black bitches!***"

54.     Wright, who is normally quiet-spoken and gentle-mannered, shot back aggressively "***What did you say Elyse??***"

55.     Dula replied "*Never mind*" and left.

56.     Shortly thereafter, Wright told Foster what Dula had said.

57.     During the week of May 17-24, 2020, Defendants were nearing completion of a construction project to relocate the servants' quarters in their Hamptons home from the main house to a separate unconnected dwelling.

58.     At or near the end of that week, Foster overheard Dula speaking to someone else about the completion of that project, after which Dula added "***I'm happy to be getting these dirty Jamaicans out of my house.***"

59.     Plaintiffs are both from Jamaica, and there was no one else Dula could have been referring to when she made that statement.

60.     Shortly thereafter, Foster told Wright what Dula had said.

61.     Approximately three days after Dula referred to Plaintiffs as "*dirty Jamaicans*," Defendants papered over the window facing the main house in the servants' quarters so that Plaintiffs would not be able to see out of it.

62.     Dula's racial profiling and insinuations of theft escalated, with Dula conducting periodic inspections of the servants' quarters beginning in late May 2020 and continuing through August 2020 (when Plaintiffs were abruptly and simultaneously terminated), with Dula questioning Plaintiffs accusatorily as to the whereabouts of various sundries ( e.g., baby wipes, diapers, soap, etc.) that Dula

claimed should still be there, thus insinuating that one or both Plaintiffs (the only adults residing in the servants' quarters) took them or may have taken them.

63.     Upon hearing such accusatory questions, Plaintiffs would explain to Dula that nothing was missing, and that food, supplies, etc. tend to get used up quickly when feeding and caring for four children.

64.     Dula generally ignored these logical explanations, and walked away coldly.

65.     On June 23, 2020, Dula falsely accused Foster of trespassing in Defendants' guest house, and implied that she had done so for a nefarious purpose. Dula did so by texting Foster "*What were you in the guest house looking for???*"

66.     Foster logically understood this to be a part of Dula's ongoing racial profiling in light of Dula's other racialized comments, Dula's knowledge that there was no basis for claiming that Foster was even in the guest house, much less that she was in there for an improper purpose, and Dula's use of three question marks indicating that this was not merely a question, but rather an accusation of trespassing and insinuation of theft or other wrongdoing.

67.     Foster immediately replied "*Do not tell any lies on me. This is a big accusation…*" and noted that Dula could easily check the video surveillance footage.

68.     Dula did not respond.

69.     On or about June 13, 2020, three weeks after Dula referred to Plaintiffs as "*dirty Jamaicans*," Defendants cut Plaintiffs' collective weekly pay by more than half.

70.     Upon information and belief, Defendants did so in an effort to get Plaintiffs to quit.

71.     Plaintiffs protested the large pay reduction, but did not quit.

72.     In mid-August 2020 Defendants inexplicably removed the Wi-Fi router from the servants' quarters.

73.     Dula continued racially profiling Plaintiffs and treating them with contempt until August 26, 2020, when Defendants simultaneously terminated both Plaintiffs without cause or explanation.

74.     Plaintiffs were replaced with one or more nonblack caregivers.

**First Cause of Action**

**Race and Color Discrimination and Harassment
In Violation of 42 U.S.C. § 1981**

75.     The Complaint's preceding paragraphs are incorporated herein

by reference.

76.     Subsection (a) of 42 U.S.C. § 1981 provides, in pertinent part,

as follows:

> All persons within the jurisdiction of the United States shall
> have the same right … to make and enforce contracts … and to
> the full and equal benefit of all laws … for the security of
> persons and property as is enjoyed by white citizens, and shall
> be subject to like punishment, pains, penalties … and exactions
> of every kind, and to no other.

77.     "Section 1981 provides a cause of action for race-based

employment discrimination based on a hostile work environment," *Whidbee v.*

*Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000), and fully applies

to at-will employment relationships.  *Id.*, 223 F.3d at 68.

78.     As Plaintiffs' employers, Defendants each had the authority to

make and influence tangible economic decisions concerning Plaintiffs, and

exercised that authority to Plaintiffs' material detriment.

