UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――x

CORDIA FOSTER and CISLYN WRIGHT,

      Plaintiffs,

 -against-                                          21 Civ. 11224 (CM)

ELYSE DULA a/k/a ELYSE SNOW
and IAN K. SNOW,

      Defendants.

―――――――――――――――――――――――――――――x

## DECISION AND ORDER ON MOTIONS IN LIMINE

McMahon, J.:

    The court, for its decision on the parties' motions in limine:

### I. Plaintiffs' Motions in Limine

    1.    Plaintiffs move in limine to preclude testimony about a pending wage and hours lawsuit between the parties. Defendants agree that no reference to that lawsuit should be made at the trial of this case. The motion, at Docket #49, is therefore GRANTED.

    2.    Plaintiff Foster also moves in limine to preclude testimony at trial about a dismissed criminal charge that was lodged against her in connection with an ostensible incident of domestic violence between her and her boyfriend. That motion, at Docket #46, is GRANTED.

### II. Defendants' Motions in Limine

    1.    Defendants move in limine to bifurcate the trial of this case insofar as punitive damages are sought or to preclude the imposition of such damages. The motion, at Docket #44, is DENIED. There will be one trial of this lawsuit. The fact that Plaintiffs took no discovery about Defendants' wealth does not preclude them from seeking punitive damages, but the fact that discovery has ended means they will not be allowed to take any discovery on that issue. They will simply have to go with what they've got. The parties should be aware that, as is my custom in all but the most obviously egregious cases, the court will not decide whether to charge punitive damages until Plaintiffs rest their case. If I conclude there is insufficient evidence either to warrant punitive damages or to allow the jury to assess them properly, I will not charge the jury on punitive damages. But I don't know much about what Plaintiffs intend to elicit during the presentation of

their case; and the fact that they took no discovery does not preclude them from asking relevant questions at trial.

2. Finally, Defendants move in limine, at Docket #41, for an order, pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), precluding the introduction of testimony from Plaintiffs' expert on "social frameworking," Dr. Jennie Weiner. (They move to preclude the introduction of her expert report as well, but expert reports are inadmissible hearsay; they may be used to cross examine a witness, but they may not under any circumstances come into evidence. That is why the expert takes the stand).

Plaintiffs oppose the motion as untimely. In that they are correct. My Individual Practice Rules expressly state that *Daubert* motions are not to be made in limine, but must be made at the time designated for making dispositive motions. No one moved for summary judgment in this case (understandably, since there are myriad disputed issues of fact in this "we said/they said' case), so it appears that Defendants overlooked my rule, which by its terms applies to all cases, not just those in which summary judgment motions are made. I could, and ordinarily would, deny the motion on that technical basis.

However, Dr. Weiner's proposed testimony on social frameworking raises interesting and difficult issues that the court actually needs to resolve prior to trial. I will, therefore, overlook the technicality and consider the motion on its merits.

Dr. Jennie Weiner is an Associate Professor of Educational Leadership at the University of Connecticut; she has also been a Visiting Associate Professor at Harvard's Graduate School of Education, from which she graduated with an EdD (Doctor of Education). Her field of expertise is gender discrimination and bias, gendered racism, intersectionality, and how these features of what she calls "structural discrimination" impact women, and especially women of color, in the workplace. She has numerous publications and has served as an expert in one case, which settled out of court. She has never testified as an expert.

Dr. Weiner proposes to provide "social framework" testimony to "inform decision makers in this case about empirically validated principles concerning the operation of racial stereotypes and discrimination applied to African-American women . . . and how such stereotypes and discrimination can, in turn, lead to discriminatory workplace penalties." Report of Dr. Weiner, "Weiner Report," Ex. A to Defendants' *Daubert* motion, at 3 of 37. The two stereotypes of Black women on which she predicates her opinions are the "Mammy" and "Sapphire" stereotypes. Dr. Weiner's testimony would acquaint jurors with an understanding of these two stereotypes "and the behavioral patterns that can cause one of those stereotypes to be replaced by another." *Id*. at 4. She offers her opinions so that jurors can "make an educated judgment about (A) whether or not the evidence before them is consistent with such racial stereotyping and discrimination, and if so, (B) whether the challenged conduct [in this case, the deterioration of the quality of Plaintiffs' workplace in 2020, their massive reduction in salary and ultimately their termination] was caused in whole or in part by such racial stereotyping and discrimination." *Id*. Dr. Weiner specifically abjures any intent to conclude whether there was or was not race discrimination in this case; she proposes to tell the jury what to consider, not what to decide. *Id*.

