UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
CORDIA FOSTER and CISLYN VERONA
WRIGHT,                                                            21-cv-11224 (CM)(DF)

                                    Plaintiffs,

          - against -

ELYSE DULA a/k/a ELYSE SNOW
and IAN K. SNOW,

                                    Defendants.
-------------------------------------------------------------------x


**MEMORANDUM OF LAW OF DEFENDANTS
ELYSE DULA AND IAN K. SNOW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
<u>AN AWARD OF ATTORNEY'S FEES AND COSTS</u>**

Gerard A. Riso
Mantel McDonough Riso, LLP
410 Park Avenue, Suite 1720
New York, New York  10022
212-599-1515
Gerard.Riso@MMRLLP.com
*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................ii-iii

PRELIMINARY STATEMENT .....................................................................................1

BACKGROUND ...........................................................................................................3

ARGUMENT .................................................................................................................7

    POINT I -    THE FEE APPLICATION SHOULD BE DENIED IN FULL .........................7

    POINT II -   IF FEES ARE AWARDED, THE FEES SHOULD BE NO
                GREATER THAN THE AMOUNT OF THE FEES COUNSEL
                AGREED TO BE PAID BY PLAINTIFFS ......................................................12

CONCLUSION...............................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Arbor Hill Concerned Citizens Neighborhood Ass' v. County of Albany*,
    522 F.3d 182, 2007 U.S. App. LEXIS 30487 (2d Cir. 2007) ................................. 17

*Casmento v. Volmar Const., Inc.*,
    2022 U.S. Dist. LEXIS 225520 (S.D.N.Y. 2022) ....................................... 15, 17, 18

*Chauca v. Abraham*,
    841 F.3d 86 (2d Cir. 2016) ..................................................................................11

*Cooper v. Upstairs, Downstairs of New York, Inc.*,
    2021 U.S. Dist. LEXIS 59679 (S.D.N.Y. 2021) ...................................................... 17

*Cordia Foster and Cislyn Wright v. Ian K. Snow and Elyse Dula*,
    Index No. 801288/2021E ........................................................................................ 3

*Emamian v. Rockefeller Univ.*,
    971 F.3d 380 (2d Cir. 2020) ........................................................................... 12, n. 9

*Farrar v. Hobby*,
    506 U.S. 103, 113 S. Ct. 566 (1992) ...................................................................... 13

*Feighan v. Res. Sys. Grp.*,
    2023 U.S. Dist. LEXIS 55380, 2023 WL 2707520 (D.D.C. March 30, 2023) ................. 9, n. 7

*G & P Warehouse, Inc. v. Cho's Church Ave Fruit Market Inc.*,
    2016 U.S. Dist. LEXIS 107935 (E.D.N.Y. 2016) ...................................................... 17

*Garcia v. Hirakegoma Inc.*,
    2020 U.S. Dist. LEXIS 40637 (S.D.N.Y. 2020) ....................................................... 18

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ................................................................................. 17

*Marchuk v. Faruqi & Faruqi LLP*,
    104 F. Supp. 3d 363 (S.D.N.Y. 2015) ............................................................... 13, 16

*Millea v. Metro-North R.R.*,
    658 F.3d 154 (2d Cir. 2011) .................................................................................. 16

*Oguachuba v. Immigration & Naturalization Services*,
    706 F.2d 93 (2d Cir. 1983) ................................................................................... 7, 8

*Quintero v. Angels of the World*,
   2021 U.S. Dist. LEXIS 172445 (E.D.N.Y. 2021) ...................................................11

*Ravina v. Columbia Univ.*,
   2020 U.S. Dist. LEXIS 39478 (S.D.N.Y. 2020) ...................................................... 16

*Sharrock v. Harris*,
   489 F. Supp. 913 (S.D.N.Y. 1980) ........................................................................... 7

*United States v. 27.09 Acres of Land*,
   43 F.3d 769 (2d Cir. 1994) ....................................................................................... 8

*Vincent v. Comm'r of Soc. Sec.*,
   651 F.3d 299 (2d Cir. 2011) ..................................................................................... 8

*Watkins v. Smith*,
   2015 U.S. Dist. LEXIS 13964 (S.D.N.Y. 2015) .................................................... 18

*Williams v. Firequench, Inc.*,
   2022 U.S. Dist. LEXIS 148682 (S.D.N.Y. 2022) ...................................................11

*Wu v. Pearson Educ., Inc.*,
   2012 U.S. Dist. LEXIS 51882 (S.D.N.Y. 2012) ................................................ 3, n.5

**Statutes**

42 U.S.C. § 1981 ............................................................................................. passim

42 U.S.C. § 1988 ................................................................. 1, n. 1, 8, 10, n. 8

N.Y. Exec. Law § 297(10) ........................................................................................ 7

NYCHRL ........................................................................11, 12, n. 9, 13

NYSHRL ......................................................................................................... passim

**Rules**

FRCP 50(b) ..................................................................................................... 1, n. 2

FRCP 59 ........................................................................................................... 1, n. 2

FRE 408 ............................................................................................................ 3, n. 5

Defendants Elyse Dula and Ian K. Snow respectfully submit this Memorandum of Law in opposition to the fee application filed by Plaintiffs' attorney, Scott A. Lucas.[1]

## PRELIMINARY STATEMENT

The Jury found Mr. Snow not liable to Plaintiff Cislyn Wright and Plaintiff Cordia Foster on all four counts alleged in the Complaint.  As such, Mr. Snow was fully vindicated.