79.     "The prohibition against racial discrimination encompasses

discrimination based on ancestry or ethnic characteristics." *Anderson v. Conboy*,

15

156 F.3d 167, 170 (2d Cir. 1998).

80.     Accordingly, "race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (citing cases).

81.     Whether Plaintiffs' race is classified as black, African-American, or Afro-Jamaican (all of which would be accurate), or some combination thereof, Plaintiffs were subject to discrimination because of their race and color throughout their employment in violation of 42 U.S.C. 1981.

82.     Plaintiff's race (which includes their ethnicity and ancestry) was a motivating and "but for" factor of Defendants' hostility and adverse employment actions.

83.     Defendants' harassment of Plaintiffs had the purpose or effect of unreasonably interfering with Plaintiffs' work performance by creating an intimidating, hostile, and offensive working environment.

84.     Defendants' hostile and discriminatory conduct as aforesaid on the basis of Plaintiffs' race and color created a hostile work environment and deprived Plaintiffs of an equal right to the making, performance, modification, and termination of their at-will employment contract, and to the benefits, privileges,

16

terms, and conditions of thereof.

85.    The unwelcome conduct alleged herein was severe enough to create an objectively hostile work environment and Plaintiffs perceived it as such.

86.    Said unwelcome conduct was also pervasive enough to create a hostile work environment, and Plaintiffs perceived it as such.

87.    Defendants are liable under 42 U.S.C. § 1981 for their race- and color-based discrimination and harassment of Plaintiffs, i.e., by racially harassing and profiling them, cutting their collective pay by over half, and simultaneously terminating them and replacing them with one or more nonblack caregivers.

88.    Defendants are also liable to the extent their discriminatory intent and conduct were exacerbated by their retaliation in response to Plaintiffs' opposition to their discriminatory conduct. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir. 2000) (Sotomayor, J.) ("one type of hostility can exacerbate the effect of another, and [] such aggravating harm is legally cognizable").

89.    As a result of the foregoing, Plaintiffs have experienced mental distress and nonpecuniary harm comparable to what a reasonable black woman in Plaintiffs' position would have experienced, and Defendants are liable therefor.

90.    Defendants are also liable for, *inter alia*, the value of the

compensation Plaintiffs would have received had their employment not been interfered with.

91.    In committing the acts alleged herein, Defendants acted with intent, oppression, malice, wanton disregard and indifference for Plaintiffs' civil rights.  Such conduct implicates compelling public interests, including the public's interest in deterring unlawful discrimination against racial and ethnic minorities.

92.    Defendants should be assessed punitive damages in an amount to be determined at trial to adequately punish Defendants and to deter Defendants and other employers from engaging in such discriminatory conduct in the future.

## Second Cause of Action

### Race and Color Discrimination and Harassment
### In Violation of the New York State Human Rights Law

93.    The Complaint's preceding paragraphs are incorporated herein by reference.

94.    The New York State Human Rights Law ("NYSHRL") prohibits employers from discriminating against employees on account of their race and color (and, in the alternative, their national origin).

95.    New York Executive Law § 296(1) provides, in pertinent part:

It shall be an unlawful discriminatory practice:

(a)    For an employer …, because of an individual's … race [or] color [or] national origin … to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

***

(h) For an employer … to subject any individual to harassment because of an individual's … race … color [or] national origin, or because the individual has opposed any practices forbidden under this article …, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories. ***

96.    Defendants are liable under the NYSHRL for the damages and punitive damages referenced above for their race- and color-based discrimination and harassment of Plaintiffs, i.e., by racially harassing and profiling them, cutting their collective pay by over half, and simultaneously terminating them and replacing them with one or more nonblack caregivers.

**Third Cause of Action**

**Retaliation and Retaliatory Harassment in Violation of 42 U.S.C. § 1981**

97.     The Complaint's preceding paragraphs are incorporated herein by reference.

98.     "Section 1981 'prohibits not only racial discrimination but also retaliation against those who oppose it.'" *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 407 (S.D.N.Y. 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 355 (2013) and *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008)).