Dr. Weiner is indubitably qualified to give testimony about social frameworking and stereotypes; her academic credentials, extensive teaching on the subject and her research are not challenged by Defendants.[1] The question for this court is whether her opinions are likely to be helpful to the jury in this particular case. To answer that question, I turn first to the parties' Joint PreTrial Order, and specifically to the propositions of fact that Plaintiffs propose to prove.

A. <u>Facts Pertinent to Plaintiffs' Case (from Joint PreTrial Order)</u>

Plaintiff Foster was hired to serve as the baby nurse for Defendants' second child in 2017. Her duties expanded to include serving as a live-in caregiver to Defendants' first child when the nanny originally hired for that position was fired. When a third child was on the way, Defendants hired Plaintiff Wright to serve as a second caregiver for their older children and baby nurse for the infant (there were eventually two more infants, for a total of four children).

During the period 2017-2019, Defendants allegedly treated Plaintiffs differently from the white (or "mostly white") employees on their staff.[2][3] For example, they acted as if Plaintiffs were invisible while interacting normally with non-black members of their staff. They expressed no dissatisfaction with Plaintiffs' work – indeed, on occasion they praised it to outsiders – but they frequently paid them late and only when asked to do so (in contrast with their regular payment of white employees) – a practice that led, on one occasion, to Wright's having to plead with her landlord to wait for her rent to be paid. They offered white employees rides to the bus, but not Plaintiffs. They also allegedly treated Plaintiffs as less than trustworthy; for example, they denied Foster access to the credit card needed to purchase necessaries for the children in her care. Defendants also allegedly had Defendant Dula's personal assistant "spy" on Plaintiffs – although when the personal assistant physically attacked Foster and tried to kick down a door, Defendants fired her.

While "hurtful," this sort of disparate treatment was tolerable to Plaintiffs for some three years. However, in January 2020, Dula allegedly referred to Plaintiffs as "those black bitches." Wright, who heard the statement, confronted her employer and said, "What did you say, Elyse?"

---

[1] I observed (though apparently Defendants did not) that at least one significant entry in Dr. Weiner's report – notably the second paragraph under "Type of Testimony" on page 3 of 37 – is taken verbatim from a report of a different expert, Dr. Peter Glick, as quoted in the decision allowing Dr. Glick's testimony in *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 214 (D. Mass. 2009). Though her report is heavily footnoted with references to various studies, this paragraph is not attributed to Dr. Glick (or even to Judge Gertner, who wrote the opinion in *Tuli*); where I come from we call that plagiarism. Were her testimony to be admitted that would be fair game for questioning on cross examination. It does not, however, impact her qualifications to testify on this subject.

[2] The PreTrial Order is replete with references to the stereotypes that Dr. Weiner would testify about, which is not helpful when deciding the *Daubert* motion. For example, during this period Plaintiffs allege that Defendants were allegedly conforming their behavior to the "Mammy" stereotype, meaning that they saw Plaintiffs are large, non-threatening and nurturing. The court here limits its discussion to fact – not to context or conclusions, especially since the issue on this *Daubert* motion is whether Dr. Weiner's stereotyping evidence is likely to help the jury determine whether the Defendants discriminated against them on the basis of their race. I am also filtering out the hearsay evidence that would not be admissible at trial – *e.g.*, Dula's personal assistant telling Plaintiffs that Defendant Dula "hates you Jamaicans," for example.

[3] The phrase "mostly white" comes from the PreTrial Order and refers to Dula's personal assistant, Tamara Walsh, who is, I gather, of mixed race.