The Jury found Ms. Dula not liable on three of the four counts – not liable for racial discrimination or harassment in the workplace under 42 U.S.C. § 1981, and not liable for racial retaliation under both Section 1981 and the New York State Human Rights Law (NYSHRL).  The Jury, however, found Ms. Dula liable with respect to the cause of action alleging racial discrimination under the NYSHRL.  The Jury awarded compensatory damages against Ms. Dula of only $8,800 to each Plaintiff.  Thus, Ms. Dula was largely vindicated. [2]

By almost any objective measure, this lawsuit – which Plaintiffs' counsel proclaimed would likely result in a verdict in his clients' favor of over *Six Million Dollars* (as discussed below) – was an economic disaster for Plaintiffs.  Plaintiffs lost their case in its entirety to Mr. Snow and secured a paltry monetary award on just one of the four causes of action against Ms. Dula.

---

[1] Even though Plaintiffs' fee motion is directed only against Elyse Dula, Ian Snow joins in this opposition.  Ms. Dula is Mr. Snow's domestic partner and the mother of six of his children, and Mr. Snow provides the financial support for his family.  Further, as discussed below, based on certain positions taken by Plaintiffs' counsel in this fee application, and the arguments presented by Defendants in this opposition, Mr. Snow herein asks the Court to reconsider the summary denial of his application, made at the conclusion of the trial, for attorney's fees pursuant to 42 U.S.C. § 1988(b).  (*See infra* at 8 to 11 and n. 8.)

[2] On December 1, 2023, Ms. Dula filed her post-trial motion to vacate the verdict and for a new trial pursuant to FRCP 59, and for judgment in her favor as a matter of law under FRCP 50(b).  (Docket Nos. 86, 87 and 88.)  If Ms. Dula is successful on that motion, Plaintiffs will have no right to make any claim for attorneys' fees.  As such, we respectfully suggest that the within attorney fee motion be deferred until after this Court has ruled on Ms. Dula's post-trial motion.

Mr. Lucas, in seeking to justify his hefty fee request of over One Hundred and Eighty Thousand Dollars[3], attempts to portray his cause in pursuing this litigation as a noble quest, as he touts "a significant legal and moral finding," and the "Plaintiffs' clear vindication of their right under the NYSHRL to a workplace free of intentional race and color discrimination" (Plaintiffs' Memorandum of Law [MOL] at 3).

However, as shown below, the cold truth is that this proceeding was brought as a cudgel to batter Mr. Snow into paying Mr. Lucas' clients *millions of dollars* to settle Plaintiffs' wage and overtime case that they had filed in the New York State Supreme Court, Bronx County.  Mr. Lucas is not the "knight in shining armor" acting to vindicate perceived racial employment transgressions.  Rather, he sought to exploit an economic opportunity to bring Mr. Snow to his knees and pay his clients millions of dollars by threatening, and then bringing, baseless, but highly inflammatory, claims of racial discrimination against Mr. Snow.

In his fee application, Mr. Lucas does not attempt to justify or defend the baseless racial discrimination charges he brought against Mr. Snow, which the Jury fully rejected.  Rather, he disingenuously contends that Mr. Snow was only joined because he was "presumably a necessary party."  (Plaintiffs' MOL at 2, 7-8.)  This statement by Mr. Lucas is fundamentally untrue.

As shown below, this Court, in its discretion, should decline to award any fees or expenses to Mr. Lucas.[4]

---

[3] Mr. Lucas seeks compensation for 306.8 hours at a rate of $590 per hour.  His offer to reduce the compensable hours to 135 was expressly made contingent on Ms. Dula not challenging an award in this lower amount.  (Plaintiffs' MOL at 10-11,  21.)  Mr. Lucas also seeks $2,766.15 in expenses. (*Id.*)

[4] The facts set forth herein are from the evidence adduced at trial and the exhibits attached to the accompanying affidavit of Gerard A. Riso (Riso Aff.).

## **BACKGROUND**

On March 30, 2021, Mr. Lucas, on behalf of Plaintiffs, commenced an action in the New York State Supreme Court, County of Bronx, against Defendants for alleged violations of the wage and overtime laws under the New York Labor Law (NYLL).  *Cordia Foster and Cislyn Wright v. Ian K. Snow and Elyse Dula*, Index No. 801288/2021E (Sup. Ct. Bronx Co.).