99.     While "[t]he Supreme Court has recognized that opposition can be manifested subtly—without uttering a firm 'no'" (*Dillon v. Ned Mgmt.*, 85 F. Supp. 3d 639, 660 (E.D.N.Y. 2015) (citing *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 277 (2009)); *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996) (Posner, J.) ("Passive resistance is a time-honored form of opposition"), Plaintiffs' opposition was not merely passive.

100.     Rather, *inter alia*, Wright directly and immediately challenged Dula's explicitly racist outburst, and Foster directly and immediately opposed Dula's most notable example of racial profiling—which became more extreme after the normally soft-spoken Wright directly challenged and opposed Dula's

20

explicitly racist outburst—by warning Dula "*Do not tell any lies on me. This is a big accusation…*"

101.   Accordingly, Plaintiffs' oppositional conduct as stated above easily surpasses the threshold for what constitutes protected oppositional conduct. See, e.g., *Benitez v. Jarvis Airfoil*, 2020 U.S. Dist. LEXIS 54786, at *36 (D. Conn. Mar. 30, 2020) ("a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion…") (citing *Crawford*, *supra*, 555 U.S. at 277-78); *Leyba v. New Mexico*, 2003 U.S. Dist. LEXIS 30361, at *18 (D.N.M. 2003) ("A jury could reasonably construe Plaintiffs' voicing of disapproval of the photographs as conveying their opposition to sex-based discrimination or harassment in the workplace."); *Blakely v. Big Lots Stores, Inc.*, 2014 U.S. Dist. LEXIS 119823, at *36-38 (N.D. Ind. 2014) (to same effect concerning plaintiff's statement that she "did not agree" with manager's plan to change the diversity of the store: "A reasonable jury could conclude that [plaintiff's manager] believed plaintiff was resisting his alleged attempts to terminate African-American employees"); *Verstraete v. Farmers Ins. Co., Inc.*, 1994 WL 373890 *4 (D.Kan. 1994) ("[F]or reasons of discretion, tact, insecurity, or otherwise, employees do not always brazenly lodge direct allegations of discrimination but may instead simply voice their concerns about the propriety of certain actions … the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the

employer.").

102.   Plaintiffs' protected oppositional conduct was one of the "but for" reasons they were harassed and retaliated against, including being subjected to increased racial profiling and other forms of harassment and mistreatment, having their collective pay cut by over half, and being terminated in unison without any stated reason.

103.   Defendants are also liable to the extent their retaliatory intent and conduct were exacerbated by their discrimination against Plaintiffs on the basis of race or color. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir. 2000) (Sotomayor, J.) ("one type of hostility can exacerbate the effect of another, and [] such aggravating harm is legally cognizable").

104.   As a result of the foregoing, Plaintiffs have been damaged as indicated above, and Defendants are thus liable under 42 U.S.C. § 1981 for the damages and punitive damages referenced above.

**Fourth Cause of Action**

**Retaliation and Retaliatory Harassment
In Violation of the NYSHRL**

105.   The Complaint's preceding paragraphs are incorporated herein by reference.

106.   Plaintiffs' oppositional conduct was one of the "but for" reasons they were subjected to the above-referenced harassment, including, without limitation, being subjected to an increased level of racially profiling, having their collective pay cut by over half, and being terminated in unison without any stated reason.

107.   As a result of the foregoing, Plaintiffs have been damaged as indicated above, and Defendants are thus liable under the NYSHRL for the damages and punitive damages referenced above.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor on each of their causes of action in amounts to be determined at trial, together with attorney's fees, prejudgment interest, costs, disbursements, and such other relief as is just.

JURY TRIAL DEMANDED: Plaintiffs demand a trial by jury of all issues so triable.

Dated: New York, New York
      December 30, 2021

Law Offices of Scott A. Lucas
200 Park Avenue, Suite 1700
New York, New York 10166
(direct) (646) 342-1139
(office) (646) 632-3737
scott@lucasemploymentlaw.com
*Attorneys for Plaintiffs*

By:  */S/ Scott A. Lucas*
     Scott A. Lucas