3

Dula failed to apologize; she simply walked away. (Dula denies making this statement, which she recognizes as unquestionably racist).

At that point, Plaintiffs assert that Defendants' generally benign attitude toward them changed. They became antagonistic, treating Plaintiffs as troublemakers who were stealing, plotting and gathering evidence to use against Defendants in what eventually became this lawsuit.

When the pandemic hit, Defendants moved their family to a new (rental) home (referred to as "the mansion") in the Hamptons. They moved Plaintiffs into a separate maids' quarters. During the move, Foster overheard Dula saying, "I'm happy to be getting these dirty Jamaicans out of my house." (Again, Dula denies making the statement). Foster told Wright about Dula's racist statement but took no other action. Dula subsequently put "cling film" over part of the maids' quarter kitchen window (an action Dula attributes to preserving privacy in the master bedroom of the "mansion," which faced the maids' kitchen); came repeatedly to the maids' quarters to look for diapers, soap and milk that had run out (per Plaintiffs) but that Dula believed should still be in stock (Plaintiffs interpret this as an accusation that they were stealing baby supplies); called Wright to accuse "someone" of stealing one of her earrings (which she had left in Manhattan); and placed a sign over a water cooler that said, "Do NOT FUCKING Touch!!!" (a message Dula explained was directed to her sister Megan, though Plaintiffs interpreted it as being directed at them).

On June 13, 2020, Defendant Snow informed Plaintiffs via instant message that their daily pay was being halved, from $1,075 per weekday to $500 per weekday. Snow justified the pay cut by saying that Plaintiffs no longer needed to perform services as baby nurses, since Defendants' fourth child was no longer an infant. Plaintiffs found this explanation unsatisfactory, noting that their salary had been increased by $100 (not $575) per weekday when they took on the additional duties of baby nurse to the fourth Snow child. Suspecting discrimination and retaliation for Wright's confrontation of Dula after the "black bitches" remark, Foster recorded her second conversation with Snow about the pay cut, which took place the next day. In that conversation, Snow said the Plaintiffs' duties were "too much," and would soon be substantially reduced. No such reduction ever happened. Snow told Plaintiffs that they were free to leave if they did not like the new arrangement.

On June 23, 2020, Dula accused Foster of having trespassed in the guest house, where she was not supposed to go, in order to "look for" something that did not belong to her. Foster, believing that Dula was engaged in racial profiling, responded in writing, "Do not tell any lies on me. This is a big accusation. That am not going to take from you." Again, Dula failed to apologize and let the incident slide. However, her suspicion that Plaintiffs were gathering evidence to use in a lawsuit became "cemented into my head."

Despite the increasingly uncomfortable atmosphere in the household, Plaintiffs remained at their jobs, allegedly for the sake of the children, whom they loved. However, they were fired on August 26, 2020 – shortly after Defendants removed a WiFi device from the maids' quarters (per Plaintiffs, placed there by Defendants in order to interfere with their ability to access the internet; per Defendants, placed there to improve the quality of WiFi reception throughout the rented property). Plaintiffs urge that the reasons given by Defendants during this lawsuit for firing Plaintiffs – their alleged use of a scary mask to discipline the children, putting them in "time out"

too frequently and in inappropriate circumstances, drawing baths that were too hot, spending too much time on their cell phones, threatening to use "black magic" on Dula, and recording Plaintiffs' behavior using a clock with a hidden camera feature – are unworthy of belief and (in the case of the "black magic") exemplify racism on Defendants' part.

That summarizes the case Plaintiffs intend to make at trial. These are the factual allegations from which Plaintiffs will argue that Defendants violated 42 U.S.C. § 1981 and the New York State Human Rights Law. It is in light of these allegations that we turn to Dr. Weiner's proposed testimony.

B. Proposed Expert Testimony from Dr. Weiner

Dr. Weiner proposes to acquaint the jury with two stereotypical view of Black women, both of which have been the subject of academic study.