By letter dated September 17, 2021, Mr. Lucas wrote to the Defendants' then attorney, John Crossman of Zuckerman Gore Brandeis & Crossman LLP, wherein Mr. Lucas set forth his calculations as to Plaintiffs' alleged damages in the Bronx County action, which he claimed to be over Two Million Two Hundred and Seventy Thousand Dollars ($2,273,446).[5]  (Exhibit A.)[6]

In his letter, Mr. Lucas warned Mr. Crossman that a "separate forthcoming lawsuit" would be "filed in the next 14-21 days", which would allege that Ms. Dula had, *inter alia*, "used racial epithets referring to Plaintiffs as '*black bitches*' and '*dirty Jamaicans*'"; that Mr. Snow would also be accused of racial profiling; and that *both* Ms. Dula and Mr. Snow had retaliated when Plaintiffs opposed "Defendants' racial profiling," by "cutting their pay by more than half while caring for four children, and firing shortly thereafter and replacing them with one or more white caregivers, all in violation of the New York City and State Human Rights Laws."  (*Id.* at 9 and 10 [emphasis added].)

---

[5] Mr. Lucas marked his letter "For Settlement Purposes Only".  The letter, however, is not being used to prove the validity or amount of a disputed claim, but to establish "special circumstances" warranting the denial of fees, as discussed below.  Pursuant to  the exception to the settlement privilege contained in Rule 408(b) of the Federal Rules of Evidence, "the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."  *See Wu v. Pearson Educ., Inc.*, 2012 U.S. Dist. LEXIS 51882, *2 – 3 (S.D.N.Y. 2012) ("evidence of settlement is admissible for other purposes.")

[6] References to "Exhibits" are to the exhibits attached to the accompanying Declaration of Defendants' attorney, Gerard A. Riso.

In his ominous demand letter, Mr. Lucas proclaimed that the "separate soon-to-be-filed case will likely result in even greater exposure to Defendants than the wage and hour case [*i.e. over Two Million Two Hundred and Seventy Thousand Dollars*]."  Mr. Lucas then estimated the "greater exposure" to be as much as *Six Million Two Hundred Thousand Dollars*, based on a jury verdict he claimed he had obtained in "a comparable discrimination case."  Mr. Lucas cautioned Mr. Crossman: "I am confident that a similar verdict will be obtained in the soon-to-be filed discrimination and retaliation case against Ms. Dula and Mr. Snow."  (*Id.* at 10.)

And then Mr. Lucas demanded the big dollars to settle "the entire matter" -- the full amount of the $2,273,446 to settle the Bronx County action, plus *One Millon Three Hundred and Fifty Thousand Dollars* to settle the threatened racial discrimination claims, for a total sum of over *Three Million Six Hundred Thousand Dollars*.  (*Id.* [emphasis added].)

Mr. Snow's vast wealth was no secret at that time.  His clients, having lived with Mr. Snow and his family for years, had a keen understanding of his wealth, given the luxury homes and lifestyle.  Moreover, on September 1, 2020, just days after Mr. Snow had terminated Plaintiffs' employment on August 26, 2020, an article appeared in the New York Post featuring Mr. Snow's photograph and revealing him as the "mystery renter who snagged the Hamptons' priciest summer rental," which "was going for $2 million from March through Labor Day, making the luxury property the East End's priciest ever."  The article also stated that "Snow co-founded private equity firm Snow Phipps."  (Exhibit B.)

It was this article that apparently provided Mr. Lucas with the required good faith basis to ask Ms. Dula at trial: "Was it the most expensive summer rental in the history of the Hamptons at that time?", with the follow-up: "Two million dollars for the summer?"  (Exhibit C at 295.)

4

Mr. Lucas knew or should have known that the racial discrimination complaint that he threatened to publicly file if his combined settlement demand of over Three Million Six Hundred Thousand Dollars was not agreed to in the next two to three weeks would have a devasting impact on Mr. Snow's business and his ability to raise capital in the private equity markets.

And it did, as Mr. Snow made clear at trial (discussed further below).

Nonetheless, Mr. Snow refused to capitulate to the settlement demand and, as threatened, on New Year's Eve 2021, the Complaint was filed with this Court.  (Docket. No. 1 (Exhibit D).)

Plaintiffs alleged in the Complaint that Mr. Snow's conduct was just as reprehensible as the conduct they attributed to Dula:

> "*Defendant Ian K. Snow, among other things <u>he allowed Dula to mistreat Plaintiffs</u>, and, <u>acting in conjunction with Dula</u>, cut Plaintiffs' collective pay by more than half and thereafter fired both Plaintiffs simultaneously*"

(*Id.* at ¶ 17 [emphasis added].

In seeking punitive damages against Mr. Snow, the Complaint alleged that:

> Mr. Snow "acted with "<u>*intent, oppression, malice, wanton disregard and indifference for Plaintiffs' civil rights*</u>"

(*Id.* at ¶ 91 [emphasis added].)

The Complaint also alleged that Mr. Snow, and not just Ms. Dula: (1) "routinely stereotyped Plaintiffs due to their race and ethnicity" (*id.* at ¶ 3); (2) acted with "increased suspicion, hostility, and racial profiling" (*id.* at ¶ 8); (3) "conspicuously treated Plaintiffs as if they were 'invisible'" (*id.* at ¶ 37); (4) "cut Plaintiffs' collective pay by more than half" "in an effort to get Plaintiffs to quit" (at ¶¶ 69, 70); and (5) "simultaneously terminated both Plaintiffs without cause or explanation" (*id.* at ¶ 73).