The first, the Mammy stereotype, allegedly shapes expectations about Black women (especially, apparently, large Black women) as docile, subservient and invisible. This stereotype has its roots in the antebellum south; it depicts Black women (especially large Black women) as nurturing, loyal and obedient, willing to put the needs of the employer's family over their own and to attend to crises that their employers can't or won't handle. Weiner Report at 6 of 37. The most famous and prototypical of Mammies is, of course, the character played in an Oscar-winning performance by the great actress Hattie McDaniel in *Gone With the Wind*.

The second, the Sapphire stereotype, alludes to the character of Sapphire Stevens, wife of the Kingfish on the old *Amos 'n Andy* radio and television shows of the 1940s and 50s. Brought to life by Ernestine Wade, another great Black actress of the mid-twentieth century, Sapphire was the epitome of what came to be known as the Angry Black Woman – wisecracking, loud, hostile and assertive. Per Dr. Weiner, Sapphire contrasted with Mammy in that she swaps "obedience for defiance, her industriousness for laziness, her timidity for aggression." Weiner Report at 7 of 37. Dr. Weiner alleges that this stereotype has long been applied to Black women in the workplace, resulting in poor performance reviews. One study has shown that the Sapphire stereotype can reinforce "more general negative stereotypes about Black people: for example, that they are more criminal suspect and/or dangerous." *Id*. However, dishonesty or danger are not inherent to the Sapphire stereotype as described by Dr. Weiner.

Having defined the two stereotypes, Dr. Weiner applies them to this case. Weiner Report, Application to Current Case, starting at 8 of 37. Dr. Weiner contends that knowing about these stereotypes may help the jury make sense of some of the disputed facts in this case. In particular, she contends that employers who harbor racial bias "may be perfectly content to have Black servants who conform to the Mammy stereotype" and when a Black female employee violates that stereotype by challenging racist behavior, it can cause the employer to "substitute the Sapphire stereotype for the original prescriptive stereotype." *Id*. at 9 of 37. And indeed, that is Plaintiffs' theory – that they were for years viewed as docile "Mammies" who could safely be ignored, but when Wright (in May 2020) and then Foster (in July 2020) challenged racist statements and actions by their employers, they turned into "Sapphires" in their employers' minds, leading to repeated

friction and disagreement in the household, a dramatic reduction in their salaries, and ultimately their dismissal.

### C. Dr. Weiner May Offer Limited Testimony

Dr. Weinstein describes her testimony as relating to "social frameworking." That term was coined by John Monahan and Laurens Walker to refer to evidence that provides jurors, either through jury instruction or expert testimony, with general information learned through social science research that might help them understand or evaluate the evidence offered at trial.[4] In a paper describing the utility of social frameworking testimony, Monahan, Walker and Mitchell note as follows:

> The very idea of a social framework is to supply factfinders with information about general social science research, to provide a context or 'framework' for the fact-finder to use when evaluating the evidence in a particular case. A social framework necessarily contains only general statements about reliable patterns of relations among variables as discovered within social scientific research, whether communicated to the jury via jury instructions or testimony of a qualified expert, and goes no further…."

Monahan, Walker & Mitchell, Contextual Evidence of Gender Discrimination: The Ascendance of Social Frameworks, 94 Va. L. Rev. 1715, 1736 (2008).

Social scientists contrast social frameworking evidence from "social fact" evidence, which is evidence that uses reliable scientific methods to analyze data applicable to a particular case in order to draw inferences about what may have happened in that case.[5]

There are few cases of which I am aware in which judges have evaluated testimony of the sort Dr. Weiner proposes to give against the *Daubert* standards for admissibility. Predictably, they go both ways. Whenever the expert indicates that s/he will be offering opinions about whether discrimination occurred in a particular case, or whether particular actions or statements in a case are discriminatory in nature, the evidence has been precluded, (*see Mullenix v. University of Texas at Austin*, 201 U.S. Dist. LEXIS 180630 (W. D. Tex. Sept. 21, 2021); *Niklova v. Univ. of Texas at Austin*, 2022 WL 443783 (Feb. 14, 2022), *see also White v. BNSF Ry Co.*, 726 F. App'x. 603 (9th Cir. 2018)), or reliance on it is criticized, (*Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 355, n.8 (2009)). However, in *Tuli v. Brigham & Women's Hosp., Inc.*, The Hon. Nancy Gertner concluded that Dr. Peter Glick[6] – the same expert whose testimony was subsequently precluded in the UT-Austin cases – could testify in a case brought by a female neurosurgeon against a prominent Boston hospital about the findings of social scientists concerning "settings in which [sexual]