In the Joint Pre-Trial Order, another public document, filed on December 16, 2022 (Docket. No. 29), Mr. Lucas asserted that the alleged acts of racial discrimination attributed to Mr. Snow also included: (a) "frequently and selectively paying Plaintiffs late even after being reminded, despite paying nonblack employees like Marleny on time without them having to even ask"; and (b) offering white employees rides to the bus, but not Plaintiffs.  (Docket No. 29 at ¶¶ 20(B) and 20(D).)  Plaintiffs abandoned those specious claims at trial as no proof was offered in this regard. Indeed, the proof at trial established that Mr. Snow paid Plaintiffs promptly based on the very amounts Plaintiffs claimed they were owed and that they were given free door-to-door car service from their homes to Defendants' home.  (Exhibit C at 125, 127, 232, and 240.)

As Mr. Snow testified at trial, the very fact of the filing of the Complaint had a devasting impact on his business – it hampered his ability to raise money in the private equity markets and he was forbidden by his co-workers from entering his own office or attending meetings.  Mr. Snow testified as follows:

Q.      How did you react when you saw that these allegations were being made against you in a publicly filed document?

A.      I was upset beyond belief. These are very serious allegations that impugn my character. I depend on my reputation which I have developed over a number of years as a businessman whose been trusted to manage money on behalf of large institutions. And to be accused at this stage in my career for the first time of these kinds of heinous acts by people that are completely false by people that I frankly treated well, was so deeply, offended me so deeply. But worse than that it has damaged me and there's no way I am ever going to get any compensation for the damages that these false allegations have caused for me.

Q.      Have these allegations caused you any issues in your business?

A. Absolutely.

Q.      Can you describe that briefly for the jury?

A.      Yes. Because these allegations have become public and they've become known to my co-workers and to my investors, I am no longer allowed and haven't

6

been since this complaint was made public to even step foot in my offices. I'm not allowed to attend any meetings, even via Zoom or telephonically. This has, I can't raise money. This is a cloud over my entire life and business career that no one's going to write the article that I was vindicated. And I will forever have to live with the stain of these accusations.

(Exhibit C at 407-09.)

Mr. Snow's reference to "these allegations have become pubic" was, in part, to the scandalous article about *this case* that appeared in the New York Post on February 7, 2023, again featuring his picture, with the sensational headline: "*Finance big and gal pal accused of racial harassment of nannies.*"  (Exhibit E.)

In his fee application, Mr. Lucas inexcusably ignores the damning allegations made against Mr. Snow in this lawsuit, and he does not even attempt to defend or justify the highly-charged allegations leveled against Mr. Snow, which the Jury rejected.  Instead, he attempts to re-write history, misleadingly stating that Mr. Snow was joined only because he was "presumably a necessary party."  (Plaintiffs' MOL at 2.)

As shown below, special circumstances exist warranting the denial of the fee application.

## ARGUMENT

### POINT I

### THE FEE APPLICATION SHOULD BE DENIED IN FULL

In moving for attorney's fees, Plaintiffs rely on N.Y. Exec. Law § 297(10).  The provision provides that "the court *may in its discretion* award reasonable attorney's fees to any prevailing or substantially prevailing party."  *Id.* [emphasis added].

In *Oguachuba v. Immigration & Naturalization Services*, 706 F.2d 93, 98 (2d Cir. 1983), the Second Circuit stated that "special circumstances" may result in a denial of fees where an award of fees would be "unjust."  *See Sharrock v. Harris*, 489 F. Supp. 913, 915 (S.D.N.Y. 1980)

7

(cited by Plaintiffs) (entitlement to attorneys' fees under 42 U.S.C. § 1988 may be denied under 'special circumstances.'")

When "viewing applications for such awards in the context of general equitable principles, [the court is] not required to limit [its] scrutiny to a single action or claim on which the applicant succeeded but must view the application in light of all the circumstances." *Oguachuba v. Immigration & Naturalization Services, supra* at 99.

The Second Circuit analogized "special circumstances" to a "safety valve" that "gives the court discretion to deny awards where equitable considerations dictate an award should not be made." *Id.*

As "an equitable 'safety valve,'" the "contours" of "special circumstances… can emerge only on a case-by-case basis." *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 304 (2d Cir. 2011).

The Second Circuit has denied counsel fees where plaintiffs had "unclean hands", *Oguachuba, supra* at 94, or where the party seeking counsel fees did not contribute to the litigant's success and their participation was "marginal, duplicative, and unnecessary." *United States v. 27.09 Acres of Land*, 43 F.3d 769, 771 (2d Cir. 1994).

This case presents "special circumstances" warranting the denial of fees.

In demanding a settlement of over *Three Million Six Hundred Thousand Dollars* on the eve of bringing this lawsuit, it was Mr. Snow's deep pockets that Plaintiffs sought to exploit, and they did so by threatening, and then bringing against Mr. Snow, highly inflammatory, but baseless, claims of racial discrimination to force Mr. Snow to settle or risk public shame. Ms. Dula was clearly not the source of the hoped-for multi-million-dollar pay-day. Ms. Dula is the mother of six very young children; she is not married to Mr. Snow; she is unemployed; she has no income; and Mr. Snow is her only source of support. (Exhibit C at 325.)