---

[4] Dr. Gregory Mitchell, who will be called by Defendants to testify in the event Dr. Weiner testifies, worked extensively with Drs. Monahan and Walker; he offered this definition of social frameworking in his Report, which is Exhibit C to Defendants' motion.

[5] The examples of social fact testimony in Dr. Mitchell's report include a labor economist's statistical analysis of personnel data from an organization to draw inferences about whether race factors into hiring decisions or consumer surveys designed to see whether consumers confuse two trademarks. The key in each case of "social fact" testimony is that the expert's conclusions are drawn based on his/her analysis of actual evidence about the parties to the case.

[6] Dr. Glick is the actual author of certain statements in Dr. Weiner's report – *see supra*, fn.1.

discrimination typically occurs." *Tuli*, 592 F. 2d at 516. Key to her ruling was that Dr. Glick did not intend to opine on whether the social framework he was describing actually applied to the facts in the case – *i.e.*, whether Brigham and Women's actually discriminated against Dr. Tuli. However, he was permitted to testify about "whether the allegations of the case at bar are consistent with the observed patterns," which Judge Gertner concluded might help the jury evaluate the evidence in the case. Judge Gertner noted in *Tuli* that the defendants did not challenge either Dr. Glick's qualifications or whether social frameworking was the subject of scientific inquiry. *Id*. at n.8.

Expert testimony in the nature of social frameworking evidence has been offered in discrimination cases in the past – indeed, dating as far back as *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989). And courts have on occasion concluded that such testimony might be helpful when it was not offered.[7] The question is whether the particular testimony Plaintiffs are offering would be helpful to the jury in this case.

As I understand Plaintiffs' case (viewing the many disputed issues of fact most generously to them), it is essentially this: for three years Defendants treated them as docile and nurturing caregivers for their children, and despite certain provocations, Plaintiffs acted the part. There were inklings during that period that perhaps Defendants (or at least Dula) harbored racist sentiments, and instances in which white household employees were treated differently – and better – than Plaintiffs were treated. These were not necessarily trivial matters (an employee should not need to ask in order to be paid, for example), but nothing was intolerable; the women were not mistreated, and they loved the children in their care.

All that changed in January 2020, when Wright overheard Dula make an indubitably racist remark – and called her out for doing so (behaved like a Sapphire, not a Mammy). Suddenly the employers' attitudes toward Plaintiffs changed. This change occurred at the outset of the COVID pandemic, as Defendants were moving their household to new and larger (rental) quarters in the Hamptons, where Plaintiffs were housed separately in maids' quarters ("segregated") from the family. At the time of the move, Foster overheard another racist remark by Dula; unlike Wright, she did not challenge her employer (*i.e.*, behave like a Sapphire). But Dula suddenly began treating Plaintiffs with suspicion, fearing that they were (1) stealing household supplies and jewelry and

---

[7] Undoubtedly seeking to convince me that I have already decided this issue in their favor, Plaintiffs cite to a remark made in my findings of fact and conclusions of law after trial in *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 549 (S.D.N.Y. 2006) – a case not at all pertinent to the analysis I must perform on this *Daubert* motion. In *Doe*, the Village of Mamaroneck passed ordinances and implemented policies with the goal of eliminating or substantially reducing the population of "day laborers" who gathered at various locations within the confines of the Village seeking day work. At one time these day laborers had been primarily white, but over time they were increasingly of Central and Latin American background – and simultaneously became increasingly bothersome to local residents and authorities. At trial, the plaintiffs argued, but without evidentiary support, that the comments of various public officials were consistent with stereotypes of Latin Americans. The court observed that, without some kind of testimony about how Latin Americans were stereotyped, there was no way to know whether the comments were consistent with "stereotypes about Latin Americans." In the end it did not matter to the outcome of the case; the plaintiffs did not need to prove that the comments reflected stereotypes for the court to conclude that they were both negative and stigmatizing, and for plaintiffs to win their case – just as plaintiffs here do not need to prove that their employers held stereotypical views about Black women in order to win this case. Observing that "there are, no doubt, persons who are expert in such matters who could have testified on the subject" is not at all the same thing as deciding that a particular expert's testimony is, in the context of a particular case, admissible consistent with *Daubert.*