Fortunately, Mr. Snow was <u>fully vindicated</u> as the Jury found him not liable on all counts.

However, his vindication does not undo the pain, anguish and financial harm Mr. Snow suffered as a result of Plaintiffs' baseless claims.  But more importantly, it should be considered in determining whether Mr. Lucas is entitled to the fee award.

In this regard, it is telling that Mr. Lucas does not address the harm caused to Mr. Snow. He does not take responsibility for it.  He does not own it, explain it, or attempt to justify it.  Instead, he disavows responsibility by disingenuously claiming that Mr. Snow "was named a co-defendant mainly because he was designated in written agreement as Plaintiffs' principal 'Employer number 1" and "was thus *presumably a 'necessary party'"*.  (Plaintiffs' Memorandum of Law at 2 [emphasis added].) [7]

Mr. Lucas is not being honest about his reasons for suing Mr. Snow.  The Complaint filed and signed by Mr. Lucas did not assert that Mr. Snow was joined because he was a necessary party. To the contrary, the Complaint charged Mr. Snow with serious misconduct, including that he "allowed" Ms. Dula's alleged "mistreatment" of Plaintiffs, and the Complaint accused him of acting with such a degree of moral turpitude that punitive damages should be awarded to *punish* him.

---

[7] Mr. Lucas also asserts that Mr. Snow was "a proper [party] given that no *Faragher-Ellerth* defense was asserted."  (Plaintiffs' MOL at 2.)  His contention makes no sense.  Mr. Lucas could not have known when he filed the Complaint against Mr. Snow the affirmative defenses that Mr. Snow would later seek to raise.  Moreover, a *Faragher-Ellerth* defense was not appropriate based on the very allegations pleaded in the Complaint, since the Complaint: (a) did not seek to hold Mr. Snow vicariously or strictly liable for the acts of Ms. Dula (rather, the Complaint charged Mr. Snow with  discriminatory actions, including direct complicity, in that he allegedly "allowed" Ms. Dula to "mistreat" Plaintiffs); and (b) the Complaint alleged "tangible employment action" (*i.e.*, the pay-cut and the termination).  *See Feighan v. Res. Sys. Grp*., 2023 U.S. Dist. LEXIS 55380, 2023 WL 2707520 (D.D.C. March 30, 2023).

Only by tagging Mr. Snow in such an aggressive fashion did Mr. Lucas have any hope of securing the multi-million-dollar settlement.

That Mr. Lucas, in seeking his fee award, misleadingly claims that Mr. Snow was only joined because he was "presumably a necessary party", and that he makes no attempt to justify or defend the serious charges made against Mr. Snow in this litigation, establishes that the incendiary claims made against Mr. Snow had no valid basis and were made to pressure Mr. Snow to capitulate to his multi-million-dollar settlement demand.   We respectfully submit that, under these circumstances, it is Mr. Snow who is deserving of a legal fee award.[8]

Further, his effort to reach Mr. Snow's wealth resulted in conduct by Mr. Lucas at trial that this Court found to be "very outrageous."   Mr. Lucas had the temerity to ask Ms. Dula: "You and Mr. Snow are both chemically addicted, true?" (Exhibit C at 364.)

The undersigned immediately objected.   The Court then excused the Jury and addressed Mr. Lucas as follows:

> THE COURT:    The only reason, the only reason that substance abuse would be an issue in this case is if it related to the ability to perceive what was going on at the time it was happening. It's literally the only relevance. And you have done nothing, nothing by way of a pretrial motion to establish that there is any basis to think that these people could not on the dates and times in question perceive what was going on.
>
> So, I'm really finding this very outrageous. You are an experienced lawyer. You should know better than not to raise an issue, than to raise an issue like this in

---

[8] Following the jury verdict, Mr. Snow moved for an award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).  The Court summarily denied his application.  (Exhibit C at 577.)  However, based on the circumstances presented herein in opposing Mr. Lucas' fee request, and the misleading contentions raised by Mr. Lucas in furtherance of his fee request, where he disingenuously contends that Mr. Snow was joined because he was a necessary party, and where he fails to defend or justify the serious allegations that were made against Mr. Snow in this litigation, all of which were rejected by the Jury, we respectfully ask the Court to reconsider awarding Mr. Snow legal fees under Section 1988(b).  We continue to urge that the case against Mr. Snow was frivolous, groundless and unreasonable.

the middle of the trial for the first time with no in limine motion and not asking permission to go down this road. This is why we have pretrial in limine motions. You may not go down this road.

(Exhibit C at 367, *see* 364-373.)

The Court struck the question and instructed the Jury to disregard it.  (*Id.* at 373.)  Later, in charging the Jury, the Court instructed as follows: "Alleged drug usage by defendants is not relevant to any issue in this case.  Completely disregard that question or any thoughts it may have raised in your minds.  I remind you, questions are not evidence.  Questions and answers are not evidence and there was no answer to that stricken question."  (*Id.* at 520.)

It seems that Mr. Lucas sought to pursue this outrageous line of questioning, at least in part in his pursuit of punitive damages against Mr. Snow.