7

(2) going to places on the property that were off limits to employees. An accusation that Foster was trespassing was met with an expression of outrage by the formerly docile Foster. A baby monitor camera placed in the maids' quarters was trained on the caregiver's bed, not the child's. Both Defendants became convinced that Plaintiffs were planning to sue them. Plaintiffs' salary was suddenly and inexplicably cut in half; only weeks later, after they protested, they were fired without warning or explanation. To justify their termination, Defendants contrived post hoc complaints about the quality of their work that could not possibly have been true, since any caring parent would have chastised a childcare worker for such behaviors if they had actually occurred. The two women were eventually replaced with a white nanny, who was paid a much higher salary.

Plaintiffs do not have to prove that Defendants harbored any stereotypical views about Black women in order to prevail in this lawsuit. They need to prove that they were harassed in the last months of their employment, had their salaries reduced and were fired because they were Black. Conversely, even if Defendants consciously or unconsciously harbored stereotypical views about Black women, they may not have discriminated against Plaintiffs. Again, the issue for the jury will be whether Defendants took adverse employment actions against the Plaintiffs because they were Black.

However, Plaintiffs wish to account for a shift in behavior that began in January 2020 – after they had been working satisfactorily (per Defendant Snow) for three years – and continued until their termination eight months later. They propose to give the jury a "context" for evaluating this change, and the evidence that they will introduce to support it – evidence that Defendants deny. The context will be provided by having Dr. Weiner explain the two contrasting stereotypes about Black women in the workplace, the Mammy and the Sapphire, that social scientists have documented in various studies. They also hope to have Dr. Weiner explain that the evidence about this case with which she is familiar is "consistent with" the stereotyping she has studied, in that Plaintiffs were treated as non-threatening Mammies for the first three years, until Wright called out Dula over the "black bitches" remark (always assuming that the jury finds that it was made – a disputed issue of fact that will not be easier to resolve if the jury hears social frameworking testimony). This was a "Sapphire" type behavior, not a "Mammy" type behavior – and it caused Defendants to alter their view of the women and to evaluate them consistent with their newfound belief that the women were not really nurturing and subservient caregivers, but "uppity" troublemakers looking for something on which to hang a lawsuit – Angry Black Women, who, as social science has discovered, experience trouble with their employers.

The ultimate question on a *Daubert* motion is whether the evidence offered will assist the jury. Many of the key facts are undisputed, and to the extent they are not, this is a classic "they said/they said" case. While Dula denies making the horrible statements of which she stands accused, she has acknowledged under oath that they are racist statements. So if the jury believes Plaintiffs' testimony, the record will contain direct evidence of racially discriminatory attitudes – evidence that requires no explanation or contextualization. Calling someone a "black bitch" or a "dirty Jamaican" is self-evidently racist; those statements, if believed, provide far more context to a jury evaluating Defendants' behaviors in the immediately following weeks than any social science jargon possibly could. So if I were trying the case I would likely conclude that Dr. Weiner's information about stereotyping was unnecessary and might even prove confusing – since the Plaintiffs have no burden to prove that Defendants harbored stereotypes in order to prevail.