As to the issue of punitive damages, in his fee application, Mr. Lucas also asserts that his application for fees is somehow enhanced by his grievance concerning this Court's refusal to permit the Jury to consider punitive damages against Ms. Dula on the NYSHRL racial discrimination claim.  (Plaintiffs' MOL at 3, n. 1.)

<u>However, the NYSHRL does not allow for punitive damages</u>.  *See Chauca v. Abraham*, 841 F.3d 86, 95 (2d Cir. 2016) ("Finally, and underscoring the importance of the policy issue here, resolving the standard under the NYCHRL is important because punitive damages are not available under the state's human rights law); *Williams v. Firequench, Inc.*, 2022 U.S. Dist. LEXIS 148682, *21, n. 14 (S.D.N.Y. 2022) ("The NYSHRL does not allow for punitive damages."); *Quintero v. Angels of the World*, 2021 U.S. Dist. LEXIS 172445 *45 (E.D.N.Y. 2021) ("Although the NYSHRL does not provide for punitive damages [citation omitted], such damages are available under Title VII, Section 1981 and the NYCHRL [citations omitted].")[9]

---

[9] Plaintiffs did not sue under the New York City Human Rights Law.  Moreover, even if punitive

As such, Plaintiffs are not entitled to any consideration of their punitive damages claim because they did not prevail on their Section 1981 claims, *which further illustrates the depth of their defeat.*[10]

In sum, special circumstances exist to deny the fee application.  The court system should not be used by litigants and attorneys to pressure innocent parties to settle for millions of dollars under fear of public humiliation and disgrace, through the filing of baseless charges of racial discrimination.

## POINT II

### IF FEES ARE AWARDED, THE FEES SHOULD BE NO GREATER THAN THE AMOUNT OF THE FEES COUNSEL AGREED TO BE PAID BY PLAINTIFFS

In the event fees are awarded, the amount of the award should no greater than the amount of the fees Mr. Lucas agreed to be paid by his clients.

Mr. Lucas discloses in his fee application that his fee agreement with Plaintiffs provided that he would be paid 32% of the recovery, if any, in this action.  (Plaintiffs' MOL at 18)  As such, if the Court is inclined to award fees, the fees should be fixed no greater than $5,632 (32% of the total damage award of $17,600).

Having thoroughly lost the case against the only defendant of means, and having secured a nominal monetary award against the other defendant, on just one of the four causes of action,

---

damages were available under the NYSHRL, this Court properly exercised its discretion in refusing to allow the Jury to consider punitive damages against Ms. Dula. *See, e.g., Emamian v. Rockefeller Univ.*, 971 F.3d 380, 389 (2d Cir. 2020) (affirming the district court's refusal to instruct the jury as to punitive damages in an action brought pursuant to the NYCHRL).

[10] On November 27, 2023, Plaintiffs filed a Notice of Appeal from a portion of the Judgment, limited to seeking a partial new trial on this issue of punitive damages against Ms. Dula.  (Docket. No. 85.)  Since the NYSHRL does not allow for punitive damages, we expect Plaintiffs to withdraw the appeal.  If not, Ms. Dula will seek appropriate remedies in the event she is required to incur the cost and expense of that appeal.

and having failed on the Section 1981 claims against that defendant where punitive damages may have been available, Plaintiffs are, at best, just barely "prevailing parties". Any fee award should reflect their substantial lack of success. Permitting no more than this amount is appropriate under these circumstances.

In *Marchuk v. Faruqi & Faruqi LLP*, 104 F. Supp. 3d 363, 366 (S.D.N.Y. 2015), the Court noted that whether an award of fees is appropriate under the federal statute is "within the sound discretion of the court". In *Marchuk* , the Court reduced the fees because of the plaintiffs' limited success. Significantly, the "limited success" included a judgment of $90,000 in compensatory damages and $50,000 in punitive damages under the New York City Human Rights Law (NYCHRL). In comparison to *Marchuk*, the *de minimis* award of just $8,800 to each Plaintiff can hardly be characterized as a "limited success." *See also Farrar v. Hobby*, 506 U.S. 103, 114-115, 113 S. Ct. 566, 575 (1992) ("[A] district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought… .")

The Bronx County action is still pending, and Mr. Lucas will no doubt continue to pursue that action, which, as stated, he has valued at over $2.3 Million dollars.

Mr. Lucas also erroneously argues that the failed claims are inextricably intertwined with the claim for racial discrimination against Ms. Dula under the NYSHRL, and thus he contends that it is too difficult for him to separate the hours he spent solely with respect to the one successful claim against Ms. Dula. (Plaintiffs' MOL at 6 – 8.)

To the extent Mr. Lucas claims that the liability under the NYSHRL claim against Ms. Dula was based on the alleged racial slurs (*see* Plaintiffs' MOL at 6: "The core allegations of this lawsuit stem from Dula's racial slurs and discriminatory treatment. . . ."), Mr. Lucas could have

easily parsed his hours to the time necessary to prove those two incidents.[11]  Mr. Lucas' other legal services focused on his unsuccessful effort to prove Mr. Snow's complicity, or to establish that Mr. Snow and Ms. Dula were abusive or neglectful parents, or concerned the alleged retaliatory acts of Ms. Dula and/or Mr. Snow, including the pay-cut and the termination, which the Jury rejected.  Moreover, the retaliation claims raised separate and distinct factual and legal issues, as to which his clients did not prevail.