8

But the standard for assessing the utility of expert testimony is not how the court would try the case, but whether the testimony would be of assistance to the jury. I assume that Plaintiffs intend to argue that Defendants' attitudes toward them and the quality of their work changed after Wright called out Dula for referring to Plaintiffs as "black bitches" (assuming, of course, that the jury believes Dula made this comment) – and then changed even more radically after Foster objected to being accused of theft. Dr. Weiner could testify about the two stereotypes that have been discussed in the literature and opine that the change in Defendants' behavior from before and after these events (assuming the jury agrees that there was such a change) would be consistent with a shift in the Defendants' unconsciously-held stereotypical attitudes. To the extent the jurors were confused about the change in Defendants' behavior, this framing might prove helpful.

But Dr. Weiner cannot say anything more.

To be specific, the court would limit Plaintiffs' counsel to asking her to explain the two types of stereotypes (Mammy and Sapphire) and then asking her a classic hypothetical question: "Dr. Weiner, I want you to assume that the following took place [briefly summarize testimony about the events prior to 2020]. Then I would like you to assume that the following event took place [the "black bitches" comment]. And I would like you to assume that after that event the following things happened [briefly summarize the events of 2020]. Do you have an opinion, to a reasonable degree of scientific certainty, whether the change of behavior I just asked you to assume is consistent with the forms of stereotyping you have described?" She can answer that question. She cannot testify about the particular actions that she is asked to assume took place; she may not offer opinions about whether any of those things actually took place. She will simply assume that the Plaintiffs' version of the facts is true. If the jury concludes that these things did not happen as Plaintiffs allege, then they will disregard Dr. Weiner's testimony.

I note that dishonesty and criminal are not traits of the "Sapphire" stereotype as described by Dr. Weiner. She describes "Sapphire" as "wisecracking, loud, hostile" and "willing . . . to talk back to people in assertive tones." Other words she uses to describe a Sapphire are "defiant" rather than "obedient," "lazy" rather than "industrious" and "aggressive" rather than "timid.' In a throwaway comment, Dr. Weiner says, "The perceived defiance and aggression inherent in the Sapphire stereotype can often serve to reinforce more generally negative stereotypes about Black people; for example, that they are more criminally suspect and/or dangerous." However, Dr. Weiner does not offer testimony about more general negative stereotypes about Black people that are "reinforced" by the Sapphire stereotype. She offers herself as an expert to provide social framework testimony about only two stereotypes, Mammy and Sapphire. I will not allow her to broaden her frame of reference beyond those two stereotypes. Therefore, she cannot testify that behavior consistent with stereotyping Plaintiffs as "Sapphires" suggests that Plaintiffs are dishonest or are criminals. And because she has not analyzed any other specific stereotype of Black persons, she may not testify that viewing Plaintiffs as "Sapphires" "reinforces" any other form of stereotyping.

As so limited, I would think Dr. Weiner's direct testimony would last no longer than 15-20 minutes. And I mean what I say: she may only testify as outlined above.

If Plaintiffs decide to offer Dr. Weiner's testimony, the jury will be charged as follows: (1) the testimony is offered for the limited purpose of explaining a purported change in Defendants'

9

behavior toward Plaintiffs beginning in early 2020; (2) it is for the jury to decide whether there was any change in behavior and what motivated it; (3) if they conclude that Plaintiffs have not proven the underlying facts that were the basis of the hypothetical question put to Dr. Weiner, they are to disregard her testimony.

      If (and only if) Dr. Weiner testifies, Dr. Mitchell, in turn, may opine that the literature demonstrates that individuating information is far more likely than stereotyping to explain behavior toward a person who is well known to a party, and that the behaviors of Defendants in the spring of 2020 are consistent with individuating information rather than stereotyping as a social framework. And nothing more. His rebuttal report does indeed undermine Dr. Weiner's conclusions, but that goes to the weight, not the admissibility, of her evidence.

      Neither expert's Report will be admitted into evidence. The Reports are hearsay, and much that is in them is being precluded. Only live testimony will be admitted.

      The Clerk of Court is directed to remove the motions at Docket ## 41, 44, 46 and 49 from the court's list of open motions.

Dated: New York, New York
      August 29, 2023

                                                         U.S.D.J.

BY ECF TO ALL COUNSEL