Mr. Lucas also appears to blame Defendants for his excessive hours.  He contends that "it would have been easier if Plaintiffs were not put in the position of having to present evidence tending to show that Ms. Dula was abusive and neglectful and thus not genuinely concerned that Plaintiffs were mistreating her children, such evidence and testimony was necessitated by Defendants' assertions to the effect that Plaintiffs were abusive or neglectful. . . ."  (Plaintiffs' MOL at 8.)

However, it was Plaintiffs, in the Complaint, who raised the specter of Ms. Dula's qualities as a mother.  The Complaint alleged that Plaintiffs "did their best to *protect* [the four children] *under difficult circumstances*."  (Exhibit D at ¶ 16 [emphasis added].)

Moreover, Plaintiffs' conduct with regard to the Joker's mask and the secret spy device was raised by Defendants as relevant to Defendants' decision to terminate Plaintiffs in August 2020.  The Jury agreed, finding no acts of retaliation.

This Court expressly found that Plaintiffs' attempts to portray Ms. Dula or Mr. Snow as bad parents (such as Mr. Lucas' outrageous question to Ms. Dula as to whether she and Mr. Snow

---

[11] As we also show in Ms. Dula's Memorandum of Law in support of the Rule 59 motion (Docket No. 88), Mr. Lucas failed to prove that Ms. Dula uttered any racial slur, as Ms. Dula was found not liable for race discrimination under Section 1981 , and his clients' testimony was materially and hopelessly inconsistent with their allegations contained in the Complaint.

were "chemically addicted") to be not relevant to any issue in this lawsuit.  Because Mr. Lucas repeatedly sought to raise such issues, the Court had to specifically charge the Jury that: "it is not your province to decide whether Ms. Dula is a good mother or whether Mr. Snow is a good father. Has no relevant [sic] to any of the issues raised in this case.  None."  (Exhibit C at 520.)

As such, Mr. Lucas should not be paid for any of his time in trying to prove that Ms. Dula or Mr. Snow were bad parents, that Mr. Snow committed acts of racial discrimination, or that either Mr. Snow or Ms. Dula committed any acts of retaliation.

Mr. Lucas does not make any attempt to isolate the hours he spent in attempting to prove the matters as to which his clients did not prevail.  It was his burden to do so.  *See Casmento v. Volmar Const., Inc.*, 2022 U.S. Dist. LEXIS 225520, *22 (S.D.N.Y. 2022) (the "law does not require the Court to disentangle the time spent on claims that were meritorious and claims that turned out not to be meritorious. The burden is on Plaintiff to 'maintain billing time records in a manner that will enable a review to identify distinct claims.'").

His offer to reduce his billings by certain over-all percentages to ostensibly account for the time he acknowledges that he is not entitled to be paid is not evidence of the actual time he spent on the matters as to which he may arguably be entitled to be paid.  *See id.* at *16 ("'[B]lock billing can make it exceedingly difficult for courts to assess the reasonableness of the house billed.' In addition, 'courts may deny compensation where the billing information submitted is too vague to sufficiently document the hours claimed.'").   Mr. Lucas also inadequately lists random billing entries of 10-to-12-hour days with the cryptic descriptions of "prep for trial" or "review/annotate depos for JPTO".

His failure to separate his fees and provide proper descriptions should result in a denial of his fees, or at least an award no greater than the amount of the contingency fee he agreed to be

paid by his clients. *See Ravina v. Columbia Univ.*, 2020 U.S. Dist. LEXIS 39478, *37 (S.D.N.Y. 2020) (declining to award fees for failed claims that were "only marginally related" to successful claims, and where the "failed legal theories" and evidence submitted in support had little in common with the successful claims.").

As Mr. Lucas acknowledges in his brief that in assessing fees this Court may consider "whether the fee is fixed or contingent."  (Plaintiffs' MOL at 11-12.)  The nature of a contingency fee was discussed in *Marchuk*, *supra* is that a:

> [C]ontingent fee, by nature, carries risk…. Counsel who aggressively prosecutes a case through trial … faces the risk that much of his work will have been wasted should the verdict come in much lower than he expected. The Court should not shield him from that risk by compensating him for every hour regardless of its marginal benefit to the client.  Fee shifting in civil rights law is … not a license to expend limitless resources on litigation simply because the defendant foots the bill. Such an approach would create perverse incentives to drive up the cost of litigation.

*Marchuk , supra*, 104 F. Supp. 3d. at 370.

Mr. Lucas by all accounts is an experienced and seasoned employment litigation attorney. He knowingly took the risks of the contingency fee arrangement.  His upside (millions of dollars) was contingent on a victory as to Mr. Snow, the only defendant of means.  The Jury handed Plaintiffs a deafening defeat as to Mr. Snow.  This Court should not now "shield" Mr. Lucas from his calculated risk.

Moreover, in taking the financial risk, Mr. Lucas sought to pressure a multi-million settlement against Ms. Snow based on baseless claims fully rejected by the Jury.  As such, he should not get the benefit of the cases he cites that seek to reward civil rights attorneys who seek redress for constitutional violations where the victim had not suffered a significant financial loss. *See Millea v. Metro-North R.R.*, 658 F.3d 154 (2d Cir. 2011) (civil rights case under the Family Medical Leave Act for intentional infliction of emotional distress - the Second Circuit remanded

16

the case for a recalculation of counsel fees, up from the award of just $204, but did not direct an

exact amount); *Cooper v. Upstairs, Downstairs of New York, Inc.*, 2021 U.S. Dist. LEXIS 59679,

*17 (S.D.N.Y. 2021) (holding that, where the plaintiff was only successful on one claim in his

civil rights suit and received a jury verdict of $6,500 in punitive damages, he was entitled to just

$5,350 in counsel fees out of the $61,075 he sought); *Casmento v. Volmar Constr., Inc.*, *supra*

2022 U.S. Dist. LEXIS (federal and New York state action for failure to accommodate a disability

where plaintiffs sought $426,540 in fees and were awarded only $82,903.50); *G & P Warehouse,*

*Inc. v. Cho's Church Ave Fruit Market Inc.*, 2016 U.S. Dist. LEXIS 107935 (E.D.N.Y. 2016)

(breach of contract claim under the Perishable Agricultural commodities Act resulting in a default

judgment, where plaintiff was awarded $4,051.50 in attorneys' fees).

Finally, as to the *Arbor Hill* factors (or the "lodestar method", as Plaintiff refers to them),

which a court must consider in evaluating whether the rate for attorney's fees is reasonable, Mr.

Lucas fails to establish the reasonableness of his fees. The factors to be considered include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3)
> the level of skill required to perform the legal service properly; (4) the preclusion
> of employment by the attorney due to acceptance of the case; (5) the attorney's
> customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time
> limitations imposed by the client or the circumstances; (8) the amount involved in
> the case and the results obtained; (9) the experience, reputation, and ability of the
> attorneys; (10) the "undesirability" of the case; (11) the nature and length of the
> professional relationship with the client; and (12) awards in similar cases.

*Arbor Hill Concerned Citizens Neighborhood Ass' v. County of Albany*, 522 F.3d 182, 186, fn. 3,

2007 U.S. App. LEXIS 30487, *12, fn. 3 (2d Cir. 2007)  (citing *Johnson v. Ga. Highway Express,*

*Inc.*, 488 F.2d 714 [5th Cir. 1974]).

Mr. Lucas has not established that the complexity of this case justifies a fee award of over

One Hundred and Eighty Thousand Dollars.  There were no complex legal issues.  There were no

pre-trial motions, apart from the motions *in limine.*  The trial lasted only about five days and other

than the four parties, only two other witnesses testified, both of whom were called by Defendants. *See Casmento v. Volmar Const., Inc.*, *supra* 2022 U.S. Dist. LEXIS at *9 (reducing requested fees from $426,540 to $82,903.50 as, *inter alia*, the claim was not "particularly complex or difficult … there were no novel legal issues … no need for expert testimony[,] [and] [t]he only significant legal briefing on the claim – the post-judgment briefing – was standard for a case of this type.")

With respect to Plaintiffs' hourly rate of $590, it is high for the rates set by the Courts of this District in other cases. *See Casmento* , *supra*, at *9 – 11 (reducing lead counsel's hourly rate from $550 to $500); *Garcia v. Hirakegoma Inc.*, 2020 U.S. Dist. LEXIS 40637, *30 (S.D.N.Y. 2020) (finding an hourly rate of $400 for a name partner at small law firm to be appropriate where the matter did not present "any novel or complex legal or factual questions….."); *Watkins v. Smith*, 2015 U.S. Dist. LEXIS 13964, *7 (S.D.N.Y. 2015) ("In the Southern District of New York, fee rates for experienced attorneys in small firms generally range from $250 to $450 in civil cases.");

The eighth *Arbor Hill factor* is the death knell – "the amount involved in the case and the results obtained."   As stated, Mr. Lucas viewed this case as having a value of over Six Million Dollars.   He lost at every level against Ms. Snow, the only defendant of means.   He barely eked out a victory against Ms. Dula, securing a *de minimis* monetary award, and losing three of the four claims, including the two claims that may have provided a basis for punitive damages.

## **<u>CONCLUSION</u>**

For the reasons set forth herein, special circumstances exist warranting a denial of the fee application.  To the extent fees are awarded, the fee award should not exceed the amount Mr. Lucas agreed to be paid by Plaintiffs (*i.e.,* $5,632).

Dated:  New York, New York
         December 4, 2023

                                     Mantel McDonough Riso, LLP

                                     */s/  Gerard A. Riso*
                                     Gerard A. Riso (8465)
                                     410 Park Avenue, 17th Floor
                                     New York, New York  10022
                                     212-599-1515
                                     Gerard.Riso@MMRLLP.com
                                     *Attorneys for Defendants*

19