# Exhibit 1

**(Redacted Trial Transcript Excerpts – Part 1)**

NANAAFOS1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CORDIA FOSTER and CISLYN
    VERONA WRIGHT,
4
                    Plaintiffs,
5
               v.                              21 CV 11224 (CM)
6
    ELYSE DULA and IAN K. SNOW,
7
                    Defendants.                Jury Trial
8
    ------------------------------x
9                                              New York, N.Y.
                                               October 23, 2023
10                                             9:30 a.m.

11  Before:

12                        HON. COLLEEN MCMAHON,

13                                             District Judge

14                             APPEARANCES

15  LAW OFFICE OF SCOTT A. LUCAS
         Attorneys for Plaintiffs Foster/Wright
16  BY:  SCOTT A. LUCAS
         STEVEN M. SACK
17
    MANTEL MCDONOUGH RISO, LLP
18       Attorneys for Defendants Dula/Snow
    BY:  GERARD RISO
19       MICHAEL GROGAN

20

21

22

23

24

25

1    BY MR. LUCAS:

2    Q.  Ms. Dula, you also go by the name 'Mrs.~Snow'; is that

3    correct?

4    A.  Yes, sometimes.

5    Q.  But you are not the real Mrs.~Snow, correct?

6    A.  I consider myself to be.

7    Q.  Okay.  You consider yourself to be the real Mrs.~Snow; is

8    that your testimony?

9              THE COURT:  That is what she just said.  Can we not

10   repeat it.  You probably have a good follow-up question.

11   Q.  Okay.  Are you married to Mr. Snow?

12   A.  No, not legally.

13   Q.  So you heard about this incident where Verona Wright says

14   that you uttered the words 'those black bitches', right?

15   A.  Yes.

16   Q.  Okay.  And you deny saying that, correct?

17   A.  Yeah.  It never happened.

18   Q.  Okay.  So let's look at some foundational facts.  You had a

19   kitten named 'Scotty', correct?

20   A.  Correct.

21   Q.  Okay.  And you got that kitten in December of 2019,

22   correct?

23   A.  That's correct.

24   Q.  And that kitten was not meant to be outside, true?

25   A.  He was an indoor cat.  He would get outside.

NANAAFOS3                          Dula - Direct

1   Q.   That was when you were living in East Hampton, correct?

2   A.   Correct.

3   Q.   Okay.  And you moved from East Hampton to Bridgehampton in

4   May 2020, correct?

5   A.   Yes, that's correct.

6   Q.   So if there was an incident involving your kitten, Scotty,

7   while you were in Bridghampton, it would have occurred between

8   December 2019 and May 2020?

9   A.   Incorrect.

10  Q.   Please tell me how that's incorrect.

11          THE COURT:  It's incorrect because you said

12  'Bridgehampton' instead of 'East Hampton'.

13          MR. LUCAS:  Yes.

14  Q.   If there was an incident involving your kitten, Scotty,

15  while you were living in East Hampton, it would have occurred

16  between December 2019 and May 2020, correct?

17  A.   If there was one, but there was not.

18  Q.   The question was, if there was one?

19          THE COURT:  She answered the question.  Your next

20  question, please.

21          Ms. Dula, I want you to do me a favor so I can get you

22  off the witness stand faster.  Just answer his questions.

23  Don't fight with him.  Don't spar with him.  Don't try to

24  figure out what to do.  He is probably going to ask you

25  questions that can be answered yes or no.  I guaranty your

1   lawyers are going to ask you questions.  They'll have an

2   opportunity to ask you questions.  If you want to move this

3   thing along, just answer the questions.

4           THE WITNESS:  Okay.

5   Q.  All right.  You and Mr. Snow each had a Mercedes G-Class

6   SUV when you lived in East Hampton, correct?

7   A.  I don't believe that's correct.

8   Q.  Okay.  Would you -- I am going to ask you to please look at

9   page 54, lines 16 through 21 of your deposition.

10          THE COURT:  Why are you asking her to look?  Are you

11  trying to impeach her or refresh her recollection?  She doesn't

12  need her recollection refreshed.  That is not what she said.

13  If you are impeaching, then she doesn't look at the transcript.

14  You read.  You say, "On such and such a day, were you asked the

15  following questions and did you give the following answers"?

16          MR. LUCAS:  Okay.

17  Q.  Ms. Dula, were you asked the following questions and did

18  you give --

19          THE COURT:  Ma'am, before this trial you gave some

20  testimony under oath, correct, something called a deposition?

21          THE WITNESS:  Yes.

22          THE COURT:  You swore to tell the truth?

23          THE WITNESS:  Yes.

24          THE COURT:  Fine.  Now.

25  Q.  Were you asked the following questions and did you give the

1  following answers during that time period you had a G-Class?

2           THE COURT:  "Question".

3  "Q.  During that time period, you had a G-Class Mercedes parked

4  in the driveway; is that correct?

5  "A.  Yes, for a portion of that time period.

6  "Q.  For what portion?  I would say April, May.

7           THE COURT:  "Question", "answer".  The court reporter

8  can't take --

9           I would say April May.  April, May.

10          THE COURT:  Strike the last thing.  Question:  April,

11 May.  Answer:  April, May.

12 Q.  Let me clarify.  So in April or May of 2020, you had a

13 G-Class Mercedes parked in the driveway in East Hampton,

14 correct?

15 A.  Sometimes.

16 Q.  And you and Mr. Snow each had a Mercedes G-Class SUV,

17 correct?

18 A.  No.  I don't believe that's correct.  Not during that time

19 period.

20 Q.  You referred to it as the G-Wagon, your G-Class Mercedes,

21 correct?

22 A.  I don't know if I referred to it as that.  That is the name

23 of the car.

24 Q.  Okay.  It was sometimes -- okay.  So, there were some

25 instances when Scotty escaped from the house, correct?

 1   A.  Yes, it happened.

 2   Q.  When was the first time in relation to when you acquired

 3   Scotty?

 4   A.  I couldn't tell you for certain.

 5   Q.  Well, what's your best estimate?

 6   A.  Shortly after we got him.

 7   Q.  What does "shortly after" mean?

 8   A.  I mean he did it regularly from the time that we got him as

 9   a kitten.

10          THE COURT:  So what you are saying is he got out of

11   the house fairly frequently?

12          THE WITNESS:  Yes.

13   Q.  When Scotty escaped and hid somewhere he would be too

14   scared to move from cover and someone would have to go get him,

15   correct?

16   A.  Correct.

17   Q.  One time Scotty ran under the car parked in the driveway,

18   correct?

19   A.  I can't recall.

20          THE COURT:  Okay.  You can't recall.  So you would

21   like to refresh her recollection?

22          MR. LUCAS:  I would, your Honor.

23          THE COURT:  I'm going to ask you to open up that

24   deposition and where would you like her to look?

25          MR. LUCAS:  Okay.  I am going to ask the witness to

NANAAFOS3                          Dula - Direct

1    look at page 54, lines six through eight.

2              (Pause)

3              THE COURT:  Does that jog your memory?

4              THE WITNESS:  I'm sorry.

5              THE COURT:  Oh, you haven't gotten there yet.

6              THE WITNESS:  Yeah.  I say "under the car or by the

7    garage area".

8    Q.  Okay.  So "under the car" means that at least once Scotty

9    got under the car?

10   A.  Not -- under a car.

11   Q.  So, are you telling me that you -- okay.  So what car, if

12   any, did Scotty get under?  Are you saying it was never the

13   G-Class car?

14   A.  I don't know.  He got out multiple times.

15   Q.  So, when you said "under the car" in your deposition what

16   were you referring to?

17   A.  I was just naming places on the property that I had heard

18   from other people that he would be hiding and I'd have to go

19   get him.

20   Q.  Okay.  You would be worried if Scotty ran outside, correct?

21   A.  Yeah, worried.

22   Q.  Okay.  And angry?

23   A.  No, not angry, just worried.

24   Q.  Would you say that you're a very passive person?

25   A.  Yes.

NANAAFOS3                    Dula - Direct

1   Q.  Gentle?

2   A.  Gentle, yes.

3   Q.  Not easily stirred to anger?

4   A.  Not easily stirred to anger, no.

5          MR. LUCAS:  All right.  With the Court's permission

6   I'd like to pull up an exhibit?

7          THE COURT:  Sure.

8   Q.  Do you recognize what's been marked as Plaintiff's Exhibit

9   PX2?

10  A.  There's nothing on my screen.

11         THE COURT:  Can we get Jimmy back?

12         Sorry, folks.

13         (Pause)

14  Q.  Ms. Dula, Exhibit PX2 is a sign that you made, correct?

15  A.  It's a note.  Yes, I am familiar with it.

16         MR. LUCAS:  Your Honor, may I publish to the jury?

17         THE COURT:  Yes, you may.

18  Q.  What is this sign, Ms. Dula?

19  A.  Should I wait until I can see it?

20  Q.  You can't see it?

21         THE COURT:  She cannot see it.  At her present moment

22  she can't see it because I can see her screen and there is

23  nothing on it.

24         (Pause)

25         THE WITNESS:  I do see it.

NANAAFOS3                          Dula - Direct

1    Q.   Okay.  Ms. Dula, can you tell us what that sign you made

2    says?

3    A.   It's a small note that I left on the back of our

4    watercooler to my sister.

5    Q.   What does that say?

6    A.   It says "Do not fucking touch".

7    Q.   Okay.  I thought a moment ago you told us you were a gentle

8    person.

9    A.   I said that I was passive and gentle.

10   Q.   And that you were not easily stirred to anger or are you

11   easily stirred to anger?

12   A.   No, I'm not.  That wasn't me being angry.

13   Q.   You texted this note to Verona on April 16, 2020; is that

14   right?

15   A.   Yes.

16           THE COURT:  Would you, just for me, would you mind

17   identifying your client by their last name, Ms. Foster,

18   Ms. Wright?  Thank you.

19           MR. LUCAS:  Yes, your Honor.

20   Q.   That sign does not look like the handy work of a passive

21   person, does it?

22           THE COURT:  Could you stop being argumentative and

23   just -- you've made your point about this.  Let's move on.

24           MR. LUCAS:  Okay.

25           THE COURT:  You can argue the case at the end of the

1   case.

2          MR. LUCAS:  Okay.

3   Q.  Ms. Dula, you love your cats, correct?

4   A.  I love all animals.

5   Q.  You love your cats very much, in fact?

6   A.  I love them very much.

7   Q.  Okay.  And your house kitten, Scotty, was the smallest and

8   most vulnerable of all your cats, correct?

9   A.  At the time, yes.

10  Q.  A lot more vulnerable than a watercooler, would you agree?

11  A.  I'm not sure I understand the question.

12  Q.  You cared more about your kitten Scotty than you cared

13  about a watercooler, right?

14         MR. RISO:  Objection.

15         THE COURT:  I'll allow it.  I don't think you need to

16  clarify anything.

17         MR. LUCAS:  Okay.

18  Q.  So, if someone touching a lifeless object that you don't

19  love like a watercooler was enough to make you write "Do not

20  fucking touch" in capital letters and three exclamation points,

21  then the thought of your beloved house kitten, Scotty, escaping

22  from the house would have made you much more upset than the

23  watercooler; is that correct?

24  A.  Incorrect.  It happened infrequently.  I was just worried.

25  Q.  Scotty escaped from the house when Ms. Wright was on duty,

NANAAFOS3                          Dula - Direct

1   correct?

2   A.   He may have.   Like I said, he escaped regularly.

3   Q.   Now, in your deposition you testified that it's highly

4   possible that instead of saying "those black bitches" you said

5   "those back bushes"; is that correct?

6   A.   I'm not sure.   Something to that effect.

7   Q.   Let's not have any -- well, you said something to that

8   effect.   Fine.

9           Can I ask you to look at page 56 line 25 of your

10  deposition.   I'm going to read the testimony and ask you if you

11  said it, if you remember hearing the question and giving the

12  answer.

13  "Q.   Did you say those black bushes instead of those black

14  bitches?

15  "A.   It's highly possible.

16  Q.   Do you remember that?

17  A.   Yeah, I see it here, yeah.

18  Q.   Were you frustrated with the placement of the back bushes?

19  A.   No.   It would have been a question as to where the cat was.

20  Q.   Okay.   So you agree that it would have made no sense to

21  utter the words "those back bushes" in the middle of a

22  commotion about the cat being under the car in the driveway?

23  A.   No.   I disagree.   It would have made sense.

24  Q.   So, just so we're clear, in the middle of a commotion about

25  the kitten outside under the car in the driveway, it would have

NANAAFOS3                    Dula - Direct

1   made sense for you to utter the words "those back bushes"; is

2   that your testimony?

3   A.   I don't know what commotion you are referring to.  I'm just

4   saying that when he got out of the house it would have made

5   sense for me to ask where he was in the backyard or front yard

6   or in the back bushes so that I could go grab him and bring him

7   inside.

8   Q.   Well, my question --

9             THE COURT:  Can we move on, please.

10  Q.   It would have been horribly racist if you said "those black

11  bitches", right?

12  A.   Yes, that would be a racist thing to say and I did not say

13  it.

14  Q.   It would have quickly altered the employment relationship

15  for the worst, true?

16  A.   It didn't happen.

17  Q.   Yes?

18            THE COURT:  It didn't happen.  So move on.

19            MR. LUCAS:  This is an important question, your Honor.

20            THE COURT:  It is an important question for you to ask

21  your clients.  She says it didn't happen.  So, we're not going

22  to deal in hypotheticals with Ms. Dula.  We're going to deal in

23  what reality with your client as your clients perceived it,

24  okay.  But we're not going to deal in hypotheticals with --

25  Q.   Your relationship with the plaintiffs began deteriorating

NANAAFOS3                          Dula - Direct

1    when COVID shut everything down, true?

2    A.  No.  I don't think so, necessarily.  It changed.  It

3    definitely changed when COVID locked everything down and we

4    were in the house all together.

5            MR. LUCAS:  Okay.  I'd like you to refer to page 20 of

6    your deposition, lines 14 through 25.

7            (Pause)

8    Q.  Do you recall being asked the following questions and

9    giving the following answers?

10   "Q.  Did there come a time when the relationship between you

11   and plaintiffs started deteriorating?

12   "A.  Not a specific point in time you know where it flipped

13   from one to the other.  It was just a slow progression.

14   Q.  When did that slow progression begin?

15   A.  Well, there was ultimately a breaking point after the slow

16   progression.  I would say when COVID shut everything down and

17   when we were living with them 24/7, not traveling.  We were in

18   the house 24/7 and able to observe their work performance.

19   Q.  Do you recall giving that testimony?

20   A.  Yes, I do.

21           THE COURT:  Were you asked a question and did you give

22   this answer?

23   Q.  Were you asked that question and did you give that answer?

24   A.  Yes, you asked me a question and I gave that answer.

25   Q.  COVID shut everything down March 2020, correct?

NANAAFOS3                        Dula - Direct

1    A.   Yes.

2    Q.   The deterioration in the parties' relationship, that

3    deterioration in the parties' relationship, that started in

4    March was a slow progression, right?

5    A.   I'm not -- can you repeat the question?

6             THE COURT:   Did your relationship get worse over time?

7             THE WITNESS:   From what period of time?

8             THE COURT:   From March when COVID began, March 2020,

9    did it get worse after that.

10            THE WITNESS:   Yes.

11            THE COURT:   Gradually, got worse?

12            THE WITNESS:   Yes.

13            THE COURT:   Thank you.

14            MR. LUCAS:   Okay.

15   Q.   You testified that there were times during plaintiff's

16   employment when you minimized your interactions with Cordia and

17   Verona, correct?

18   A.   Yes.

19   Q.   Okay.   And your perception was that plaintiffs were

20   quarrelsome and combative people, correct?

21   A.   No.

22            THE COURT:   Are you impeaching?   She doesn't look.

23   She hasn't said she needs her recollection refreshed.

24            MR. LUCAS:   Yes, your Honor.   Thank you.

25            Page 21 --

NANAAFOS3                        Dula - Direct

1          THE COURT:  I am a real stickler about doing this by

2    the book, evidence class.

3          MR. LUCAS:  Thank you, your Honor.

4          I am going to read page 21 line through 18 of your

5    deposition.

6          Did there come a time --

7          THE COURT:  "Question".

8    "Q.  Did there come a time when plaintiffs started becoming

9    quarrelsome and combative with you?

10   A.  Yes.  But I think that that was always clear.

11   "Q.  From day one they were quarrelsome and combative?

12   A.  Probably, not.  Sorry.  One minute.  Not initially but very

13   soon into it, I saw that that was just the kind of

14   personalities and it became more quarrelsome or combative to

15   the end.

16   Q.  Do you recall being asked that and giving those answers?

17   A.  Yes.  I was asked that and I gave that answer.

18   Q.  Okay.  Were you stereotyping plaintiffs as angry black

19   women?

20   A.  No, I was not.

21   Q.  You knew both plaintiffs were close, correct?

22   A.  Can you help me out?  What do you mean by "close"?

23   Q.  For example, Ms. Foster is the one who referred Ms. Wright

24   to you, correct?

25   A.  Yes, that's correct.

NANAAFOS3                          Dula - Direct

1   Q.  Okay.  Okay.  Let's go back to the times when you minimized

2   your interaction with Ms. Foster and Ms. Wright.  On the

3   occasions when you did so, did you do so to avoid conflict with

4   them?

5   A.  I just don't like conflict at all from anyone.  I minimize

6   interactions, period.

7   Q.  So my question is, why did you minimize your interaction

8   with them?

9   A.  I am not -- can you repeat?

10          THE COURT:  Did there come a time when you minimized

11   your interactions with Ms. Foster and Ms. Wright?

12          THE WITNESS:  I would say it was always minimal.

13   That's just the kind of person I am.

14   Q.  Okay.  So over time it didn't get less and less?

15          THE WITNESS:  I don't think so.

16          THE COURT:  Okay.  Fine.

17   Q.  When was the first such instance when you minimized your

18   interactions?

19          THE COURT:  She just said she didn't.  So, let's move

20   on.

21          Actually, let's take your afternoon break.  Five

22   minutes.  Don't discuss the case.  Keep an open mind.

23          Taji is going to take you back to the jury room.  When

24   you see it you may not want to leave.  The view is

25   unbelievable.  She is going to give you some information about

NANAAFOS3                          Dula - Direct

1    how to contact us and get some contact information from you and

2    then we will come back in.  Okay?

3              (Jury not present)

4              THE COURT:  You can step down.

5              Everyone sit down for a minute.

6              You had wanted to make an objection but I kind of

7    stared you down but now that the jury is out of the room --

8              MR. RISO:  I don't recall the objection.  I do recall

9    at one point asking that this exhibit be taken down if we

10   weren't using it.

11             THE COURT:  That's what you wanted.  Okay.  Fine.  The

12   exhibit will be taken down.

13             I'm not quite sure what's going on here but I will

14   tell you that whatever it is, it's not impressing anybody in

15   that box.

16             MR. LUCAS:  You are referring to --

17             THE COURT:  It would be helpful -- I can't tell you

18   how to try the case.  It would be helpful if I were a juror if

19   I heard the story first, which is to say if I heard from your

20   clients first.

21             Now, I can't stop you.  I can't prevent you.  Everyone

22   seems to think that the easiest and best way to prove their

23   case is to put on the other side as a possible witness.  It's

24   not.  I can tell you from sitting in this seat or as long as I

25   have been sitting in this seat that what the jurors need to

1    hear is the story, which didn't come from your mouth.  You know

2    what you said was not evidence.  So you haven't laid a

3    foundation for any of this.  And if someone had objected on the

4    ground of 'no foundation', I would have sustained the

5    objection.

6              So take five minutes and think about how you lay

7    foundation for whatever questions you want to ask Ms. Dula and

8    I'll bet, I'll just bet it's by putting your client on the

9    stand.  Okay?

10             (Recess)

11             THE COURT:  Case on trial continues.  The parties are

12   present.  The jury is not.

13             By the way, I am a complete and total stickler from

14   knowing the difference of refreshing and impeaching and for

15   doing it exactly the way it is in the evidence textbook.  If

16   you're refreshing recollection, you can show the witness

17   something.  You don't read it out loud.  You ask the witness if

18   that jogs the memory.  If you are impeaching by prior

19   inconsistent statement, you don't show the witness something.

20   You do say that you are reading from page and line.  You read

21   the questions and answers.  You ask the witness if she gave --

22             MR. LUCAS:  Yes.

23             THE COURT:  Please.

24             MR. LUCAS:  Thank you, your Honor.

25             So given your Honor's suggestion, I'm going to call

1    Ms. Foster to the stand.

2            THE COURT:  I think that makes so much sense.

3            MR. LUCAS:  But I would if there's a way to just make

4    clear the jury will be hearing from Ms. Dula later so it

5    doesn't seem like really strange.  That's all.

6            THE COURT:  I don't care how strange it seems.  It is

7    the more sensible thing to do.

8            Bring in the jury.

9            (Jury present)

10            THE COURT:  Hi.  Okay.  Have a seat.

11            What we are going to do is we've decided there's a

12    better way to do this.  You are going to hear from Ms. Dula

13    later and the plaintiff is going to call a different witness.

14            Call your next witness.

15            MR. LUCAS:  Thank you, your Honor.

16            So we're going to start by calling Ms. Cordia Foster

17    and then resume with Ms. Dula.

18            THE COURT:  Okay.  Ms. Foster, come on up, ma'am.

19     CORDIA FOSTER,

20        called as a witness by the Plaintiff,

21        having been duly sworn, testified as follows:

22            THE COURT:  Have a seat, ma'am.  Make yourself

23    comfortable.  You can talk into that microphone and if you

24    would, state and spell your name for the court reporter.

25            THE WITNESS:  C-o-r-d-i-a, F-o-s-t-e-r.

NANAAFOS3                    Foster - Direct

```
1              THE COURT:  "Cordia Foster".

2              You may inquire.

3              MR. LUCAS:  Thank you, your Honor.

4    DIRECT EXAMINATION

5    BY MR. LUCAS:

6    Q.  Good afternoon, Ms. Foster.

7    A.  Good afternoon, Mr. Lucas.

8    Q.  Can you tell us a little bit about where you were born and

9    raised?

10   A.  I was born in Jamaica.

11   Q.  Okay.  And how long have you been in the United States?

12   A.  Over 20 years.

13   Q.  And what inspired you to pursue a career as a caregiver?

14   A.  When I first came here my kids was back in Jamaica and I

15   missed them so much that I said I want to do something that

16   involved with kids to keep my mind occupied.

17   Q.  And how many years have been working in this field?

18   A.  I would say over 18 years or it could be more.

19   Q.  Okay.  Can you tell us the training and qualifications you

20   received to become a nanny or baby nurse?

21   A.  So.  I did a course with an agency and then after, they

22   placed me in a job.

23   Q.  Are there any aspects of your job that you love?

24   A.  Yes, I do.  I love working with kids.  It's my passion.

25   Q.  Okay.  Do you have any interests or hobbies outside of
```

NANAAFOS3                          Foster - Direct

```
 1   work?
 2   A.  No.  I'm not a outsider.  I just, when I'm not working I
 3   would stay home and just probably watch a movie or something.
 4   Q.  How do you handle challenges or misunderstandings at work?
 5              MR. RISO:  Objection.
 6              THE COURT:  Could you rephrase that?
 7              MR. LUCAS:  Sure.
 8   Q.  Ms. Foster, is there anything in particular you do at work
 9   to handle a challenge or misunderstanding if one should arise?
10              MR. RISO:  Objection.
11   Q.  In the course of your service --
12              THE COURT:  Ma'am, over the course of the, I assume
13   that you worked for a number of employees over the years.
14              THE WITNESS:  Um-hmm.
15              THE COURT:  Have differences or disputes ever arisen
16   between you and any employees other than the defendant?
17   A.  No.  I'm always a team player and everyone that I work with
18   up until this day, we still communicate.
19              THE COURT:  Well, the question was, have you ever had
20   like misunderstandings?
21              THE WITNESS:  No.
22              THE COURT:  There haven't been any.  So, she hasn't
23   had to develop a way of handling them.
24              Next question.
25   Q.  Okay.  Ms. Foster, what values or principles are important
```

1   to you in your profession?

2   A.  I'm always, I make sure that whosoever I'm working with,

3   I'm always making sure that they're in the stable and they're

4   environment is safe while I'm on duty.

5   Q.  Okay.  Apart from this dispute, have you ever faced

6   challenges in your career related to your race or background?

7   A.  No.

8   Q.  Have you ever accused anyone of discrimination apart from

9   this lawsuit?

10             MR. RISO:  Objection.

11             THE COURT:  Overruled.

12  A.  I didn't hear your question.

13  Q.  Have you ever accused anyone of discrimination apart from

14  this lawsuit?

15  A.  No.

16  Q.  What do you hope families take away from the experience

17  with you as a caregiver?

18  A.  What?

19  Q.  Yeah.  Like what do you want -- you know what, let me move

20  on to a different question.

21             Okay.  Did there come a time when the defendants hired

22  you?

23  A.  I didn't hear you.

24  Q.  Did there come a time when the defendants hired you to come

25  and work for them?

NANAAFOS3                        Foster - Direct

1    A.   Yes.

2    Q.   When was that?

3    A.   It was August of 20 and 17.

4    Q.   How did you hear about the position?

5    A.   I was working with an agency and they were the one who let

6    me start working with them.

7    Q.   Okay.  And what was the job that you were initially hired

8    to do?

9    A.   A baby nurse.

10   Q.   Okay.  For who?

11   A.   Ian and Elyse Snow.

12   Q.   For what baby?

13   A.   Child 2.  I'm not sure of the correct spelling.

14        THE COURT:  Okay.

15   Q.   Okay.  What was your starting pay for working?

16   A.   Six hundred dollars for 24 hours.

17   Q.   Okay.  Was the job advertised as a 24/7 position?

18   A.   No.  It was -- Yeah, it was 24 hours per day.

19   Q.   Okay.  And where was the location of your workplace when

20   you started working for defendants?

21   A.   It was in Manhattan.

22   Q.   Where?

23   A.   414 --

24   Q.   Was it an apartment, a home?

25   A.   Yes.  It was in their home.

NANAAFOS3                    Foster - Direct

1   Q.   Okay.  Can you tell us about your first week on the job

2   working for defendants?

3   A.   So, my first week working on the job, it was a little bit

4   crazy cause the first day when I got in Ms. Dula and nanny that

5   was working for the older kids was at each other throat, like

6   was you know, arguing with each other and it was very difficult

7   for me because I was not in a situation like that to go on a

8   job for the first day and have to see what was going on with

9   them.

10  Q.   Okay.  Can you tell us anything more about what happened

11  during your first week on the job?

12  A.   Yes.  So, when the nanny that was with the older kid, she

13  and Ms. Dula got into an argument and I don't know what

14  happened but she got fired and in that same week there was

15  child protective service came in.  They were questioning me and

16  asking me like if I ever took drugs or if, what do I see when I

17  came in.  So I explained to them that I just started the job

18  like two days ago, so I don't really know what was going on in

19  the household before I came there.

20  Q.   Okay.  When you started serving as **Child 2's** baby nurse,

21  can you describe **Child 2's** physical condition at that time?

22  A.   So, from my experience he was a little bit slow.  He was

23  underweight and I have to like, I explained to Mr. Snow and Ms.

24  Dula that **Child 2** was supposed to be standing like on his legs

25  and he was not doing that.  Ms. Dula had explained to me

NANAAFOS3                          Foster - Direct

 1    that the first baby nurse that was there, she was not feeding

 2    him at night or he wasn't getting enough feed, so he was under

 3    weight.

 4              MR. LUCAS:  Okay.  And I want to, with the Court's

 5    permission, pull up Exhibit PX21 and show it to the witness.

 6              (Pause)

 7              MR. RISO:  Just this one page exhibit?

 8              MR. LUCAS:  Yes.

 9    Q.  Ms. Foster, are you able to see that on your screen?

10    A.  Yes.

11    Q.  Can you identify what it is?

12    A.  It's an email from the agency that I sent.  I sent a email

13    to Ashley which is the recruiter from the agency that I was

14    working for.

15              MR. LUCAS:  Okay.  Your Honor, may I publish it the

16    jury as I question Ms. Foster about it?

17              THE COURT:  You may.

18              (Pause)

19              THE COURT:  It would be helpful if your colleague

20    could do the technical stuff while you stay at the podium.

21              MR. GROGAN:  Unfortunately, your Honor, I'm a

22    technology disaster.  I know nothing about technology.  It

23    would be giving me a heart attack.  I'm sorry.

24              THE COURT:  Okay.

25    Q.  Okay.  Ms. Foster, the bottom part of the exhibit, can you

1  read what you wrote to Ashley Munt of British American

2  Household Staffing?

3  A.  I'm just going to do the two.

4       THE COURT:  I don't want you to be reading this out

5  loud.  If you have a question to ask her --

6       MR. LUCAS:  Okay.

7       THE WITNESS:  You said at the bottom or at the top?

8       MR. LUCAS:  Let me ask you a question.

9  Q.  So it appears from the exhibit that one of the things that

10  you wrote to Ashley Munt is, "OMG it's more drama than I

11  expected.  But I just the same to them and here the work and I

12  don't talk a lot.  So the mom says she like that about me."

13       Do you see that?

14  A.  I'm not seeing it on my screen.

15       THE COURT:  She can't see it on her screen because you

16  haven't turned it down to that.

17       MR. LUCAS:  Okay.

18  A.  Yes.

19  Q.  Okay.  Did Ms. Dula tell you in words or substance that she

20  likes that you don't talk a lot?

21  A.  Yes.

22  Q.  Okay.  A few moments ago you mentioned that the nanny for

23  the older child was fired shortly after you started, correct?

24  A.  Yes.

25  Q.  Okay.  And what, if any, childcare arrangements did

1   defendants make for that older child once that nanny was fired?

2   A.  Ms. Dula had asked me if I could take over the role as the

3   older kid to be his nanny to work with along with Child 2 as

4   the baby, still as a baby nurse and a nanny for the other kid.

5   Q.  Okay.  And the other kid's name was?

6   A.  "Child 1" or "Child 1".

7   Q.  That older child was how old?

8   A.  He was 17 or 16 months old.

9   Q.  Okay.  At that point you were asked to serve in a dual

10  role, is that correct, from your testimony?

11  A.  Yes.

12  Q.  Baby nurse and nanny?

13  A.  Yes.

14  Q.  Did you accept?  Did you say, yes, I'll do that?

15  A.  Yes.

16  Q.  Okay.  And what, if any, pay adjustment did you get after

17  that point?

18  A.  So I got $200 extra.

19  Q.  Okay.  Now, you mentioned some visits from Child Protective

20  Services.  Did there come a time shortly after those visits

21  that you were asked to sign an agreement?

22  A.  Yes.

23  Q.  Okay.  What kind of agreement was it?

24  A.  It stated that video recording and like we have to keep

25  everything confidential what happens in the home of the Snows,

1   Mr. Snow and Elyse.

2            MR. LUCAS:  Okay.  With the Court's permission, I'd

3   like to show the witness Exhibit DX1.

4            THE COURT:  Okay.

5            (Pause)

6            THE COURT:  This is taking so long that perhaps you

7   want me to give her Plaintiff's One.  Is that what you want to

8   show her?

9            MR. RISO:  I believe this is Defendant's One.

10           THE COURT:  Plaintiff's One or Defendant's One?

11           MR. LUCAS:  Defendant's One.

12           THE COURT:  Thank you.

13           Ma'am, take a look at defendant's DX1.

14           You go back and ask questions because we're not going

15   to have that back and forth business.

16           (Pause)

17  Q.  Ms. Foster, please, take a look at what's been marked as

18  DX1 and let us know if you are able to identify it.

19           (Pause)

20  A.  Yes.

21  Q.  What is it?

22  A.  It's a confidential agreement.

23  Q.  Okay.  Is it correct that that agreement identifies you as

24  the employee?

25  A.  Yes.

NANAAFOS3                    Foster - Direct

1    Q.  And Ian Snow and Elyse Dula as the employers?

2    A.  Yes.

3    Q.  Okay.  During your first several weeks of employment what,

4    if anything, did you do to address Child 2's being under

5    weight?A.  So I feed him a lot because I know that he was

6    underweight.  I had to start giving him more food because he

7    wasn't getting enough to eat.  So I have to start giving him

8    like extra and feeding him like probably like more than how he

9    is supposed to be fed at night so that he could gain his weight

10   when he go back to the doctor, which he did.

11   Q.  Tell us about your daily caregiving activities while you

12   served as the nanny for Child 1 and that part of your role?

13   A.  So the first when I was with just Child 2 I had Child 2

14   doing tummy times because I noticed that his head support

15   wasn't good.  So I give him a lot of exercise to develop his

16   head and support.  And then when I fully start the role of

17   having both kids I used to take them to the park to, you know,

18   get associated with other kids, like put them in the swing

19   because Ms. Dula had mentioned to me that the older kid was

20   never going to the park or he will go outside with other nanny

21   but he was not like interacting with other kids.

22   Q.  So, did you increase the level of physical activity that

23   the older child, Child 1, had?

24   A.  Yes.

25   Q.  Okay.  During your employment with defendants, was it

NANAAFOS3                        Foster - Direct

1    important for you to avoid conflict with Elyse?

2    A.  Yes.

3    Q.  Why was that?

4    A.  Because I don't like the drama and I tried to, don't want

5    any conflicts with Ms. Dula.  So whatever Ms. Dula asked me to

6    do, I always follow her instructions and do what she asked.

7    Q.  When you say "I don't like the drama", what are you

8    referring to?

9    A.  It's like always something going on in that household.

10   Like other employer would be arguing with each other and I am

11   not there for, like to be in, like in between other workers.

12   I'm just there to do my job that I was hired to do.

13   Q.  Okay.  Do you ever express agreement with Elyse or tell her

14   what she wants to hear even if you would disagree?

15              MR. RISO:  Objection to leading.

16   A.  Yes.

17              THE COURT:  Objection is overruled.

18   Q.  Can you give us some examples of when you did that?

19   A.  Yes.  Because I want to the protect the kids and I want to

20   protect my job.

21   Q.  But can you give us examples of when you expressed

22   agreement with what Elyse said to do when with you actually

23   didn't agree with it?

24   A.  When Ms. Dula would ask me to put the kids in time-out, I

25   don't want to do it.  If it was for my decision alone I would

NANAAFOS3                        Foster - Direct

1   never put them in time-out but I have to follow the rule of

2   what she instructed me to do.

3   Q.  And what rule was that?

4   A.  She wanted me to put the kids in time-out.  She said that

5   they're naughty.  So when they're naughty, I am to give them

6   time-out.

7   Q.  Did she define for you what "naughty" consisted of?

8   A.  Yeah.  Because they cries a lot and she just don't want to

9   hear them crying.  So she just tell me to put them in time-out.

10  Q.  Okay.  Can you give any other examples of where Elyse --

11  strike that.

12          Can you describe the type of time-outs, if any, that

13  you were instructed to put the children in?

14  A.  She asked me to put them into a closet.

15  Q.  Okay.  How big was the closet?

16  A.  I am not -- it was a huge closet that has a window.  I am

17  not sure of the dimension of the closet but it was a huge

18  closet.

19  Q.  Okay.  And would she indicate how long you were to keep the

20  child in the closet?

21  A.  Yeah.  She tell me to let them stay in until they finished

22  crying.

23  Q.  Okay.  And after putting the child in the closet, where, if

24  anywhere, did you position yourself?

25  A.  I stand at the door.

NANAAFOS3                    Foster - Direct

1   Q.   Okay.  And did you communicate with the child through the

2   door?

3   A.   Yes.  I keep talking to the child and said it's okay.  When

4   you finish crying, then you'll come out.

5   Q.   Okay.  I think you mentioned a Manhattan apartment that

6   defendants had and that you worked at.  Where did you sleep, if

7   anywhere, in that apartment when you were working?

8   A.   So it would be the kids' room.  So the first room would be

9   Mr. and, Ms. Dula and Mr. Snow.  Then the second room would be

10  for the boys and then the third room, that's where I sleep.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAN4FOS4                    Foster - Direct

1   Q.  OK.  And in defense counsel's opening statement and also in

2   mine, there was references to a camera clock being in that

3   apartment.  Do you recall that?

4   A.  Yes.

5   Q.  OK.  And did there come a time when you bought a camera

6   clock to have anywhere on defendants' premises?

7   A.  Yes.

8   Q.  Okay.  When was that?

9   A.  I can't recall the time when the camera was bought.

10  Q.  You can or can't?

11  A.  No, I can't.

12  Q.  Can you tell us the year?

13  A.  I think it was between 2018 or 2019.

14  Q.  OK.  And for what purpose did you buy this camera clock?

15  A.  So I bought the camera clock, and I had it in my room

16  because it was for my own protection.

17  Q.  OK.  And why did you think you needed protection?

18  A.  Because, I just wanted to make sure that whatever I'm

19  doing -- but the thing is --

20          THE COURT:  I'm sorry.  You want to make sure that

21  whatever you're doing is what?

22  A.  I bought the clock, and when I got it from Amazon, it I

23  just put it down on the bedside table in the room that I was

24  staying.  But I did not install the camera, it wasn't

25  installed.

NAN4FOS4                          Foster - Direct

1   Q.   Did you try to activate the camera feature?

2   A.   No.

3   Q.   Did you read the instructions for it?

4   A.   Yeah.

5   Q.   Why did you read the instructions?

6   A.   I just read it to see you know what, the camera was like.

7            THE COURT:  I'm sorry.  Let me go back.  When did you

8   do this?  Perhaps, you can't be really precise.  Was it in 2020

9   or 2019 or 2018, or 2017, can you give us --

10           THE WITNESS:  2018.

11           THE COURT:  In 2018 you bought this camera clock on

12   Amazon?

13           THE WITNESS:  Yes.

14           THE COURT:  And you say you installed it.  Where did

15   you put it down?

16           THE WITNESS:  It wasn't installed.  It was at the

17   bedside table.

18           THE COURT:  In your bedroom?

19           THE WITNESS:  Any my bedroom, yes.

20           THE COURT:  Bedside table in your bedroom in the

21   apartment in New York?

22           THE WITNESS:  Yes.

23           THE COURT:  OK.

24   BY MR. LUCAS:

25   Q.   OK.  So at any point in time, did you ever use this camera

NAN4FOS4                          Foster - Direct

 1  clock to spy on the defendants?

 2  A.  No.

 3  Q.  Was there ever any point in time when anyone else was able

 4  to activate the camera feature on that clock for you?

 5  A.  No.

 6  Q.  Was there ever a time that you were concerned about the

 7  possibility of any -- being accused of anything?

 8          MR RISO:  Objection to leading.

 9          THE COURT:  Overruled.

10  A.  Yes.

11  Q.  OK.  Can you tell me a little bit about why you had that

12  concern?

13  A.  Ms. Dula had stated that she had missing slippers in the

14  New York apartment.  And she was, like, saying someone must

15  have took it.

16  Q.  Anything else?

17  A.  And she was saying that she knows that the slippers was

18  there.  And Tamela, that was someone else that was working for

19  Ms. Dula.  She said that Elyse asked her to spy on us.

20          MR RISO:  Objection to what Tamela said.

21          MR. LUCAS:  It goes to state of mind, your Honor.

22          THE COURT:  Could you read back the question, please.

23          (Record read.)

24          THE COURT:  Well, I don't know it goes to state of

25  mind.  The objection is sustained.

1              MR RISO:  Move to strike the answer, your Honor.

2              THE COURT:  Well, the answer is stricken as to what

3    Tamela said Ms. Dula asked her to do.  That's stricken.

4    BY MR. LUCAS:

5    Q.  Apart from Ms. Dula's statement that her slippers were

6    missing, was there anything else that caused you to be

7    concerned about protecting yourself on defendants' premises?

8    A.  Yes.

9    Q.  What was that?

10   A.  There was constant abuse of the kids by Ms. Dula.  And also

11   there was a lot of drugs using in the apartment.

12             THE COURT:  A lot of, pardon?  I didn't hear you.

13             THE WITNESS:  Drugs.

14             THE COURT:  Drug use in the apartment?

15             THE WITNESS:  Yes.

16   Q.  Are you aware of any instance where anyone claims to have

17   seen this camera clock outside of your personal sleeping area

18   within defendants' apartment?

19   A.  No.

20   Q.  Did there ever come a time when defendants had a third

21   child?

22   A.  Yes.

23   Q.  What was that third child's name?

24   A.  Child 3.

25   Q.  And did there come a time when Ms. Dula asked you to put

NAN4FOS4                    Foster - Direct

1  Child 3 in the

2  basement?A.  Yes.

3  Q.  And can you tell us what happened?

4  A.  When Ms. Dula asked me to put Child 3 in the basement?  Can

5  you rephrase the question.

6        THE COURT:  Tell us what happened when Ms. Dula said

7  put Child 3 in the basement.  Tell us what happened.  Tell us

8  the story.

9  A.  She just said that he's been naughty, and he needs to be

10  punished.

11  Q.  Did she say anything about how long Child 3 should be kept

12  in the basement?

13  A.  No.

14  Q.  Did there ever come a time when Ms. Dula asked you to put

15  Child 3 in the basement overnight?

16  A.  Yes.

17  Q.  Can you tell us what happened?

18  A.  So she -- Child 3 got dressed for bed.  He was in his crib.

19  And he was screaming, like really crying.  And Ms. Dula said he

20  needs to go into the basement for a timeout.  Then I got a text

21  from Ms. Dula stating that he needs to stay down there for the

22  night.  I just bought him a nightlight and a blanket.

23        MR. LUCAS:  With the Court's permission I would like

24  to show the witness what's been marked as Exhibit PX-8.

25  Q.  Ms. Foster, can you see the exhibit?  Is it on your screen,

NAN4FOS4                    Foster - Direct

1    Ms. Foster?

2           THE COURT:  No, it's not.  You may.

3           MR. LUCAS:  Thank you, your Honor.

4           THE COURT:  It would be much more helpful.

5    Q.  Ms. Foster, that the text message from Ms. Dula that you

6    just referred to?

7    A.  Yes.

8    Q.  OK.  And can you read it for us?

9    A.  I put a nightlight and blanket down in the room.  I put a

10   nightlight down in that room for him to sleep down there.  He

11   needs to learn.  He's doing things he used to do, screaming for

12   two hours.

13          MR. LUCAS:  Your Honor, may I publish the exhibit to

14   the jury?

15          THE COURT:  There's no need.  She just read it.  Move

16   on.

17          MR. LUCAS:  Very well.

18   Q.  So did **Child 3** spend the night in the basement?

19   A.  Yes.

20   Q.  And did you receive any instruction as to whether or not

21   you should be with **Child 3** while he spent the night in the

22   basement?

23   A.  No.

24   Q.  Ms. Dula didn't say anything about where you should be,

25   whether you should be down there or upstairs with the other

NAN4FOS4                    Foster – Direct

1   kids or anything?

2   A.   No.

3   Q.   And did you go down to the basement?

4   A.   Yes.

5   Q.   OK.  And how long did **Child 3** stay in the basement?

6   A.   He spent the night down there.

7   Q.   And you went down to the basement?

8   A.   Yes.

9   Q.   For what purpose?

10  A.   I just went down there to comfort him because he was a year

11  old.  It was in the middle of winter.  So I just wanted to go

12  down there and cuddle him and just give him love.

13          MR. LUCAS:  With the Court's permission I would like

14  to show the witness Exhibit PX-9.

15          THE COURT:  OK.

16  Q.   Ms. Foster, can you identify what's been marked as Exhibit

17  PX-9?

18  A.   It's **Child 3** in the basement.

19  Q.   I'm sorry.  I didn't get your answer.

20  A.   It's **Child 3** in the basement.

21  Q.   Did you take those pictures?

22  A.   Yes.

23          MR. LUCAS:  With the Court's permission I would like

24  to publish that to the jury.

25          THE COURT:  Go right ahead.

 1              MR. LUCAS:  Can the jurors see that?

 2              Your Honor, may I briefly show the pictures to the

 3    jury because they are not coming up -- oh, you can see it.  OK.

 4    I apologize.  OK.

 5    Q.  OK.  Ms. Foster --

 6              THE COURT:  Can we take them down as soon as the jury

 7    is done looking at them.

 8              MR. LUCAS:  Yes, your Honor, of course.

 9    Q.  Ms. Foster, we heard about a mask during opening

10    statements.  Did there come a time when you bought a scary

11    children's Halloween mask?

12    A.  Yes.

13    Q.  When was that?

14    A.  I think it was in 2017 or in 2017 or 2018, I'm not sure

15    what year.

16    Q.  OK.  And why did you buy that mask?

17    A.  I buy the mask because the older son, Ms. Dula would, like,

18    he cries.  So Ms. Dula would go in the crib, and she will pick

19    him up, shake him, toss him back in there or scream in his

20    face.  I got the mask just to comfort him and show him that it

21    doesn't matter how scary things are.  It's OK.  It may not be

22    the best mask for me to have bought, but just to let him see

23    that it's OK for you not to be afraid.

24    Q.  Did you ever see anybody wear the mask?

25    A.  No.

NAN4FOS4                          Foster - Direct

1    Q.  So what happened to the mask?

2    A.  It was in the toy pen where all the toys was kept.

3    Q.  And was there any effort to conceal the existence of the

4    mask from anybody?

5    A.  Ms. Dula know that I bought the mask.

6              THE COURT:  No.  The question was did you ever try to

7    hide the mask.

8              THE WITNESS:  No, it was in the pen where all the toys

9    were kept.

10             THE COURT:  OK fine.

11   Q.  How do you know that Ms. Dula knew about it?

12   A.  Because I told her.

13   Q.  Did there come a time -- strike that.

14             Did you ever experience any type of what you perceived

15   to be stereotyping while you worked for defendants?

16             MR RISO:  Objection.

17             THE COURT:  Objection sustained.

18   A.  Yes.

19             THE COURT:  Strike the answer.  When I say the

20   objection is sustained, that means he has to ask a different

21   question.  I know it's all technical.

22             THE WITNESS:  Yes.

23             THE COURT:  Sorry about that.

24   Q.  Did you ever form the belief that one or more of the

25   defendants ever stereotyped you in any way on the basis of your

NAN4FOS4                         Foster - Direct

1   race?

2              MR RISO:  Objection.

3              THE COURT:  The objection is sustained.  The word can

4   be eliminated, please.

5   Q.  Did there come a time, Ms. Foster, when you began to feel

6   that the relationship between you and defendants began to

7   deteriorate?

8   A.  Yes.

9   Q.  OK.  And when was that?

10  A.  It was in 2020 and the first time was when Ms. Dula said

11  those black bitches and Ms. Wright had confronted her about it.

12  Q.  How did you learn about that incident?

13  A.  Ms. Wright had told me.

14  Q.  And what, if anything, happened in the parties'

15  relationship after that to cause -- strike that.

16             When you say the parties' relationship began to

17  deteriorate at that point, what do you mean?  How did it

18  deteriorate?

19  A.  So Ms. Dula would like isolate herself from us.  She wasn't

20  talking to us.  And like she would, if we were passing by, she

21  would slam the doors in our face.  Also, when she accuses me of

22  what am I doing in the guest house.  And when we moved she said

23  that I'm happy to get these dirty Jamaicans out of my house.

24  She took away the wifi from us.  She would bring stuff for the

25  kids, and she would put it down on the floor.  And she would

NAN4FOS4                      Foster - Direct

1   ask me, do you see that?

2   Q.  So let's address some of those.  Did there come a time when

3   the defendants moved from one property in the Hamptons to a

4   different property in the Hamptons?

5   A.  Yes.

6   Q.  Do you recall when that was?

7   A.  It was May of 2020.

8   Q.  OK.  And what role, if any, did you play in participating

9   in that move?

10  A.  I help them to pack all of the stuff.

11  Q.  Anything else?

12  A.  And organize like the kids -- like the stuff that we bring

13  from the other house, I had helped them to organize the kids'

14  things, like put them where they are supposed to go.

15  Q.  And did you help transport any items to the new residence?

16  A.  No, I didn't.

17  Q.  When did you first arrive at the new residence?

18  A.  I think it was May 20 -- I know it was a few case before

19  Labor Day of 2020.

20          THE COURT:  Labor Day, the first week in September?

21          THE WITNESS:  Not Labor Day.  I'm sorry.  I think it

22  was May, before Memorial Day, yes.

23          MR. LUCAS:  OK.  With the Court's permission, I would

24  like to show the witness PX-12 for identification.

25          THE COURT:  OK.  These are all in evidence.

NAN4FOS4                         Foster - Direct

1              THE WITNESS:  That's the house that we moved to.

2   Q.  OK.  That's the second residence in the Hamptons?

3   A.  Yes.

4   Q.  OK.  And you mentioned that Ms. Dula said -- made a

5   reference to you as "dirty Jamaicans"?

6   A.  Yes.

7   Q.  Can you tell us about that.  How did you hear it?

8   A.  So in the -- we were staying in the maid quarters.  And I

9   was taking things from downstairs like the staircase from where

10  Ms. Dula's and Mr. Snow's entrances.  So I was taking like the

11  bags and the clothes up to their apartment.  And when I was

12  coming back down, I heard Ms. Dula talking to someone and

13  saying that I'm happy to get these dirty Jamaicans out of my

14  house.

15  Q.  Did you tell anybody about what you had overheard?

16  A.  Yes.

17  Q.  Who?

18  A.  Ms. Wright.

19  Q.  So you referred to a maid's quarters on that property

20  attached to the mansion?

21  A.  Yes.

22  Q.  Were you allowed in the mansion?

23  A.  No.

24  Q.  Where did you care for the children when defendants moved

25  to that second property in the Hamptons?

NAN4FOS4                          Foster - Direct

1    A.  In the maid's quarter where we were living.

2    Q.  Did they sleep there?

3    A.  Yes.

4    Q.  Did you ever set foot in the mansion?

5    A.  No.

6    Q.  Prior to the time when Ms. Wright told you that Elyse Dula

7    referred to you or her or both as black bitches, had there been

8    occasions when you interacted with Mr. Snow, and Ms. Dula, say,

9    at dinner time?

10   A.  If I said it to Mr. Snow or Ms. Dula at any time?

11           THE COURT:  Dinner time?

12   A.  No.

13   Q.  What about on holidays, anything like that?

14   A.  No.

15   Q.  Did you help feed the children during dinner time -- strike

16   that.

17           How did you feel when you overheard Ms. Dula say, "I'm

18   happy to be getting these dirty Jamaicans out of my house"?

19   A.  I feel heartbroken.  I felt bad.

20   Q.  Besides the maids' quarters, were there other structures on

21   the property that you were free to go into?

22   A.  No.

23   Q.  Was there a structure known as the guest house or the pool

24   house?

25   A.  Yes.

NAN4FOS4                          Foster - Direct

1    Q.  Were you allowed in there?

2    A.  No.

3    Q.  Did there come a time when you learned that part of the

4    kitchen window in the maids' quarters was covered over?

5    A.  Yes.

6    Q.  When was that?

7    A.  It was I think around -- I think it was in June.  I took

8    the kids out.  And when I came back, we went outside for them

9    to have their play time.  And when I came back inside, the

10   windows was covered with paper.

11   Q.  Did there come a time when Ms. Dula began making

12   inspections of the maids' quarters?

13   A.  Yes.

14   Q.  When was that?

15   A.  So when I'm on duty, Ms. Dula would come and see whatever

16   like diapers and whatever products are there for the kids.  She

17   will come and check off while I'm there.  And if Ms. Wright is

18   leaving then she will do also the same with Ms. Wright.

19   Q.  OK.  And did Ms. Dula or anyone else ever ask you why any

20   particular items were missing?

21   A.  Yes.  She would say that I -- if we want products for the

22   kids we would have to text and ask.  And if she bring like

23   diapers for the kids, working seven days, and if there are out

24   of wipes or diapers, and if I'm working, I would text her and

25   say we're out.  And she would say already?  Or how come it's

NAN4FOS4                    Foster - Direct

1   finished so fast?

2   Q.  Did there come a time when you were contacted by Mr. Snow

3   while you were visiting family?

4   A.  Yes.

5   Q.  When was that?

6   A.  It was August of 2018.

7   Q.  And that visit, was that vacation, something else?

8   A.  Yes.  It was my vacation.

9   Q.  OK.  And where were you at the time?

10  A.  In Jamaica.

11  Q.  OK.  Were you visiting --

12  A.  My families, yes.

13  Q.  And what, if anything, did Mr. Snow say to you when he

14  contacted you while you were in Jamaica?

15  A.  He texted me and said that Ms. Dula is giving birth, so if

16  I could come back immediately.

17  Q.  OK.  And did you agree to come back immediately?

18  A.  Yes.

19  Q.  And how many days into your vacation was it when you got

20  that call?

21  A.  So I went the Saturday, and he texted me I think it was the

22  Sunday.

23  Q.  So you had just started your vacation?

24  A.  Yes.

25  Q.  OK.  And did he tell you, did Mr. Snow tell you where he

NAN4FOS4                          Foster - Direct

1   wanted you to meet Ms. Dula?

2   A.   Yes, it was in California.

3   Q.   Where?

4   A.   In Beverly Hills at their apartment.

5   Q.   And that was for the birth of the baby?

6   A.   Yes.  That was for the birth of Child 3.

7   Q.   Child 3?

8   A.   Yes.

9   Q.   OK.  And was Child 3 born in that apartment?

10  A.   Yes.

11  Q.   OK.  So you flew to Beverly Hills to help following Child 3's

12  birth at the apartment?

13  A.   Yes.

14  Q.   And how long were you in Beverly Hills after Child 3 was

15  born?

16  A.   We weren't there for a month because we came back in

17  September.  So we flew from New York to California and then

18  that's the same night when they flew to California, that was

19  the same night in the morning, a.m., I flew to Jamaica.

20  Q.   And so after staying in California, in Beverly Hills,

21  following Child 3's birth you went back to New York?

22  A.   Yes.

23  Q.   How did you get back?

24  A.   We flew together.  Ms. Dula and Mr. Snow and the other two

25  boys.  So it would be three kids.

NAN4FOS4                           Foster - Direct

1   Q.  OK.  How did you fly?

2   A.  Private, on a private jet.

3   Q.  OK.  Did there come a time when you were notified that your

4   pay was going to be cut?

5   A.  Yes.

6   Q.  When was that?

7   A.  It was August of 2020.

8   Q.  August of 2020?

9   A.  Yes, I think it was August or July.  I'm not sure of the

10  month.

11  Q.  Is there anything that might refresh your recollection as

12  to when it was?

13  A.  I'm trying to remember.  I think it was between July and

14  August.  I'm not sure of the month.  I don't remember.

15  Q.  Were you notified -- how were you notified initially?

16  A.  Mr. Snow sent me a text message.

17  Q.  OK.

18          MR. LUCAS:  OK.  With the Court's permission, I would

19  like to show Ms. Foster the text message.

20          THE COURT:  Did you say something?

21          THE WITNESS:  No.

22          THE COURT:  Yes, fine.

23          MR RISO:  What exhibit?

24          MR. LUCAS:  It's PX-13 and DX-25.

25  Q.  Do you recognize this exhibit, Ms. Foster?

NAN4FOS4                      Foster – Direct

1    A.   Yes.

2    Q.   What is it?

3    A.   It's where Mr. Snow has said that --

4         THE COURT:  I'm sorry.  Could you use the microphone.

5    A.   So it was what Mr. Snow was saying, as you have heard, I've

6    spoken to Verona.  We are no longer able to pay you the salary

7    you have been receiving.

8    Q.   OK.  Can you read the rest of it.

9    A.   As we discussed when Child 4 was born, this -- as we

10   discussed when Child 4 was born, this payment schedule was

11   temporary, and should have been adjusted before.  We are

12   willing to continue paying you at the rate of 500 per day when

13   you have spoken --when we have spoken to a number of people.

14   And we will make other arrangement.  Thank you very much.

15        MR RISO:  I'm not sure if that was all read.

16        MR. LUCAS:  OK.  So if I could just read the last

17   part.

18        We have spoken to number of people and know this this

19   is more than reasonable for the job being performed.  If this

20   is unacceptable, let me know, and we will make other

21   arrangements.  Thanks a lot.

22        THE COURT:  Let's wrap this up in the next five

23   minutes for today.

24   Q.   Ms. Foster, when Child 4 was born, was there any indication

25   from Mr. Snow that after Child 4 reached a certain age your pay

NAN4FOS4                    Foster – Direct

1  would be reduced to $500?

2  A.  No.

3  Q.  OK.  What, if anything, did Mr. Snow tell you about any pay

4  adjustment relating to Coco's birth in the fall of 2019?

5  A.  He only said that he was going to give us a hundred

6  dollars.  And when Child 4 is sleeping through the night, then

7  he will reduce the hundred dollars.

8  Q.  OK.  And after receiving this text, what, if anything did

9  you think its significance was?

10  A.  I think he wanted us to quit.

11  Q.  Why do you think that?

12  A.  Because Ms. Dula has made comments that we are black

13  bitches, and dirty Jamaicans.  And because Ms. Wright had

14  confronted her, and I think I don't know.  I can't say they

15  come to a decision that, you know, this is what we're going to

16  do to get rid of them.  I don't know.

17          THE COURT:  That was just your perception?

18          THE WITNESS:  Yes.

19          THE COURT:  Your supposition.

20          Let's stop for today.  It's almost 5:00.  Let's let

21  these jurors go home.

22          OK.  Ladies and gentlemen, tomorrow we will start at

23  10:15.  That's because many, many months ago I scheduled, at

24  10:00, an approval hearing in a class action that was settling,

25  and you have to do that way in advance, way in advance of

NAO4FOS1                         Foster- Direct

1    A.   Good morning.

2    Q.   OK.  Ms. Foster, I forgot to ask you yesterday, do you have

3    any children of your own?

4    A.   Yes.

5    Q.   Can you tell us just a little bit about them?

6    A.   So I have three kids:  Two boys, one girl.  My son is in

7    aviation college.  My daughter is an RN, and the other one is a

8    social worker.

9    Q.   How would you describe your relationship with defendant's

10   children during your tenure with defendants?

11   A.   I was very close with the kids.  I was very attached to

12   them.  I loved them as they were my own kids.

13   Q.   OK.  During the course of your employment, did you provide

14   service to the defendants at any of their other properties?

15   A.   Yes.

16   Q.   OK.  Which ones?

17   A.   So I did California.  I did the Hamptons, and I did New

18   York City.

19   Q.   OK.  Did Ms. Dula have any rules concerning food

20   consumption for the children?

21   A.   Yes.

22   Q.   What were those rules?

23   A.   So Ms. Dula don't like when the kids eat a lot because she

24   complains that they are gaining weight.  Also, she doesn't like

25   when they drink like regular whole milk.  She wants them to

NAO4FOS1                    Foster- Direct

1    have, especially **Child 3**, she want them to have almond milk,

2    non-sweetened milk.

3    Q.  Did you follow Ms. Dula's rules?

4    A.  Yes.

5    Q.  OK.  All right.  Were there video cameras in defendants'

6    home?

7    A.  Yes.

8    Q.  Can you describe how many and the placement?

9    A.  So it was a lot of video cameras.  We have a video camera

10   pointing on the bed that we were sleeping on.  Also, we have

11   video cameras in the hallways.  Also, there were video cameras

12   in the kitchen right above the stove where we share the kids'

13   meal and in the living room, in the dining room.  It was all

14   over in the house.

15   Q.  For how long was there a video camera pointing on the bed

16   that you were sleeping on?

17   A.  It was when we moved to the mansion.

18   Q.  The one in Bridgehampton?

19   A.  Yes.

20   Q.  So the one that you mentioned in May of 2020?

21   A.  Yes.

22   Q.  OK.  Did Ms. Dula talk through the camera?

23   A.  Yes.

24   Q.  Okay.  What types of things would she say?

25   A.  If the kids are crying she would scream at them over there

1    and said they need to stop crying.  The one that are in the

2    kids' bedroom, you know, the kids would be playing and

3    screaming at each other.  She would speak to them over the

4    camera.  And also in the living room, like, we would have the

5    kids playing, you know, if they are misbehaving then she would

6    scream at them and tell them they need to stop doing what

7    they're doing.  Also the one that is in the kitchen, sometimes

8    like when we are sharing the food, she would be watching and

9    say that's too much food on their plates.

10   Q.  OK.  Were there any weight issues with the children other

11   than what you alluded to **Child 2** being underweight when you

12   first started?

13   A.  Yes.  So when we were in the house in the city, Ms. Dula

14   and -- I wasn't working, but I understand from --

15   Q.  I just want while you were working.

16   A.  Yes.

17   Q.  OK.

18   A.  So the kids were -- all of the kids from **Child 1**, **Child 2**,

19   and **Child 3**, they were underweight.  Because Ms. Dula wanted to

20   just give them, like, vegetables and just, like, a little piece

21   of meat.  She don't want us to give them like a big portion of

22   food.

23   Q.  Okay.  And did you do any types of outdoor activities with

24   the children during your tenure with defendants?

25   A.  Yes, I do a lot of those.  I take them to the park.  I

NAO4FOS1                    Foster- Direct

1    arrange playdates in the park with other kids.  Like I would

2    take their lunch with them in the park so they could, you know,

3    be with their friends, bring balls.  I also bring books that we

4    could read to the kids in the park.  Yes, and we took them to

5    the library, yes.

6    Q.  OK.  What types of indoor activities, if any, did you do

7    with the children during your tenure with defendants?

8    A.  So we have in the city apartment, there was a play room.

9    So I would go down there.  I ordered chalkboard for the older

10   boy.  I teach him how to try to spell his name.  I like show

11   him, like, write letters, and let him pronounce the different

12   letters.  And I also, like, you know, read to him.  I give him,

13   like, crayons so he can circle, you know, teach him how to

14   start writing.

15   Q.  OK.  What, if anything, did you do to provide emotional

16   support to the children?

17   A.  There was a lot of abuse going on in the homes.  And I

18   tried to comfort them as much as I can.  There was one incident

19   in July of 2020 where Mr. Snow told me the night before that he

20   wanted to take the boys out for breakfast.  So I got them

21   dressed, ready.  And then he came and he got the boys.  So I

22   noticed that it wasn't long, he came back, and he was screaming

23   for my name, "Cordia, Cordia, Cordia."  And I say to him, Ian,

24   what happened?  And with a rage, he was, like, Child 3 was

25   being so naughty, and I had to spank him.  And he said that the

     other

NAO4FOS1                          Foster- Direct

```
1    boys couldn't get to finish their breakfast because of the way
2    how Child 3 was behaving.  And the -- so I gave Child 3
3    breakfast because he said Child 3 was screaming.  So I gave
4    Child 3 a bowl of cereal.  I noticed that when Child 3 was
5    sitting down to eat, he wasn't sitting properly, like the way
6    like I am sitting now. And I, you know, I went to -- because he
7    was still in diapers, I went to change his diaper, and then I
8    see a lot of bruises, like bad bruises like, a lot of batters on
9    him.
10   Q.  Did you do anything to comfort Child 3?
11   A.  Yes.  I hold him.  I hugged him.  I cried.  And Ms. Dula's
12   sister came over.  And I showed her the bruises on Child 3.  It
13   was very concerning.  And Ms. Dula's sister said, oh, boy, daddy
14   really beat him bad.
15   Q.  Did you play any sports with the children?
16   A.  Yes.
17   Q.  What kind?
18   A.  bought, like, baseball bats, and I guess for like Ms. Dula
19   and we used to play ball.  We used to walk around.  The three
20   boys would walk around.  So I would push Child 4 in the
21   stroller. So we would walk around the field, and they have
22   their swings. I would push them in the swings.  Sometimes I
23   would sit in the swings and whoever wants to come, I'll just
24   put them in my lap and we'll swing together.  I would also
25   climb in the playhouse with them and play hide and seek with
     them.  And we would
```

NAO4FOS1                     Foster- Direct

 1   sometimes run around the field.  There is like a -- also a

 2   thing on the playfield where I don't know exactly what it is,

 3   but it's like where skaters would go and skate on.  So we would

 4   just run.  We would just run on it.

 5   Q.  So were there any times when you felt -- strike that.

 6           You mentioned yesterday in substance that you weren't

 7   allowed in the second mansion or in the guest house/pool house.

 8   Do you recall that?

 9   A.  Yes.

10   Q.  OK.  How did that make you feel?

11   A.  I feel very horrible.  It makes me feel like I'm not a

12   human being.  But most importantly, I felt bad for the kids

13   because they were also not allowed.  And on a few occasions,

14   Mr. Snow would come and take the kids to go watch TV with him

15   in the mansions.  Like a few seconds, he will take them back,

16   and I will see like long faces on the kids.  And I'm like what

17   happened?  Momma don't want us.  Momma don't want us to have --

18   watch TV.  So it was pretty heartbreaking for me to see what

19   was going on with those kids, physically, mentally, abuse.

20   Q.  Does it make sense to you that someone who didn't care all

21   that much about their children would have so many children?

22           MR. RISO:  Objection.

23           THE COURT:  The objection is sustained.

24   Q.  Is it your testimony that Ms. Dula did not care about her

25   children?

NAO4FOS1                          Foster- Direct

1              MR. RISO:  Objection.

2              THE COURT:  The objection is sustained.  Let's move

3    on.  This is actually not a case about how Ms. Dula feels about

4    her children.  It's a race discrimination case.  Let's move on,

5    please, to something relevant.

6    Q.  Did Ms. Dula ever tell you why the kitchen window in the

7    maids' quarters had been partially covered over?

8    A.  No, she did not tell me.

9    Q.  Did you ever try to peek through any of the windows in the

10   mansion at any time?

11   A.  No.  There is no windows.  Because where the window was

12   pasted over, if you stand there and are washing the dishes.

13   The window is right there so you have to look.  You can't be

14   holding your head down.  It's straight in front of you where

15   the kitchen sink is facing the mansion.

16   Q.  Well, could you see into the mansion --

17   A.  No, no.

18   Q.  A few moments ago you mentioned a -- strike that.

19              Where did Child 4 sleep, the youngest child, when you

20   were in the maids' quarters at the second mansion?

21   A.  Child 4 was in the same room with me.

22   Q.  With you?

23   A.  Yes.

24   Q.  And you mentioned audio-visual camera in that room.  Could

25   it also pick up where Child 4 was after it was moved?

NAO4FOS1                          Foster- Direct

1    A.   The camera was directly on our bed.

2    Q.   OK.  But could it also pick up the crib once it was moved?

3    A.   I'm not sure if the camera was -- or if it could turn.  But

4    it was directly facing down on the bed where we sleep.  And it

5    was the corner to where our bed was, not to where the crib was.

6    Q.   Is that how the cameras had been pointed at the previous

7    properties?

8    A.   No.  Those are in Child 4's crib only.

9    Q.   How did it make you feel to have an audio-visual camera

10   pointed at your bed?

11   A.   I feel very devastated, very heartbroken, because Ms. Dula

12   wasn't the only one who could view the cameras.  Mr. Snow has

13   access to the camera too.  And, you know, for a woman sleeping

14   in the bed, he could view it.  I could turn back in the bed,

15   and he could see me, how I was positioned.  So I was very

16   uncomfortable with that situation.

17   Q.   Would you have been OK with Ms. Dula watching you through

18   the camera in your bed?

19   A.   No.

20   Q.   Why not?

21   A.   I think it's inappropriate for you to be spying on someone

22   how they are sleeping.  Because as I said, you could make a bad

23   turn, I have my clothes on which is a nightgown, I could turn a

24   certain way and she seen how I look in the back.  So I wasn't

25   comfortable.

NAO4FOS1                    Foster- Direct

1   Q.  Did that have any impact on how you slept at the second

2   mansion there?

3   A.  Yes.  A lot of times I go into the living room even though

4   there were camera in the living room.  I would go in the living

5   room, and I would sleep in the couch.  Sometimes I will go on

6   the floor.

7   Q.  Did you perceive any sort of relationship between these

8   events that we have been discussing since after Ms. Dula --

9   since after you were told that Ms. Dula referred to you and

10  Ms. Wright as black bitches?

11  A.  Yes.

12  Q.  What relationship did you perceive?

13  A.  Well, can you repeat the question.  I don't understand what

14  you said.

15          THE COURT:  I don't either.

16          THE WITNESS:  I don't understand.

17  Q.  We covered a number of things, some racial slurs --

18          THE COURT:  OK.  Such as?  Don't you give a speech.

19  Ask the question.

20  Q.  OK.  With respect to the things that you said changed about

21  the relationship after Ms. Wright told you that Ms. Dula

22  referred to you as black bitches, did you perceive a

23  relationship between those various changes that were happening?

24          MR. RISO:  Objection.

25          THE COURT:  The objection is sustained.  That's for

1    the jury to decide.  Let's move on, please.

2    Q.  OK.  Now, Ms. Foster, I want to play for you a video that's

3    in evidence.

4           Before I do so, let me ask you, so did you record the

5    conversation with Mr. Snow about the pay cut?

6    A.  Yes, I did.

7    Q.  OK.  And I'm going to play an exhibit in evidence for you

8    and then ask you a few questions about it.

9    A.  Sure.

10          (Video playing)

11          (Continued on next page)

12          MR. RISO:  DX44?

13          MR. LUCAS:  Yes.  Apparently, the Court's -- it's not

14   being picked up on the system.  So maybe I can come back to

15   that later.

16          THE COURT:  Let's come back to that.

17          MR. LUCAS:  Yes.  With the Court's permission, could I

18   show the witness the transcript that the parties have exchanged

19   of that audio and ask questions about that?

20          MR. RISO:  I have no objection, your Honor.

21          THE COURT:  I said let's move on.  Do it any way you

22   want.  I'M not going to tell you how to try the case.

23          MR. LUCAS:  I didn't hear you, your Honor.  Thank you.

24          (Pause)

25   Q.  So, Ms. Foster, what I'd like to do is have you take a

NAOAAFOS2                          Foster - Direct

1   moment and read through that.  Then I'm going to ask you a few

2   questions about it.  All right?

3           MR. RISO:  Your Honor, should we mark the exhibit?  It

4   was an aid.

5           THE COURT:  Correct.

6           MR. LUCAS:  I have no objection to it being marked.

7           THE COURT:  What number is the tape?

8           MR. RISO:  Forty-four.

9           THE COURT:  Plaintiff's 44A, okay, now for

10  identification.

11          Now let's go.

12  Q.  Do you recognize that exhibit, Ms. Foster?

13  A.  Yes.

14          THE COURT:  What is it?

15  Q.  What is it?

16          THE COURT:  Tell me what it is.

17  A.  This is a transcript of the recording.  I don't see -- the

18  writings are too fine for me.

19          THE COURT:  Is this a transcript of a recording that

20  you made of the conversation you had with Mr. Snow?

21          MR. RISO:  Yes.

22          THE COURT:  This is the words that were said on the

23  tape.

24  Q.  Are you able to read it?

25  A.  The writings are fine but, yeah, I could understand some of

NAOAAFOS2                              Foster - Direct

```
 1    what's there.
 2               THE COURT:  I don't understand what that means.  It's
 3    a yes or no question.
 4               THE WITNESS:  Yes.
 5               THE COURT:  You can read it.  Keep going.
 6    Q.  Okay.  On the left-hand side of the exhibit you can see
 7    numbers representing the time interval of the transcript.
 8               Do you see that?
 9               THE WITNESS:  Yes.
10               MR. LUCAS:  Okay.  Could you just go down to the four
11    minute --
12               THE COURT:  Actually, no.  Put it down.
13               Ask her what was said in the conversation, okay.
14    That's what you do with your witness.  You do not do this.  You
15    ask her what was said in the conversation.  What did you say to
16    him?  What did he say to --
17    Q.  Ms. Foster, what was said during the conversation?
18    A.  So, Mr. Snow was explaining to us about the pay cut and he
19    was telling us that he is going to get other people to come in
20    and help us to take care of the boys.  So he had to cut our
21    salary so that, I guess the rest of the money is to help to pay
22    whosoever was coming in.  And he had mentioned that we would be
23    working eight hours per day and during the conversation we
24    were, you know, talking.  Mr. Snow was explaining that, you
25    know, he likes us.  He likes the job that we were doing.  We
```

1    also, Ms. Wright and I, also said that we liked both women and

2    Ms. Dula.  Ms. Dula wasn't in the meeting with us, so we asked

3    Mr. Snow if he could go get Ms. Dula to come join us.  Mr. Snow

4    went but he came back.  Ms. Dula did not come back with him.

5    So during the conversation I said to Mr. Snow that it's okay

6    with him if he's going to go down with our work, if he is going

7    to get other people to come in and help us to do the job.

8    Q.  Okay.  And were your roles or responsibilities ever reduced

9    at any point in time after that meeting?

10   A.  No.  It was the same.

11   Q.  Was your pay reduced at any time after that meeting?

12   A.  Yes.

13   Q.  Okay.  How long after?

14   A.  So, Ms. Wright was -- the same Sunday when we had the

15   meeting that was the same Sunday that I came on.  So Ms. Wright

16   get the full salary of what our pay used to be.  I asked

17   Mr. Snow that since I am coming on this week if he could reduce

18   my pay the following week.  Mr. Snow went and asked Ms. Dula if

19   that was okay.  And he came back and Ms. Dula said it was okay.

20   Q.  Okay.  So your pay was reduced from what to what?

21   A.  So it was from 1300 to 500 per day.

22   Q.  Okay.  And just for clarity, for you, when did it become

23   500?

24   A.  So we do two weeks on and two weeks off.  So I spent -- so

25   it was when I come off and when I came on back the following

1   week, then that would be when my --

2   Q.  Okay.  During that meeting did you say anything to Mr. Snow

3   about how you felt about the pay cut?

4   A.  Yes.

5   Q.  Okay.  Did you tell him everything that you felt about the

6   pay cut?

7   A.  Yeah.  I told him that you know, if someone else is coming

8   in, and as I said, was going to help us to do the job, then we

9   will be okay with the $500 per 24 hours.

10  Q.  Okay.  Now, did there come a time when you received a text

11  message concerning something about going on in the guest house?

12  A.  Yes.  I got a text message from Ms. Dula asking me what was

13  I looking in the guest house for.

14  Q.  Okay.  I am going to pull that up and ask you to please

15  take a look at that.

16          (Pause)?

17          MR. RISO:  Didn't we do this yesterday?

18          THE COURT:  No.

19          MR. LUCAS:  I don't think so.

20  Q.  Can you see what's been marked as PX 15, Ms. Foster?

21  A.  I'm not seeing anything on my screen.

22          THE COURT:  There's nothing on her screen.

23          MR. LUCAS:  Okay.  So the screen stopped working.

24          THE COURT:  Vincent is here.

25          MR. LUCAS:  May I approach, your Honor?

1          THE COURT:  No, no.  Vincent is here.

2          (Pause)

3    Q.  Ms. Foster, is the text message?

4    A.  It went off.

5          THE COURT:  It did go off.  Why don't you just ask her

6    questions about the text message.  Okay.  There it is back on

7    the screen.

8          MR. LUCAS:  I'd just like her to be able to identify

9    it, your Honor.

10   Q.  Okay.  Is this the text message that you just testified

11   about?

12   A.  Yes.

13   Q.  Okay.  Had you been looking for anything in the guest

14   house?

15   A.  No.

16   Q.  At any point in time?

17   A.  No.

18   Q.  Had you ever been in the guest house at any point in time?

19   A.  No.

20   Q.  What did you think or feel about Ms. Dula's text about you

21   looking for something in the guest house?

22   A.  I feel really bad because I just think that Ms. Dula was

23   accusing me of something that I did not do.  So I feel really

24   bad.  I felt very uncomfortable.

25   Q.  What did you write back to Ms. Dula in response to that

NAOAAFOS2                         Foster - Direct

1   text?

2   A.  So I wrote back, What are you talking about?  What guest

3   house did you see me in?  And a question sign.  Do not tell any

4   lies on me.  This is a big allegation that I am not going to

5   take from you.  You have your cameras to show you everything.

6   Q.  Did Ms. Dula apologize after getting your response?

7   A.  She did not.

8   Q.  Did she respond to you in any way?

9   A.  No.

10  Q.  Did there come a time when the -- strike that.

11          Was there a wifi extender in the maids' quarters?

12  A.  Yes.

13  Q.  Did there come a time when the wifi extender was no longer

14  in the maids' quarters?

15  A.  Yes.

16  Q.  Okay.  Tell us what happened.

17  A.  So, the wifi was there and Ms. Dula and Mr. Snow was going

18  to the city.  I noticed that Ms. Dula came in and she took the

19  wifi out.  Mr. Snow came into the apartment and I told Mr. Snow

20  that Ms. Dula took the wifi out and I don't remember if

21  Mr. Snow texted her or he asked her about the wifi, and she

22  said that it wasn't working.

23  Q.  And when did that happen in relation to when you were

24  terminated?

25  A.  I think it was in August.  I'm not sure of the exact date

1   but it was when, you know, everything that was going on after

2   Ms. Wright heard Ms. Dula say "black bitches" and when Ms. Dula

3   called us "dirty Jamaicans".

4   Q.  Did there come a time when you learned that you no longer

5   had a job to care for defendants' children?

6   A.  Yes.

7   Q.  When was that?

8   A.  It was in August I got a text message from Mr. Snow stating

9   that -- I'm not sure of the exact text but he said that I'll

10  probably hear from Ms. Wright that thanks for working with my

11  family.  Your service is no longer needed.

12  Q.  What did you think or feel when you learned that you were

13  terminated?

14  A.  I feel very heartbroken.  I feel very bad.  Most

15  importantly, I missed the kids.  And I, you, know I did not get

16  to say good bye to them.

17  Q.  Well, how did that make you feel, not being able to say

18  good bye to the children?

19  A.  It was very heartbroken for me because the kids and I have

20  a very good relationship.  We have a great bonding.  There are

21  times every time when I'm leaving my job the older boy, Child

22  1, he would come.  He would cry, devastated.  Don't go, Cordia.

23  Don't go.  He would hang onto my pants, you know.  So I have a

24  great relationship with the kids.  I love them so much as if

25  they were my own kids and I was very heartbroken because of all

NAOAAFOS2                      Foster - Direct

1    the things that I went through with them.  So it was very hard

2    for me not to say good bye to them.

3    Q.  Did you discuss those feelings that you were experiencing

4    with anyone else?

5    A.  Yes.  Ms. Wright.

6            MR. RISO:  Objection.

7            THE COURT:  Overruled.

8    Q.  Did Ms. Wright discuss what, if any, feelings she was

9    having with you?

10           MR. RISO:  Objection.

11           THE COURT:  The objection is sustained.

12   Q.  Did there come a time when you spoke to Ms. Wright about

13   the termination?

14   A.  Yes.

15   Q.  Okay.  What did you say and what did she say?

16           MR. RISO:  Objection.

17           THE COURT:  Overruled.

18           THE WITNESS:  Answer the question?

19           THE COURT:  Yes.

20   A.  Yeah.  So, Ms. Wright, I mean we were --

21           THE COURT:  I don't want to know what you were

22   thinking.  I don't want to know what you were feeling.  I want

23   to know what you said to her and she said to you.

24   A.  I said to Ms. Wright that I really missed the kids and I

25   wish if I could say good bye to them.  Ms. Wright also said the

1    same thing to me.  And I, you know, the housekeeper there who

2    would send us pictures even though we were terminated, pictures

3    of the kids still showing us how they were doing.  And at one

4    point the housekeeper had told me that --

5              THE COURT:  No, no.  We don't want to know what the

6    housekeeper said.

7              Move on.  Ask your next question.

8              THE WITNESS:  I'm sorry.

9              MR. LUCAS:  I'm done with Ms. Foster, your Honor.

10             THE COURT:  Okay.  Great.

11             Cross?

12             MR. RISO:  Yes, your Honor.

13   CROSS-EXAMINATION

14   BY MR. RISO:

15   Q.  Good morning, Ms. Foster.

16   A.  Good morning.

17   Q.  You'd testified earlier that when you began to work with

18   the Snow/Dula family you were paid $600 a day; do you recall

19   that?

20   A.  Yes.

21   Q.  That was to be a baby nurse to Child 2, right?

22   A.  Yes.

23   Q.  And the pay at $600 a day, that's something that you

24   discussed with Mr. Snow, correct?

25   A.  No.  I did not make any discussion with Mr. Snow regarding

NAOAAFOS2                        Foster - Cross

1    money.  I came through an agency.  The agency was the one who

2    made the payment arrangement with Mr. Snow and the agreement. Q.

3    When you became a nanny for **Child 1**, in addition to being the

4    baby nurse for **Child 2**, in or about September 2017, you were

5    given an escalation in your rate to $800 a day, correct?

6    A.  Yes.

7    Q.  Did you discuss that with Mr. Snow?

8    A.  Me and Ms. Dula had the conversation.

9    Q.  Okay.  So you talked about what you thought would be a fair

10   rate for you given that you were now being asked to take on the

11   responsibility of **Child 1**, correct?

12   A.  Yes.

13   Q.  So you had the ability as a baby nurse nanny to negotiate

14   with the families what pay rate you believed would be

15   reasonable and that would satisfy you, correct?

16   A.  Yes.

17   Q.  You don't have to stay with any family.  You could leave

18   and go somewhere else at any time, right?  You have this

19   freedom, right?

20   A.  Not if I'm under a contract.

21   Q.  Okay.  You were not under a contract for more than two

22   months with Mr. Snow?

23   A.  No.  I was still under a contract.

24   Q.  When did your contract end?

25   A.  I think it was supposed to end in September.

NAOAAFOS2                    Foster - Cross

1  Q.  So I said two months.  Okay.  You started in August.  It

2  was supposed to end in September.  After that period, you were

3  not under a contract with Mr. Snow, correct?

4  A.  No.

5  Q.  So for all of the time from September 2017 to August of

6  2020, you were free to leave at any point, right?

7  A.  Yes, if I want to.

8  Q.  If you thought you weren't getting enough money, you could

9  leave, correct?

10  A.  Yes.

11  Q.  You thought that the conditions of your employment were not

12  palatable to you, you had a choice to leave, correct?

13  A.  Yes.

14  Q.  Is it fair to say that your assignments that you had

15  throughout the course of your career have basically been as a

16  baby nurse; is that a fair characterization?

17  A.  Could you repeat the question?

18  Q.  Yeah.  So you have been in this profession since I believe

19  that you said around 2005?

20  A.  Yes.

21  Q.  So from 2005 to today, almost 20 years, most of your

22  assignments have been as a baby nurse, right?

23  A.  It's a yes or no question.  Because if I sometimes go on a

24  job and my assignment would be for three months, then the

25  parents would extend it to six months.  They could extend it to

NAOAAFOS2                    Foster - Cross

1    nine months.  They could extend it a year.  They could extend

2    it to two years.

3    Q.  So it's a little fuzzy of a question because if you are

4    with that baby beyond a point and time when a baby nurse

5    requiring baby and stay on, then you consider that you're no

6    longer a baby nurse but you are still taking childcare for that

7    six-month-old, nine-month-old, one-year-old; am I saying that

8    correctly?

9    A.  Yes, but I still get the same salary as baby nurse.

10   Q.  Okay.  As a baby nurse you're basically there from pretty

11   much day one of the child's life; is that fair?

12   A.  Yes.

13   Q.  In most instances, right?

14   A.  Yes.

15   Q.  In fact, you told us about **Child 3** being born in California,

16   right?

17   A.  Yes.

18   Q.  And you were there when **Child 3** was born, right?

19   A.  I came after the birth of **Child 3**.  So it was a mistake that

20   I made.

21   Q.  So **Child 3** had already come into the world by the time you

22   got to California?

23   A.  Yes.

24   Q.  So, is it fair to say that the baby nurse stage typically

25   for babies is about two maybe three months, this 24-hour

NAOAAFOS2                    Foster - Cross

1    assignment period?

2    A.  As I said, depending on what the family wants.

3    Q.  Okay.

4    A.  So I can answer your question and said yes that would be

5    fair for two months, when it could be longer than two months.

6    Q.  So some kids could be a little longer than two months.

7    Some could be a little shorter than two months?

8    A.  Yes.

9    Q.  Isn't it true that at any time in 2020 as you continued on

10   as a nanny for my clients' children, you had never been a

11   caregiver for a four-year-old.  Child 1 was about as old as a

12   toddler as you had ever cared for as a nanny; is that fair to

13   say?

14   A.  No.

15   Q.  Had you worked with any child as old as a four-year-old

16   before 2020?

17   A.  Yes.  I worked with a family before that.

18   Q.  When was that?

19   A.  I think it was, I'm not sure of the year, if it was 2016 or

20   2015.

21   Q.  Was that the Wolfe family?

22   A.  Yes.

23   Q.  And the Wolfe family, you came onto the Wolfe family when

24   the child was a day old, right?

25   A.  Yes.

NAOAAFOS2                     Foster - Cross

1    Q.  And you stayed there for two years, right?

2    A.  Yes.

3    Q.  So he is two years old when you leave, right?

4    A.  I think Mark was, I'm not sure of the age, if he was two or

5    three.  I'm not sure of the exact date.

6              MR. RISO:  Okay.  I'd like to mark as our next exhibit

7    Defendant's Exhibit 45 for identification, A two-page document

8    and show it to the witness.

9    Q.  So before I show it to you, Ms. Foster, do you have a

10   LinkedIn page?

11   A.  No.

12   Q.  Are you on LinkedIn?

13   A.  Oh, yes.

14   Q.  You have a resume on LinkedIn that you would post?

15   A.  Yes.

16   Q.  Okay.  I'd like to show you what I found on LinkedIn and

17   ask you if you can identify it.

18             MR. LUCAS:  May I have a copy, counsel?

19             MR. RISO:  Sure.

20   Q.  Is this your resume that you post on LinkedIn?

21   A.  Yes.

22   Q.  Okay.  And this is basically a resume which describes your

23   work in the field as a baby nurse from roughly 2007 through

24   September 2016, correct?

25   A.  Yeah.  I have more jobs that I do.  So I reorganize my

NAOAAFOS2                    Foster - Cross

1    resume most of the time.

2    Q.  Okay.

3    A.  So this was a long resume that I didn't make any change to.

4           MR. RISO:  All right.  I'd like to move DX 45 into

5    evidence, your Honor.

6           MR. LUCAS:  No objection.

7           THE COURT:  Admitted.

8           (Defendant's Exhibit DX45 received in evidence)

9    Q.  So just looking at THE resume that we do have in front of

10   us --

11          THE COURT:  You are offering?  By the way, you don't

12   move it.  You offer it.

13          MR. RISO:  Yes, your Honor.  I'M sorry.

14   Q.  On these TWO pages you list 16 assignments, correct?

15   A.  Yes.

16   Q.  And the first assignment is in 2007, correct?

17   A.  I'm not seeing 2007.

18          MR. RISO:  Your Honor, may I hand the witness a hard

19   copy?

20          THE COURT:  Yes, you may.  I wish you would.

21          (Pause)

22          MR. RISO:  May I approach the witness?

23          THE COURT:  You are going to have to, if you are going

24   to hand it to her.

25          MR. RISO:  Thank you, your Honor.

NAOAAFOS2                    Foster - Cross

1                (Pause)

2   Q.  That, Ms. Foster, is a hard copy of what is in evidence as

3   DX 45.  And you start in 2007 on your resume, right?

4   A.  Yes.

5   Q.  And for all 16 positions on this resume which is two pages,

6   each one you're saying that you're a baby nurse, right?

7   A.  Yes.

8   Q.  And is it fair to say just from looking at the beginning

9   dates and the end dates, that of these 16 assignments, your

10  assignments are lasting anywhere between ten days and several

11  months to as long as two years on the last one, correct?

12  A.  Yes.

13  Q.  And the last one is the Wolfe family that we started to

14  talk about, correct?

15  A.  Yes.

16  Q.  And there you list on your resume that you started in

17  September 2014 and the assignment ended in September 2016.

18          Do you see that?

19  A.  Yes.

20  Q.  So the one-day child that you would have begun as baby

21  nurse for in 2014 would have been two years old at the time of

22  your departure from that family; would you agree?

23  A.  Yes.

24  Q.  I'll ask you the question again.  In 2020 when you were a

25  fanny for my client, isn't it fair to say that Child 1 was the

NAOAAFOS2                    Foster - Cross

1   first four-year-old under our care?

2   A.   Yes.

3   Q.   And in fact, his brother, **Child 2**, was the first

4   three-and-a-half-year-old in your care?

5   A.   Yes.

6   Q.   Did you ever tell either Elyse or Ian that you had never

7   provided nanny services for a young toddler that age?

8            MR. LUCAS:  Objection, your Honor.

9            THE COURT:  Overruled.

10  A.   I don't remember having that conversation with Mr. Snow or

11  Ms. Dula.

12  Q.   Okay.  So let's go back to September 2017 when you take

13  over the nanny role for **Child 1** and that was precipitated by,

14  I think you testified that Elyse Dula had fired Liz Little?

15  A.   Right.

16  Q.   By the way, Liz Little is white, right?

17  A.   Yes.

18  Q.   You are the one taking over the nanny job for **Child 1** that

19  she had before she was fired, correct?

20  A.   Yes.  Before I took over the role of being the nanny or

21  anyone, Ms. Dula sister, Megan, was the one who started it

22  before I started.

23            THE COURT:  You mean, Megan was the nanny for **Child**

24            **1**?THE WITNESS:  Yes, before I took over Dula.

25  Q.   Megan is Elyse Dula's sister?

NAOAAFOS2                    Foster - Cross

1    A.   Yes.

2    Q.   And Megan Dula is helping her sister in the household with

3    the children, right?

4    A.   Yes.

5    Q.   You are coming on as the professional paid nanny, right?

6    A.   Yes.  So Megan and I used to do the rotation.

7    Q.   And when you came on for the sole position at $800 increase

8    you then became the nanny caretaker or Child 1; is that fair to

9    say?

10   A.   Yes.

11   Q.   Is it fair to say that by the end of September/early

12   October Child 2 was no longer in the baby nurse stage, right?A.

13   Yes.

14   Q.   So then by October 2017, you're a nanny, right?

15   A.   Yes.

16   Q.   For two boys?

17   A.   Yes.

18   Q.   Three or four-month-old and about a-year-and-a-half-old,

19   right?

20   A.   Yes.

21   Q.   But your pay continues at $800a day, right?

22   A.   Yes.

23   Q.   And then in April of 2018, does your rate change?

24   A.   In 2018, yes, that was when Child 3, yes.  No.  In 2018 of

25   April it was still the same 800.

NAOAAFOS2                         Foster – Cross

1   Q.  Well, did you get extra pay for weekend days?

2   A.  If I got paid for weekends?

3   Q.  Yes.

4   A.  Yes.  Mr. Snow start paying me on Saturday and Sunday for

5   time and a half.

6   Q.  Okay.  So I'm just trying to pinpoint when you got the

7   extra time and a half for the weekends.  Am I correct that that

8   would have been in or about April of 2018?

9   A.  I'm not sure of the correct date but I think it was that

10  time because Mr. Snow started paying me time and a half for the

11  weekend, which is Saturday and Sunday when he and Ms. Little, I

12  think, went to court.  That's when --

13  Q.  Is this a rate that you negotiated with Mr. Snow at that

14  time?

15  A.  No, I did not.

16  Q.  Okay.  And then we have a new baby that's born, right, on

17  August is the ■, 2019; do you recall that?

18  A.  Yes.

19  Q.  And that's Child 3?

20  A.  Yes.

21  Q.  And when Child 3's born you become a baby nurse, right?

22  A.  Yes.

23  Q.  And you are also the nanny for tow boys now, Child 1 and

24  Child 2?

25  A.  Yes.

NAOAAFOS2                           Foster - Cross

1   Q.  You become a baby nurse for **Child 3**, your pay rate goes up,

2   right?

3   A.  Yes.

4   Q.  At that point in time which would be August 2019, you are

5   paid $1,200 for weekdays, correct?

6   A.  Yes.

7   Q.  And $1,800 a day for weekends, correct?

8   A.  Yes.  I'm not remembering the calculation in my head but.

9   Q.  Okay.  And then is it fair to say that by January 2019,

10  **Child 3** is no longer in the baby nurse stage?

11  A.  So Mr. Snow said that when **Child 3** -- Actually, I didn't

12  have a conversation with Mr. Snow about.

13  Q.  So what I'm asking you is not a conversation with Mr. Snow.

14  I'm asking your recollection by January of 2019, am I correct

15  that **Child 3** was no longer in the stage of requiring a baby

16  nurse?

17  A.  He was four months old.  So I would still say that, yeah, I

18  have to perform the job as a baby nurse because he wasn't

19  sleeping through the night.  So, yes, I was still a baby nurse.

20  Q.  So at what point would you say that **Child 3** was no longer

21  requiring the services of a baby nurse?

22  A.  It really took a long time for **Child 3** because there was a

23  lot of complication with **Child 3** wasn't sleeping at all through

24  the night at all.  He was constantly not sleeping. We'd have to

25  be getting up, you know, comforting him, walking

NAOAAFOS2                    Foster - Cross

1   around the room.  So **Child 3**, the baby nurse took really a

2   long time for **Child 3**.

3   Q.  Do you recall filing a pleading in court under oath where

4   you made the representation in your pleading that by January

5   2019, **Child 3** no longer required the services of a baby nurse?

6   You were performing at that point in time the functions of a

7   nanny?

8           MR. LUCAS:  Your Honor, may we approach at side bar?

9           THE COURT:  No, we may not.

10  A.  I don't recall.

11  Q.  All right.  I'd like to show you something and see if I can

12  refresh your recollection.

13          MR. RISO:  May I approach, your Honor?

14          MR. LUCAS:  May I as well, your Honor?

15          THE COURT:  Why are you approaching?  You are not

16  asking her questions.  Sit down.

17          MR. LUCAS:  I am asking, your Honor --

18          THE COURT:  You may not.

19          MR. LUCAS:  I believe one of your orders is about to

20  be violated.

21          THE COURT:  Excuse me.  Excuse me.  Show her the

22  document.  See if it refreshes her recollection.  Sit down.

23  Q.  I'd like to show you Paragraph 15 and read it to yourself.

24          THE COURT:  Don't read it out loud, ma'am.

25  Q.  Does Paragraph 15 refresh your recollection that you stated

NAOAAFOS2                    Foster - Cross

1   that by January 2019, you were solely performing the services

2   of a fanny, not as a combined baby nurse nanny?

3           THE COURT:  Does that jog your memory about that,

4   ma'am?

5           (Pause)

6   A.  Yes, I see that.

7           THE COURT:  Now, the question isn't what you see.  The

8   question is does that jog your memory so that as you sit here

9   today you recall?

10  A.  Yes, I still can't recall.

11          THE COURT:  She still can't recall.

12          MR. RISO:  Your Honor, I would like to now ask her

13  specifically about a document I want to move in admission.

14          THE COURT:  Excuse me.  Excuse me.  Are we done with

15  the deposition?  Are you offering her testimony since she can't

16  recall?  She is a party.  What are we doing here?

17          MR. RISO:  I'm offering Paragraph 15 of that document

18  into evidence as an admission.

19          THE COURT:  Any objection?  It's in.  Next?

20          MR. RISO:  Okay.  Thank you.

21          (Defendant's Exhibit Paragraph 15 received in

22  evidence)

23  Q.  Okay.  So, after Child 3 no longer required the services of

24  a baby nurse you continued to be paid at the rate of $1,200 for

25  weekdays and $1,800 for weekends, correct?

NAOAAFOS2                          Foster - Cross

1   A.   Yes.

2   Q.   And then **Child 4** was born on September █, 2019; is that

3   correct?

4   A.   Yes.

5   Q.   And at that point in time you received an increase in pay

6   to $1,300 a day, right?

7   A.   Yes.

8   Q.   And you received $1,950 for weekend work at that point in

9   time, right?

10  A.   Yes.

11  Q.   And is it fair to say that by February 2020, **Child 4** no longer

12  required the services of a baby nurse?

13  A.   Yes.

14  Q.   Okay.  So then from February 2020 until the time of your

15  termination in August of 2020, you are a nanny for the four

16  children, correct; is that a fair characterization?

17  A.   Yes.  But may I say something?

18  Q.   And your pay rate remains the same up until June of 2020

19  when have you this conversation with Mr. Snow; is that correct?

20  A.   Yes.  But can I say something?

21          THE COURT:  No, no you can't.  You can answer his

22  question and then your lawyer gets a chance to ask some more

23  questions.  So you'll probably get to say something then.  Same

24  thing I said to Ms. Dula yesterday.

25          THE WITNESS:  Okay.  Answer the question.

NAOAAFOS2                        Foster - Cross

1          THE COURT:  If you answer his question and don't do

2     anything else, it'll all go faster.

3          THE WITNESS:  Okay.

4     Q.  Would Mr. Snow pay you by check?

5     A.  Yes.

6     Q.  So as I recall, for a certain period, you were working

7     every other week, correct?

8     A.  Yes.

9     Q.  After his wife came on, right?

10    A.  Yes.

11    Q.  Then at some point in 2020 during the pandemic you had

12    two-week shifts and you were paid every two weeks, right?

13    A.  Yes.

14    Q.  Okay.  And to get a pay check from Mr. Snow you would

15    typically text him and tell him how many hours you had worked,

16    how many days you had worked and whatever expenses you believed

17    should be reimbursed; is that fair to say?

18    A.  Yes.

19    Q.  Mr. Snow would get a text and he would write you a check,

20    right?

21    A.  Yes.

22    Q.  You would take that check and deposit into your bank

23    account, right?

24    A.  Yes.

25    Q.  And the expenses that Mr. Snow would reimburse would

NAOAAFOS2                          Foster - Cross

1    include the food that you personally consumed while you were

2    performing your childcare services in his home; is that fair

3    too say?

4    A.  Yes.

5    Q.  It would also include all of your transportation to and

6    from your home that's in the Bronx, right?

7    A.  The only transportation he covers was for a jitney and the

8    Uber to their mansion.

9    Q.  Okay.  So when they were in the Hamptons first then in East

10   Hampton, you would take a jitney to East Hampton?

11   A.  Yes.

12   Q.  And that would be paid for my Mr. Snow, right?

13   A.  Yes.

14   Q.  And any -- back and forth to the jitney would be paid for

15   by Mr. Snow, right?

16   A.  Yes.

17   Q.  Then later on when you were at the mansion during the

18   pandemic, Mr. Snow had a driver, right?

19   A.  Yes.

20   Q.  Do you recall his name?

21   A.  Ako.

22   Q.  What race was Ako; do you recall?

23   A.  He was African.

24   Q.  So he was Black?

25   A.  Yes.

1    Q.   Okay.  Did you know that he had been, that he was

2    Mr. Snow's personal driver and had been for some time?

3    A.   Yes.

4    Q.   So Ako would take you door-to-door from your home to

5    Bridgehampton during that period, right?

6    A.   Yes.

7    Q.   You didn't pay for any of that, right?

8    A.   No.

9            MR. RISO:  Put up DX 24 please.

10           (Pause)

11           MR. RISO:  I am showing you DX 24.  Higher on the

12   screen.

13   Q.   The green box, that's your message, right?

14   A.   Yes.

15   Q.   So that would be an example of you calculating your pay

16   that you are due for the shift that you had just worked,

17   texting it to Mr. Snow so that Mr. Snow could write you a check

18   for that amount, right?

19   A.   Yes.

20   Q.   This one that we're looking at, you are asking for seven

21   days, plus two days at time and a half, you're putting in food,

22   Ubers, jitneys, and days for the Venette, which I think is

23   Child 4, and you are something for a total of $11,882, right?

24   A.   Yes.

25   Q.   Mr. Snow wrote you that check, right?

NAOAAFOS2                    Foster – Cross

1   A.   Yes.

2   Q.   Whatever amount you texted Mr. Snow, whatever amount you

3   said you worked, whatever expenses you said you incurred, he

4   wrote you the check, right?

5   A.   Yes.

6             MR. RISO:   You can take that down.

7             (Pause)

8   Q.   Do you recall I think you testified a little bit on direct

9   that there was a point in time in October of 2019 when Mr. Snow

10  came to you to let you know that he thought he was paying more

11  than two times than he had ever paid and that at some point in

12  time your rate had to be adjusted; do you recall that?

13  A.   I got a text message from Mr. Snow.

14  Q.   Okay.  That was about the time Child 4 was born, right?

15  A.   Yes.

16  Q.   And that was in connection with your getting a boost in pay

17  of $100 for day the weekday and another 150 for the weekend

18  days, correct?

19  A.   Yeah.  The time and a half for Saturday and Sunday.

20  Q.   Mr. Snow was letting you know this is going to be temporary

21  while Child 4 still needed a babysitter?

22  A.   Yes.

23  Q.   We talked a few minutes ago that is that rate continued into

24  2020 even though Child 4 had long been out of the baby nurse

25  stage; you agree with that, don't you?

1   A.  Yes, but --

2   Q.  Even after you claim that Ms. Wright told you that sometime

3   in January Elyse Dula had made that nasty comment to her and

4   even though you claimed that in May 2020 Mr. Dula had made

5   another nasty comment that you overheard, you continued to be

6   paid at the existing rate that we just went over, correct?

7   A.  Yes.

8               MR. RISO:  Put back up DX 24.

9               (Pause)

10  Q.  You see the top blue box?  That's Mr. Snow texting you

11  about a change of the rate that's coming your way at some point

12  down the road, right?

13  A.  Yes.

14  Q.  And he's telling you "The struggle I am having is I already

15  paid you two times more than I have ever paid previously to a

16  baby nurse, right?  Do you see that?

17  A.  I see that.

18  Q.  Okay.  Then he agrees to give you the extra amount for

19  Venette, right?

20  A.  Yes.

21  Q.  Then he reminds you about your significant increase in pay

22  when **Child 3** was born, right?

23  A.  He did -- Mr. Snow and I did not have a conversation when

24  **Child 3** was born, of the increase.  We did not have any

25  conversation.  Mr. Snow was the one who gave the raise but it

NAOAAFOS2                    Foster - Cross

1    we didn't have a conversation about it.

2    Q.  I appreciates that.  In this text Mr. Snow says to you he

3    increased your pay significantly when Child 3 was born during

4    the period you were taking care of him through the night, right?

5    A.  Yes.

6    Q.  And that he never reduced it when he got over it, right?A.

7    Yes.

8    Q.  You agree with it cause we just went over it, right?That's

9    all true, right?

10   A.  Yes.

11   Q.  Then he says, let me know what you think, right?  That's

12   how he ends his text.

13   A.  Yes.

14   Q.  So he wanted your input into this, right?

15   A.  Yes.

16   Q.  He wanted to know how you wanted in terms of compensation

17   as to whether or not an arrangement could be worked out or not

18   that could permit you to stay or not, correct?

19   A.  Correct.

20   Q.  In response you then just text him and say you owe me close

21   to twelve thousand dollars.  Am I reading these messages

22   correctly?

23   A.  I don't see it where it says you owe me.

24   Q.  Well, the next message he texted you at 4:46 on October

25

NAOAAFOS2                      Foster - Cross

1   28th.  You respond at 5:19 on October 28.  You total up what

2   you are owed and you come to $11,882, right?

3   A.  But I was still getting the same salary and I worked for

4   the seven days.

5   Q.  That's all fine.  But you don't respond to Mr. Snow's

6   overture, "Let me what do you think", do you?

7   A.  Because I was coming to work —

8           THE COURT:  No, no.  I'm sorry, ma'am.  Just answer

9   his question.  It's a yes or no question.

10          Did get back to Mr. Snow and tell him what you

11  thought?

12          THE WITNESS:  I did not respond to Mr. Snow.

13          THE COURT:  You did not respond to Mr. Snow.  So the

14  answer is "no".

15          Next question.

16          MR. RISO:  Take that down, please.

17  Q.  By the way, did you share with Ms. Wright the text message

18  that you received from Mr. Snow that we just looked at whether

19  he is expressing his concern about what he is saying to you?

20  A.  I don't remember if I shared the message with Ms. Wright.

21  Q.  You discuss in sum or substance the substance of what

22  Mr. Snow had said to you in that text?

23  A.  We talked about our salary, yes, we.

24  Q.  You let her know that Mr. Snow was concerned about how much

25  he was spending and that after Child 4 is no longer in the baby

1    nurse stage we may be getting a cut in pay.  You had that

2    discussion with Ms. Wright; did you not?

3    A.   I don't remember what conversation me and Ms. Wright have

4    but I know there were is some point in time when we speak about

5    our pay.

6    Q.   Right.  And in that context you are speaking about your pay

7    which you also say, hey, we have a boss who thinks he is paying

8    more than twice as much as he should be paying --

9    A.   I don't remember having that conversation with Ms. Wright

10   like that.  I can't recall.

11              THE COURT:   Okay.  Let's move on.

12   Q.   Do you recall how much in total you made in compensation

13   from Mr. Snow during the three-year period that you worked?

14   A.   If I recall -- could you repeat it please.

15   Q.   Sure.  You have an idea as you sit here today as to how

16   much you were paid by Mr. Snow for the three years that you

17   worked?

18   A.   If I have an idea?

19   Q.   Yeah.

20   A.   No, I don't.

21   Q.   Would it be fair to say that over the three-year period you

22   received compensation checks from Mr. Snow exceeding $750,000;

23   is that a fair statement?

24   A.   I never sit and calculate all the money.  I can't answer

25   that question because I never assumed --

NAOAAFOS2                         Foster - Cross

1           THE COURT:  So you don't know.

2    A.  No, I don't know.

3           MR. RISO:  I'd like to mark the next Exhibit DX 46.

4           (Pause)

5           MR. RISO:  This is for identification.

6    Q.  Ms. Foster, are you aware that in this case the parties

7    produced the actual checks that Mr. Snow wrote to you and that

8    you deposited into your bank account during the period that you

9    performed services for him?

10   A.  Yes.

11          MR. RISO:  I would like to show you those checks.

12          THE COURT:  No.  You would like to show Defendant's

13   Exhibit 46 for identification and ask her if she can identify

14   what that is.  That is what you would like to do.

15          THE WITNESS:  Yes.  These are the checks.  And I was

16   the one who produced these.

17          MR. RISO:  I would like to move this into evidence.

18          THE COURT:  You would like to offer it into evidence.

19          MR. RISO:  I'm sorry.  I would like to offer,

20   absolutely.  I think this is 47.

21          THE COURT:  Forty-seven, any objection?

22          MR. RISO:  So we'll add it up.

23          MR. LUCAS:  No objection.

24          THE COURT:  There's no objection.  They're admitted.

25          (Defendant's Exhibit DX47 received in evidence)

1          THE COURT:  Ladies and gentlemen, you can add them up

2    or somebody will undoubtedly add them up for you before we get

3    done with this.

4    Q.  Ms. Foster, did you report on your income tax returns the

5    amount of compensation that you were paid by Mr. Snow and

6    Ms. Dula during the years you worked for them?

7    A.  No, I did not.

8    Q.  So is it fair to say that you paid no income taxes to any

9    governmental taxing authority on any of the income that was

10   paid to you by Mr. Snow?

11   A.  No.  At the time I did not, but I did --

12          THE COURT:  No, no.  Remember.  Just answer his

13   question.

14          THE WITNESS:  Okay.

15   Q.  Do you recall yesterday in response to your attorney's

16   question when he asked you whether or not you had spent any

17   time with Mr. Snow and Ms. Dula for any holidays; do you recall

18   that?

19   A.  He asked me if -- I don't remember what he said.  There was

20   a lot of questions but I don't remember.

21   Q.  Okay.

22   A.  If I was served or I don't remember.

23   Q.  All right.  I'd like to refer you to yesterday's testimony.

24   Mr. Lucas asked you, prior to the time Ms. Wright told you that

25   Elyse Dula referred to you or her or both as "black bitches",

1   had there been occasions when you interacted with Mr. Snow and

2   Ms. Dula say, at dinnertime?

3   "A.   If I said it to Mr. Snow and Ms. Dula at any time?

4           Then the Court interjects "dinnertime".  Then you

5   respond "no".  Then Mr. Lucas says asks you.

6   "Q.   What about on holidays, anything like that?  And you

7   answered "no".

8           Do you recall that?

9   A.   Yes.  But the question that he said if it was after with

10  Ms. Wright, I did not have any dinner or holidays with the

11  defendant.

12  Q.   So when Mr. Lucas asked you prior to the time when

13  Ms. Wright told you that Ms. Dula referred to you as "black

14  bitches", you thought his question was asking you after the

15  time?

16  A.   So what I get from what Mr. Snow, Mr. Lucas was asking

17  during the time when Ms. Dula called Ms. Wright a black bitch

18  if we had like any dinner or holidays together.  That's what I

19  gathered from the question.  So that's why I said no.

20  Q.   All right.  His question very clearly was prior to the time

21  but you are saying -- So let me ask you this, prior, you did in

22  fact have holidays with Ms. Dula and Mr. Snow and the family,

23  right?

24  A.   Yeah, before the incident happened.

25  Q.   So you didn't mean to give the impression to the jury that

NAOAAFOS2                    Foster - Cross

```
 1    you didn't spend any holidays with them, right?
 2    A.  We did spend -- I did spend one Thanksgiving, two
 3    Thanksgiving prior early on in my role of employment with the
 4    defendants but after when the slurs, the racial comments came
 5    up, I did not have any holidays or dinner with them.
 6    Q.  Before you spent you said two Thanksgivings?
 7    A.  Yes.
 8    Q.  You also spent Christmas, right?
 9    A.  Yes.
10    Q.  And I believe there was a birthday party for Child 3; do
11    you recall that?
12    A.  I don't remember if I was the -- no.  I wasn't the one that
13    spent the birthday party with Child 3.  I think it was
14    Ms. Wright.
15    Q.  What about Easter; do you recall Easter?
16    A.  Yes.
17            MR. RISO:  Your Honor, I would like to put up in
18    evidence DX 33.
19            MR. LUCAS:  No objection, your Honor.
20            THE COURT:  Admitted.  It's actually already admitted.
21            MR. RISO:  I would like to quickly go through a few
22    pictures and the jury's looking at it also.
23    Q.  That is you sitting on the couch in Mr. Snow and Ms. Dula's
24    apartment, right?
25    A.  Yes.
```

NAOAAFOS2                    Foster - Cross

1   Q.  That's Christmas morning?

2   A.  Yes.

3   Q.  And that's you and Ms. Dula kind of hunched around the

4   children, right?

5   A.  Yes.

6   Q.  And presumably, they're opening up presents?

7   A.  Yes.

8   Q.  Okay.  So we see the little baby.  Who is the little baby

9   in that picture?

10  A.  I think that was Child 2.

11  Q.  It's Child 2.  How about the young toddler standing up in

12  the red?

13  A.  Child 1.

14  Q.  Then the another child in white kind of looking at you, who

15  is that?

16  A.  I think that's Mr. Snow's other daughter.

17  Q.  Okay.  So that's from Mr. Snow's other relationship that he

18  had prior to Ms. Dula, right?

19  A.  Yes.

20  Q.  Then that's Ms. Dula as well, right?

21  A.  Yes.

22          MR. RISO:  Okay.  Could we go to the next picture.

23          (Pause)

24  Q.  Again, the same crowd, right?

25  A.  Yes.

NAOAAFOS2                          Foster - Cross

1          MR. RISO:  Next one.

2    Q.  So these are all Christmas.

3          MR. RISO:  You can keep going through.

4    Q.  Okay.  Now this is a dinner table, right?

5    A.  Yes.

6    Q.  Is this the New York City apartment?

7    A.  No.  That looks like it's in California.

8    Q.  So this is California, okay.  Is that Elyse Dula standing

9    up with the apron?

10   A.  Yes.

11   Q.  She cooked all that food that's on the table, right?

12   A.  Yeah, with the help of her mom and her sister.

13   Q.  And the woman next to Ms. Dula, that's her sister, Megan?

14   A.  Yes.

15   Q.  Then we see the two little boys, **Child 1** and **Child 2**, at the

16   table?

17   A.  Yes.  Actually, hold on a second.  This picture with,

18   looking at the table, I'm not sure if this is the California

19   apartment or it's the Hamptons.  If that's the Hamptons, then

20   that would be Ms. Wright.  It would not be me.

21          MR. RISO:  Okay.  So let's go to the next one.  Maybe

22   we can clear it up.

23   Q.  So, that's Ms. Wright?

24   A.  Yeah.  So, that was Ms. Wright.  That wasn't me.

25   Q.  So this is Ms. Wright having this celebratory holiday

NAOAAFOS2                    Foster - Cross

1   dinner at the dinner table that Elyse had cooked, right, as far

2   as the picture shows?

3   A.  As far as the picture shows because I wasn't there.

4           MR. RISO:  Next picture please.

5           (Pause)

6           MR. RISO:  Next one.

7           (Pause)

8           MR. RISO:  Next one.

9           (Paue)

10          MR. RISO:  Next one.

11          (Pause)

12          MR. RISO:  I am just skipping because it's a lot of

13  the same event.

14          Next one.

15          (Pause)

16          MR. RISO:  Next one.

17          (Pause)

18  Q.  Okay.  Now do you see that one you are in the background,

19  right?  That is you standing in the back in the corner?

20  A.  Yes.

21  Q.  And this is the Hamptons again, East Hamptons?

22  A.  Yes.

23  Q.  Now we have three little ones at the table?

24  A.  Yes.

25  Q.  Can you tell the jury who the three little ones are?

NAOAAFOS2                          Foster - Cross

1   A.   That's **Child 1**, **Child 2** and **Child 3**.

2   Q.   And who is standing up with the little kids?

3   A.   That's Ms. Dula's sister, Megan.

4   Q.   That's Megan again?

5   A.   Yes.

6   Q.   And in the back, all the way behind the sink, who is behind

7   the sink?

8   A.   Ms. Dula.

9           MR. RISO:  All right.  You can take that down.

10          I want to talk about the time that the family was

11  moving from one property in the Hamptons to another property in

12  the Hamptons, which you told us about through Mr. Lucas.

13  Q.   This would have been around May of 2020?

14  A.   Yes.

15  Q.   Do you recall that this was during the pandemic?

16  A.   Yes.

17  Q.   So was the "lockdown", right?

18  A.   Yes.

19  Q.   People weren't going any where, generally?

20  A.   Yes.

21  Q.   And Mr. Snow who used to work outside the home is now

22  working inside the home?

23  A.   Yeah.  He was working.  I think he have a office in the

24  home that he was using.

25  Q.   So he's home everyday, right?

NAOAAFOS2                         Foster - Cross

1  A.  If I see him but if -- I would say he would be home, but

2  it's not all the time I see him.  So I can't say that he's home

3  everyday.

4  Q.  I guess the distinction I'm making, before the lockdown

5  Mr. Snow would leave the home and go to work and come home

6  later, right?

7  A.  I don't know.  Sometimes I see him.  Sometimes I don't.  So

8  I just cannot answer that question and say yes because it's

9  just when I see Mr. Snow.

10 Q.  Is it fair to say they weren't doing the amount of

11 traveling that he had been doing prior to the lockdown?

12 A.  No, they weren't.  I now Mr.  -- so what used to happen is

13 that Mr. Snow and Ms. Dula would go to from the Hamptons to the

14 New York apartment.  Sometimes they would go Monday morning.

15 Sometimes they will go Sunday night and then they will come

16 back on the weekend or before the weekend, both Ms. Dula and

17 Mr. Snow.

18 Q.  Okay.

19 A.  They would drive in together.

20 Q.  You would stay in the Hamptons?

21 A.  Yes.

22 Q.  During your two-week shift?

23 A.  Yes.

24 Q.  Okay.  Do you recall that the family was moving from one

25 Hampton home to another because they lost their rental lease on

NAOAAFOS2                          Foster - Cross

1    the East Hampton property because the owner was selling that

2    home?

3    A.  I don't know for what reason it was but I know that we were

4    moving -- they were looking --

5            THE COURT:  Okay.  Next question.

6    Q.  And that the new home that you were moving into was a

7    rental home that he was able to secure during the pandemic for

8    his family to stay out in the Hamptons during the lockdown; do

9    you recall that?

10   A.  I know we were moving into another home.  That is all I

11   know.

12   Q.  By May of 2020, what members of the household including

13   staff were involved in the move to the new rental home in

14   Bridgehampton?

15   A.  So we used to do, Ms. Wright and I used to do two weeks

16   on/two weeks off.  When it was my time to get two weeks off

17   Ms. Dula had asked me, I was supposed to go home for two weeks

18   but she had asked me if I could just go home for one week, just

19   to come home to help them with the moving.  I was supposed to

20   be two weeks but I did only one week off.

21   Q.  Okay.  So you are involved in the move, right?

22   A.  Yes.  I helped them to do the packing and everything.

23   Q.  And Ian Snow is involved in the move, right?

24   A.  Just once Mr. Snow helped.

25   Q.  Okay.  And Elyse Dula is involved in the move, right?

1   A.  Yes.

2   Q.  And her sister Kaitlyn Paul is involved in the move, right?

3   A.  I don't know that Kaitlyn is Ms. Dula's sister but she

4   helps.

5   Q.  Okay.  And Kaitlyn was living with the family at that point

6   in time that they were moving to the new home in Bridgehampton,

7   right?

8   A.  Yes.

9   Q.  Whatever period Megan was helping out, that had occurred

10  before Kaitlyn came along, right?

11  A.  Yes.  With the kids.

12  Q.  When Megan was helping Elyse with the children in East

13  Hampton --

14  A.  I wouldn't say Megan was really helping out.  She would

15  come there for maybe a weekend or maybe a day and, yes, she

16  would help.

17  Q.  Okay.  So was there also the housekeeper, Marleny

18  Rodriguez --

19  A.  So, Marleny would come like maybe a day or she would come

20  like on a Sunday to help.

21  Q.  Okay.  Do you recall her helping with the move?

22  A.  Yeah, she will -- I don't say she was helping to move but

23  she came to, cause she was working for them on the weekend,

24  like do the cleaning.

25  Q.  So she was present?

NAOAAFOS2                        Foster - Cross

1   A.  Yeah, she was there.  Not all the time but --

2   Q.  Can you think of anyone else who was there other than the

3   names I just listed?

4   A.  There was a housekeeper that worked during the week which

5   was Tanya.

6   Q.  Okay.  Anyone else?

7   A.  Mr. Snow.  No.  So, it was, who I remember was me, Elyse.

8   The housekeeper was there.  Megan maybe come one day and

9   Mr. Snow and myself.  I don't remember if there was someone

10  else there, and actually, and the cats.

11  Q.  Do you recall during this period whether or not there was a

12  construction project at the Bridgehampton home in process to

13  relocate your living quarters to another part of the property?

14  A.  No, I don't recall.  I don't know if there was.

15  Q.  There was nothing like that going on.  Do you agree with

16  that?

17  A.  I don't know.

18  Q.  Do you recall any construction project going on while he

19  was moving into the rental?

20  A.  No, I don't remember.

21  Q.  Okay.  And you testified that during this move at some

22  point you overheard Elyse Dula speaking to somebody, right?

23  A.  Yes.

24  Q.  And by the way, was Ms. Dula in the main house the time you

25  say you overheard her?

NAOAAFOS2                          Foster - Cross

1    A.  So.

2    Q.  Was she in the main house at the time you overheard her?

3    A.  No.  I think she was in the washroom.

4    Q.  Where is the washroom?  Is that part of the main house?

5    A.  It was in the mansion house.

6    Q.  Okay.  And I thought you told us you had never been in the

7    mansion?

8    A.  No, because if the door, if the door opened then you can

9    see that there's a washroom.  I don't go in there.  But the way

10   how the house is set up, then you can see if the door is open.

11   Q.  Okay.  So you were in part of the house that you were

12   saying is not part of the mansion but was connected by an open

13   door?

14   A.  It's the way, it's kind of complicated to explain how it,

15   how the mansion was set up cause you have a door to come in

16   where you go upstairs to the mansion.  Then you have another

17   door to the right where you go into the mansion.  Also, there

18   is a window right there.  It's a huge window that you can see.

19   So.

20   Q.  Okay.  So, where is the washroom?  It's in the main house,

21   right?

22   A.  Yes.  And how I really know that there's a washroom, like

23   if we go outside to play with the kids and if Marleny is there

24   and she heard us coming in, she would come and said oh, I'm

25   doing laundry and that's how I really know that there's a

1   washroom right there.

2   Q.  Okay.  Oh, so you are telling this jury you've never

3   actually seen this washroom.  You just know of it because

4   Marleny said she does the wash?

5   A.  I don't remember if I ever seen the washroom.

6   Q.  If you don't recall ever seeing the washroom, you don't see

7   Ms. Dula at the time you claim to have overheard her, right?

8   A.  Ms. Dula was --

9   Q.  Answer the question, please.

10  A.  I never see Ms. Dula but I could hear her talking.

11          THE COURT:  She heard her.  Didn't see her.  We call

12  that overhearing.  Now let's move on please.

13  Q.  Were you able to make out the person she was speaking to?

14  A.  I know it was -- So, I know it was not Mr. Snow because she

15  was talking to a woman but it was not Mr. Snow.

16  Q.  Was she talking to her sister, Kaitlyn?

17  A.  I don't know if it was Kaitlyn or Marleny, cause Marleny

18  was there.

19  Q.  Okay.  How far away are you from Ms. Dula when you overhear

20  her saying --

21  A.  I would say around eight feet.

22  Q.  And through how many doorways do you have to walk through

23  from where you are to get into the washroom to where you say

24  Ms. Dula was at the time you overheard the statement?

25  A.  So there was -- I was -- okay.  So the way how it's set up,

1    that door is to the mansion and you have the, down by the

2    stairs to go upstairs where the mansion is.  So down at the

3    bottom stairs I went down because all the stuff was packed

4    there.  So the diapers and everything would be closer to the

5    door to go to where with the entrance is to the mansion.

6    Ms. Dula was talking very loud.  So I could hear everything

7    that she was saying.

8    Q.  I thought you said you only heard her say "dirty

9    Jamaicans".  What else did you hear her say?

10   A.  I'm saying I could hear her talking.

11   Q.  You could hear what you overheard; is that what you are

12   telling us?

13   A.  I hear her when she said "I'm happy to get those dirty

14   Jamaicans out of my house".

15   Q.  Did you hear her in any other part of the conversation she

16   was talking about at the time?

17   A.  No.  I only heard her say, the only thing I heard when "I'm

18   happy to get these dirty Jamaicans out of my house" and then I

19   took what I was tooking up --

20   Q.  Okay.  But you didn't hear what anyone else said to her?

21   A.  I only hear when she said "I'm happy to get those dirty

22   Jamaicans out of my house".  That's what I heard she say.

23   Q.  You are aware that your attorney filed a complaint in this

24   case, right?

25   A.  Yes.

1  Q.  And you have an understanding that the complaint that you

2  filed with the Court is your opportunity to set forth your

3  allegations of fact that you were saying make up your claim;

4  you understand that, right?

5  A.  What I tell my attorney, that's what he used to.

6  Q.  So, if you -- you would have been the source of the

7  information to your attorney about the circumstances of you

8  having heard that "dirty Jamaicans" conversation?

9  A.  Yes.  I heard Ms. Dula say that.

10  Q.  Is it fair to say you read the complaint?

11  A.  I read some of it.  I did not read all of it.

12  Q.  Did you read the parts of the complaint that had the facts

13  in it that contain your personal observations of what you say

14  happened based on your knowledge?

15  A.  I don't understand your question.

16  Q.  Well, you gave Mr. Lucas information about what you saw and

17  heard, right?

18  A.  Yes.  I tell him I hear when we moved I hear Elyse said

19  that she's happy to get these dirty Jamaicans out of her house.

20  Q.  Did you read that part of the complaint that Mr. Lucas

21  prepared?

22  A.  No.  I read some of the complaint.  I did not recall if I

23  read that part of the complaint.

24  Q.  All right.  Mr. Lucas as your attorney was authorized to

25  construct those allegations put in the complain and file it

1    with the Court on your behalf; is that fair to say?

2    A.  Yes.

3           MR. RISO:  I'd like to show what's in evidence as DX

4    5.

5           Go to the first page, please.

6    Q.  This is your complaint in this case, right?

7    A.  Yes.

8    Q.  It says that you plaintiff, Cordia Foster and Cislyn

9    Wright, by undersigned attorneys, allege as follows for their

10   complaint against defendants Elyse Dula and Ian K. Snow, right?

11   A.  Yes.

12   Q.  It you go to the top you see the banner that this document

13   was filed as a public document with the court of law, this

14   court, on December 31, 2021.  Do you agree?

15   A.  Yes, I see the dates.

16          MR. RISO:  Could you go to page 23.

17          (Pause)

18   Q.  And do you see at the bottom it's being signed by Scott A.

19   Lucas?

20   A.  Yes.

21   Q.  He is your attorney, right?

22   A.  Yes.

23          MR. RISO:  Go to page 12.

24          (Pause)

25   Q.  Take a look at what your complaint says about this

1    incident.  Paragraph 47 you say that during the week of May

2    17th of 24, 2020 the defendants were nearing completion of a

3    construction project to relocate the servants' quarters in

4    their Hamptons home from the main house to a separate

5    unconnected dwelling.

6                Did I read that accurately?

7    A.  Yes.  But I think --

8    Q.  Let me ask the questions, please.  Isn't it true that there

9    was no construction project to relocate the servants' quarters

10   occurring at that home at that time?

11   A.  I'm not sure what was going on because I think --

12               THE COURT:  It's 'yes', 'no' or 'I don't know'.

13   A.  I don't know.

14   Q.  Well, isn't it true that there was not separate and

15   connected dwelling?

16   A.  The house was, the maid quarters that we were in was

17   connected to the house.

18   Q.  Okay.  So when I asked you before whether there was a

19   construction project going on you had indicated to me that to

20   your knowledge that there wasn't, correct?

21   A.  Yeah.  I don't know of any construction that was going on.

22   If construction was going on I don't.

23   Q.  You do you agree with, Ms. Foster, that there certainly

24   would not have been a construction project specifically to

25   relocate the servants' quarters to a separate unconnected

NAOAAFOS2                      Foster - Cross

 1   dwelling.

 2              Do you agree with that?

 3   A.  So the mansion -- I don't understand.

 4   Q.  Yes or no, if you can please?

 5   A.  There wasn't -- the house, the mansion and the quarters was

 6   joined but it was like separate entrance.

 7   Q.  Okay.  So this statement is not true in Paragraph 57; do

 8   you agree?

 9   A.  I can't say if it was true or it's not true.

10   Q.  You can't say that there was no separate unconnected

11   dwelling?

12   A.  I know that -- I can't.

13              MR. RISO:  Can you put a picture of house please.

14              (Pause)

15              MR. RISO:  Putting up Plaintiff's Exhibit 12.

16              (Pause)

17   Q.  This is your exhibit, Ms. Foster.  This is the home that

18   you're moving into in May of 2020 right?

19   A.  Yes.

20   Q.  Do you see that the helm is basically shaped like an "L"?

21   A.  Yes.  I could see the house but I'm not, like I can't read.

22   Like --

23   Q.  It's all connected, right?  Well you know it is.  You lived

24   there all summer?

25   A.  Yeah.

1  Q.  Don't be shy.  That's a connected house, right?

2  A.  There are separate parts.  Yes, I could see.

3         THE COURT:  Okay.  The issue isn't are there separate

4  parts or I don't know, wings or whatever you call it, one

5  building or is it like two separate buildings?

6         THE WITNESS:  It's one building.

7         THE COURT:  All right.  That is all we need to know.

8  Q.  Then you are, where you were staying I think you called the

9  maids' quarters?

10 A.  Yes.

11 Q.  It was referred to as kids' quarters; do you recall that?

12 A.  That's what Ms. Dula called it, so.

13 Q.  So was there a connecting, interior connect from the little

14 part of the "L" into the main part of the "L" you could walk

15 through, right?

16 A.  So there are doors you could go through.  There's a door

17 down at the bottom of the step.  There's a door to the right

18 that leads you, I think, to the mansion.  And there is a door

19 upstairs.  When you go up to the staircase I think there is a

20 door to, leading to the mansion because most of the time that's

21 where Ms. Dula walked to come in but that door is closed.  We

22 cannot open that door.  Also, with the entrance down at the

23 bottom of the stairs that door is also closed.  So --

24 Q.  All right.  You could take this down.  Isn't it fair to say

25 that the door that connected the two hallways of the structure,

1  that door was always opened.  The boys always ran back and

2  forth into the main house?

3  A.  No, that's not true.

4  Q.  So I want to go back to Defendant's Exhibit Five which is

5  the complaint that you filed, and look back at Paragraph 57.

6         So you now agree having looked at the picture, there

7  is no separate unconnected dwelling, right?

8  A.  Yes.

9  Q.  There could never have been a completion of a construction

10  project to relocate your quarters?

11  A.  When you said "construction", what do you mean?

12  Q.  I get to ask the questions.  These are your words,

13  "construction project".  I want to go to Paragraph 58 now.  In

14  Paragraph 58 you say:

15         "At or near the end of that week Foster overheard Dula

16  speaking to someone else about the completion of that project."

17         You see those words?

18  A.  Completion of that.  I see this but --

19         (Continued on next page)

20

21

22

23

24

25

NAO4FOS3                      Foster - Cross

1   Q.  But that's not true, is it?  You're telling us that you

2   couldn't understand or hear or overhear what anyone else was

3   saying; right?

4   A.  I hear Ms. Dula.

5   Q.  That's not what I'm asking.  This statement and this

6   complaint, do you agree, was not true?

7   A.  It is true.

8   Q.  So you heard Ms. Dula speaking?

9   A.  Ms. Dula talking to someone that I'm happy to get these

10  dirty Jamaicans out of my house.

11  Q.  Did you hear Ms. Dula speaking to someone else about the

12  completion of that project?

13  A.  I don't understand what project you are talking about.

14  Q.  I don't either.  Ms. Foster, it's your complaint.

15  A.  I heard -- the only thing I know that I hear when she is

16  saying that I'm happy to get these dirty Jamaicans out of my

17  house.  So I don't know if --

18           THE COURT:  We exhausted this subject.  Let's move on.

19           MR. RISO:  We could take that down.

20  Q.  Isn't it true, that you're only telling us what you think

21  you heard her say, but you can't actually tell us what she

22  said?

23  A.  I'm not thinking.  I hear exactly what Ms. Dula said.  That

24  she's happy to get these dirty Jamaicans out of her house.  I'm

25  not thinking.  I heard what Ms. Dula said.

NAO4FOS3                    Foster - Cross

1    Q.  Do you recall that I took your deposition in this case in

2    June of 2022?

3    A.  I didn't hear your question.

4    Q.  I'm happy to repeat it.  Do you recall that I took your

5    deposition be under oath in June of 2022?

6    A.  Yes.

7    Q.  And do you recall saying something different at that

8    deposition?

9    A.  I don't recall.

10   Q.  All right.  I want to ask you whether you made the

11   following statement to the following question, this is

12   page 156.

13   "Q.  Do you hear what anyone else is saying to her in response

14   or that prompted that comment already part of that

15   conversation?"

16   "Q.  Counsel, I hear when Ms. Dula said, I'm happy to dirty

17   Jamaicans out of my house.  I cannot say that Ms. Dula said

18   something."

19   Q.  Do you recall making that statement?

20   A.  I can't recall that.

21              THE COURT:  Do you have anything you want to say?

22              MR. LUCAS:  Yes.  It's not the complete answer.

23              THE COURT:  Read the complete answer, please.

24              MR. RISO:  I'm setting it up with the next question.

25   BY MR. RISO:

1   Q.  And then you said, "I am saying what I heard what Ms. Dula

2   said."  Right?

3   A.  Yes, because I heard what she says.

4   Q.  Aren't you telling us that you cannot tell us what Ms. Dula

5   said, but that's what you think you overheard.  Is that what

6   you are saying?

7   A.  I'm telling you that I heard --

8             THE COURT:  I understand her answer.  He heard this

9   enough.  Let's move on.  Don't argue with the witness.

10  Q.  The black bitches incident, that's not something that you

11  know about other than what Ms. Wright told you; right?

12  A.  Yeah, Ms. Wright told me.

13  Q.  And during your direct examination you never were asked to

14  detail what you recall Ms. Wright saying to you at or about

15  that time; right?

16  A.  The conversation that Ms. Wright and I have, Ms. Wright had

17  called me when the incident happened, and she told me what

18  Ms. Dula had said.

19  Q.  OK.  And did you hear Ms. Wright tell you that she went to

20  get a broom because Scotty was under the G-Wagon.  Is that part

21  of what Ms. Wright told you?

22  A.  Ms. Wright didn't explain to me what had happened.  She

23  only told me the part when Ms. Dula said that we're black

24  bitches.  I don't recall, or I don't remember if we have any

25  other conversations stating what the incident was and what took

1    place when.

2    Q.  So you're telling us today, that as you sit here,

3    Ms. Wright did not tell you anything other than what she claims

4    Ms. Dula said black bitches?

5            MR. LUCAS:  Objection.  Misstatements the testimony.

6            THE COURT:  The objection is overruled.  If it

7    misstates the testimony, she will correct him.  Don't worry.

8    A.  I can't remember.  I don't remember, and I can't recall

9    what else we spoke about.

10   Q.  Do you recall at the deposition that I took of you under

11   oath, that I asked you about what Ms. Wright had said to you.

12   Do you recall giving the following answer to the following

13   question?

14           MR. LUCAS:  Page?

15   Q.  I've got to get the page, it's page 147.

16   "Q.  Did she say to you where Ms. Dula was when she heard

17   Ms. Dula make that statement?

18   "A.  Yeah, she went inside, and she went to get a broom because

19   Scotty was under the G-Wagon.  And she get the broom to try to

20   come to see if she could, like, let him to get out so he could

21   run back inside, to the inside of the house.  Then little Child

22   1 said, Momma, Momma, Scotty is out under the G-Wagon.  So

23   Ms. Wright went back inside and Ms. Dula was there, and she

24   said, those black bitches.

25   Q.  Do you recall giving that testimony?

NAO4FOS3                    Foster – Cross

1  A.  I don't remember.

2  Q.  You don't dispute you gave that testimony; correct?

3  A.  I don't remember giving -- because the --

4          THE COURT:  No.  Not because.  She doesn't remember.

5  She has no recollection of giving that testimony.

6  Q.  So having now been confronted with what you told me in June

7  of 2022, that I just read to you, isn't it true that you

8  testified that Ms. Wright told you that the first thing that

9  happened was that she went to get the broom after Scotty had

10  already gotten under the G-Wagon?

11  A.  I remember.  I just, as I said, if Ms. Wright and I have

12  other conversation, I don't remember.  But I remember when she

13  said that Ms. Dula called us black bitches.

14  Q.  Do you remember Ms. Wright telling you what she told you, I

15  guess back in January of 2020, that when she got to get the

16  broom, she then went to get the cat out.  And then **Child 1**

17  said, momma, momma.  Do you recall that?

18  A.  I don't remember.  I can't recall.

19  Q.  Were you the source of the information about that incident

20  that is pled in your complaint that was filed with this Court?

21  A.  Can you rephrase the question.  I don't understand what you

22  just said.

23  Q.  Sure.

24          So you are aware that in your complaint, we looked at

25  a section of it before, that's filed with this Court, there is

1  a portion of that complaint that talks about this January 2020

2  incident that Ms. Wright claims happened with Ms. Dula; right?

3  A.  Yes, I think it's in the report.

4  Q.  It's in the complaint; right?

5      Are you the source of that information to your

6  attorney about that incident?

7  A.  No, it was Ms. Wright.

8  Q.  So Ms. Wright --

9  A.  Ms. Wright was the one who -- she was working when the

10  incident happened.  It wasn't me on duty that day.

11  Q.  I'll ask Ms. Wright.

12      THE COURT:  OK.  We're going to have to take a real

13  quick break because the witness needs to use the restroom.  I

14  was hoping we could get through ten more minutes.  Anyone else

15  need to use the restroom right this second?  All right.  Be

16  quick.

17      (Recess)

18      THE COURT:  OK.  Ma'am, you are still under oath.

19      MR. RISO:  Your Honor, I would like to put into

20  evidence the question and answer of page 147 of Ms. Foster's

21  deposition that I just read into the record.

22      THE COURT:  It's in evidence.

23      (Defendant's Exhibit Page 147 received in evidence)

24      MR. RISO:  Thank you.  Can you put it up on the

25  screen, please.

NAO4FOS3                    Foster - Cross

1   Q.  Ms. Foster, I'm showing you what I read to you a few

2   moments ago.  And that's the testimony you gave in this case;

3   right?

4           THE COURT:  Were you asked that question, ma'am?  And

5   did you give that answer?

6           THE WITNESS:  It's there, but I don't recall.

7           THE COURT:  OK.  Move on, please.

8           MR. RISO:  OK, take it down.

9   Q.  I want to talk a little bit more about the pay cut.  By

10  June of 2020, am I correct that Mr. Snow and Ms. Dula had

11  already brought in other people to play more active activities

12  with the boys?

13  A.  The only person that I know that was there, Ms. Kaitlyn

14  would help, like sometimes she would come and take the boys.

15  And we always have a sweeping structure for the boys.

16  Q.  And you recall there was a young fellow by the name of

17  Johnny?

18  A.  Yeah, Johnny was there.

19  Q.  And Johnny often stayed in the guest house; right?

20  A.  I know Johnny was there, but I don't know if he stays in

21  the guest house.

22  Q.  And do you know they were paying Johnny to do activities

23  with the boys in the afternoon?

24  A.  I know he will come, like, maybe one day to take the boys

25  out for a ride.

NAO4FOS3                          Foster - Cross

1   Q.  So by the time of the conversation you had with Mr. Snow in

2   the middle of June 2020, Kaitlyn was already doing activities

3   with the boys; right?

4   A.  Yeah, sometimes Kaitlyn may come like a day.  She would

5   read them, like, a story.

6   Q.  And Johnny was doing activities with the boys; right?

7   A.  Johnny was mostly doing, like, work around the yard, but

8   sometimes he will take the boys out for a bike ride.

9   Q.  So the answer is yes; right?  He did activities with the

10  boys; right?

11  A.  He would take them for a bike ride.  I wouldn't say like a

12  daily thing.  But --

13  Q.  And you mentioned swim lessons too; right?

14  A.  No.  They had their own swim instructor, not Johnny.

15  Q.  I thank you for that correction.  I didn't mean to infer

16  that Johnny was the swim instructor.  It was someone else who

17  gave the swim lessons; right?

18  A.  Yes.  Before we moved to the mansion, Mr. Snow has

19  arraigned swim lessons for the boys.

20          MR. RISO:  PX-25.

21  Q.  Do you recall on or about this period, say June 13, 2020,

22  Mr. Snow sent you a text letting you know that he wanted to

23  adjust your pay?

24  A.  Yes.

25  Q.  I'm showing you what's in evidence as DX-25.  And this is a

NAO4FOS3                         Foster - Cross

1   text message from Mr. Snow to you on June 13, 2020; correct?

2   A.  Yes.

3   Q.  And is this the text message you were referring to in your

4   last answer?

5   A.  Yes, this is the text from Mr. Snow.

6   Q.  Mr. Snow says to you:  As I know you've heard, I've spoken

7   to Verona.  We are no longer willing or able to pay you the

8   salary you have been receiving.  As we discussed when Child 4

9   was born, this payment schedule was temporary and should have

10  been addressed before.  We are willing to continue paying you

11  at the rate of $500 per day.  We have spoken to a number of

12  people and know this is more than reasonable for a job being

13  performed. If this is unacceptable, let me know, and we will

14  make other arrangements.  Thank you so much.

15          This text is really just a continuation of the text

16  Mr. Snow sent you on October 28, 2019.  Do you agree?

17  A.  I should think so.

18  Q.  OK.  And in response, the next page, you voice your

19  opinion; right?  You're insulted.  You think a 50 percent

20  reduction is just too much; right?

21  A.  Yes.

22  Q.  So you're having your say on the issue of the pay rate.

23  You're giving your opinion; right?

24  A.  Yes.

25  Q.  You're pushing back on your boss and saying, basically

1   that's insulting.  I'm worth more than that; right?

2   A.  Well, I should say that we work around the clock, 24

3   hours --

4   Q.  I'm not asking you to justify your position.  I'm saying

5   you are letting your boss know that you don't think, in this

6   text anyway, that that's appropriate; right?

7   A.  Yeah, that's the text message --

8   Q.  You have no problem speaking up to Mr. Snow, at least in

9   this text.  Do you agree?

10  A.  Yes, I speak how --

11          THE COURT:  OK.

12  Q.  When Verona Wright tells you many months earlier that Elyse

13  Dula had called you a black bitch, you never once raised that

14  with Mr. Snow, did you?

15  A.  I didn't say it to Mr. Snow because I was trying to protect

16  my job, and I was trying to protect the kids.  I didn't want to

17  be fired.

18  Q.  You didn't tell Mr. Snow anything about that; right?

19  A.  No, I did not tell him.

20  Q.  And you claim you overheard Ms. Dula in May 2020 make this

21  dirty Jamaicans remark.  You never complained to Mr. Snow;

22  right?

23  A.  I was still protecting my job.  I didn't want to get fired,

24  and I was still protecting the kids.  Was I happy?  No, but I

25  was just protecting the kids, protecting my job.

NAO4FOS3                       Foster - Cross

1   Q.  Your boss's domestic partner called you a dirty Jamaican.

2   You never raised that had with either one of them.  Is that

3   your testimony?

4   A.  As I said, it hurt me so badly.  But I was still protecting

5   my job, and I was still protecting the kids.

6   Q.  But it didn't hurt you enough to speak up, is that fair to

7   say?

8   A.  I was still protecting my job, and I was still protecting

9   the kid.

10  Q.  Isn't it true that you personally had never heard Elyse

11  Dula ever say anything racially derogatory such as "black

12  bitches" prior to the time Ms. Wright told you that she heard

13  Ms. Dula say that?

14  A.  Only the time when Ms. Wright told me when Ms. Dula said we

15  a black bitches and when I heard her say we were dirty

16  Jamaicans.

17  Q.  And you dirty Jamaicans you had never heard with your own

18  ears?

19  A.  Yes, I did hear.

20  Q.  Let me, please, finish the question.  And I think when I am

21  finished you will understand what I'm asking.

22          Isn't it true that you never, with your own ears, ever

23  heard Ms. Dula utter a racially derogatory comment other than

24  the time you claim that you overheard her say dirty Jamaicans?

25  A.  No, that's the only time I heard when Ms. Dula said I'm a

1   dirty Jamaican.  So I heard --

2            THE COURT:  OK.  Next question.

3   Q.  And isn't it true that you never heard Mr. Snow ever utter

4   any racial or derogatory comment about you or about Ms. Wright?

5   A.  I never heard Mr. Snow said any racial slur towards us.

6   Q.  So when you pushed back on Mr. Snow in your text, and you

7   tell him his suggestion to reduce your pay by 50 percent is

8   insulting, Mr. Snow responds to you; right?  He wants to share

9   his reasoning with you; correct?

10  A.  I wasn't pushing back at Mr. Snow.  I just tell Mr. Snow

11  how I feel.

12  Q.  Okay.  You told him it was insulting; right?

13  A.  Yes, I think I did.

14  Q.  And he responds and says there is a huge difference between

15  a baby nurse wage and nanny wages.  You don't work through the

16  night as a nanny.  If you don't want to continue on this basis,

17  I understand.  That was his response; right?

18  A.  Yes.  But we still work 24 hours even though Mr. Snow said

19  that we did not work through the night.  But if anything

20  happened to any one of the kids, it's still 24/7, because we

21  have to get up and we have to attend to those kids.

22  Q.  And from their perspective, whether or not you believe you

23  were working 24 hours, because if somebody woke up you had to

24  be there.  From their prospective, would you agree, they did

25  not believe you were working 24 hours; right?

NAO4FOS3                          Foster - Cross

1    A.  I know I was working 24 --

2              THE COURT:  No, ma'am.  I'm so sorry.  We are going to

3    break for lunch right after this.  That wasn't his question.

4              THE WITNESS:  Can you repeat it.

5              THE COURT:  His question was, did you have some

6    understanding about what they believed?

7              THE WITNESS:  Yeah, that's what they believed.

8              THE COURT:  They believed that you were working 24

9    hours or they believed you were not working 24 hours?

10             THE WITNESS:  They believed we were not working 24

11   hours.

12             THE COURT:  OK.  Let's break for lunch and be back

13   here 1:30 on the dot.  Don't discuss the case.  Keep an open

14   mind.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

NAO4FOS3                          Foster - Cross

1                (In open court; jury not present)

2                THE COURT:  How much more do we have of this witness?

3                MR. RISO:  Probably half hour or 45 minutes.

4                THE COURT:  People, I'm going to start putting you on

5      the clock.  You told me this was a short trial.  You told me

6      this was going to be three or four days.  And it's going to be

7      three or four days.  So you've got to move it.

8                MR. RISO:  I have done an hour.  That's it.

9                THE COURT:  Yeah, but we are going to have redirect.

10               MR. LUCAS:  Brief redirect, your Honor.

11               MR. RISO:  I want them to hear the tape.  That's

12     really going to be most of the next question.

13               THE COURT:  Good.  Then figure out how to play the

14     tape.  But make sure over lunch we figure out how to play the

15     tape.

16               MR. RISO:  Yes, your Honor.  Thank you.

17               (Lunch recess)

18                          AFTERNOON SESSION

19                              1:35 p.m.

20               (In open court; jury present)

21               THE COURT:  Hi, I hope you all had a great lunch.

22     Have a seat.

23               Word got back to me if somebody asked if you all could

24     submit questions and the answer is no.  I have to let the

25     lawyers ask the questions.  I know that can be frustrating

1  because I'm sure there are things that come up in your mind

2  that you would like to know the answer right then, but we try

3  the cases on the basis the way the lawyers choose to present

4  the evidence.  Sorry about that.

5          OK.  Now, you are still under oath, ma'am.  Let's

6  finish your testimony.

7  BY MR. RISO:

8  Q.  Good afternoon, Ms. Foster.

9  A.  Good afternoon.

10 Q.  So I want to have us listen to the audio recording that you

11 made of the conversation that you and Ms. Wright had with

12 Mr. Snow on June 14, 2020.  You made that recording; correct?

13 A.  Yes.

14 Q.  And am I correct that June 14, 2020, was a Sunday?

15 A.  Yes.

16 Q.  So that was a day where you and Ms. Wright would actually

17 be together at the same time at the Bridgehampton home;

18 correct?

19 A.  Yes.

20 Q.  Your shift was it was ending, and she was coming to start a

21 new shift?

22 A.  Yes.

23 Q.  Did you plan at that time together to have a conversation

24 with Mr. Snow about his June 13th text, about wanting to

25 discuss a pay cut?

1   A.  Yes.

2   Q.  And is it fair to say that Mr. Snow had no idea that you

3   were recording that call at that time; right?

4   A.  No.

5   Q.  Well, you didn't tell him you were recording the call;

6   right?

7   A.  No.

8   Q.  I just wanted to be clear.

9           THE COURT:  It's clear.  She said, no, she didn't tell

10  him.  Let's move on.

11          MR. RISO:  Judge, I want to play the tape.  May I hand

12  out to the jury the transcripts that are marked as 44-A.

13          THE COURT:  You may.

14          So, folks, while he is handing those out, let me

15  explain to you that the actual evidence in the case is the

16  tape.

17          Now, somebody has prepared, one of the parties has

18  prepared a transcript of what's on the tape.  And that's

19  prepared as an aid to help you in case you have difficulty

20  hearing something on the tape, but the transcript is not

21  evidence.  So if you hear something on the tape that you don't

22  think is right, is correct in the transcript, it's the tape

23  that is the evidence, not the transcript.  So if, for example,

24  you hear a word "not" on tape.  I'm just taking it as an

25  example.  You hear "not" and there is no "not" in the

NAO4FOS3                    Foster - Cross

1   transcript at the same place, it's what you hear that controls,

2   not what you read.  All right.  Fine.

3        MR. RISO:  Thank you, your Honor.  Would your Honor

4   like a transcript?

5        THE COURT:  No, thank you.

6        MR. RISO:  I'd like to hand one to the witness.

7        THE COURT:  Of course.

8        MR. RISO:  Thank you, your Honor.

9        THE WITNESS:  Thank you.

10       MR. RISO:  All right.  We are now playing DX-44.

11       (Video playing)

12       THE COURT:  Ms. Foster, it is it fair to say that

13  during this conversation, one of the concerns that you and

14  Ms. Wright had to Mr. Snow's advice to you that he wanted to

15  cut the way pay was, well, can you give us sometime before you

16  do that.

17  A.  Yeah, because Ms. --

18       THE COURT:  So the answer is yes.

19       Next.

20  Q.  Is it fair to say I've listened after listening to the tape

21  and what happened thereafter that Mr. Snow gave you time before

22  he reduced the pay, isn't that true?

23  A.  Yes, he gave me two weeks.

24  Q.  And your two weeks would have ended after your next shift;

25  right?

NAO4FOS3                         Foster - Cross

1   A.  Yes.

2   Q.  So if this was June 14 you would have been back on June 28;

3   correct?

4   A.  Yes.

5   Q.  So that two-week period would have started June 28 and

6   would have continued 14 days thereafter, yes?

7   A.  Yes.

8   Q.  So I see in the tape that at one point you tell Mr. Snow

9   that you want to have your say; right?  You want to be heard?

10  A.  Yeah, I tell him I just want him to understand the

11  conversation or what we are trying to have.

12  Q.  And he wants to hear what you have to say; right?  You

13  heard the tape.

14  A.  Yes.

15  Q.  And you and Verona Wright, at different parts of the tape,

16  you criticize, in some way, Elyse for not letting know or being

17  more involved with you; right?

18  A.  I didn't hear what you said.  Could you repeat, please.

19  Q.  At one point in the tape you tell Mr. Snow that I wish

20  Elyse was more involved and would tell us what she wants to do

21  with the kids and words to that effect; right?

22  A.  Yes.

23  Q.  And at another point you vent some frustration to Mr. Snow

24  about Elyse Dula's sister Megan Dula; right?

25  A.  Yes.

1   Q.  And that Megan was trying to make the kids like her the

2   best and you and Elyse less; right?

3   A.  I didn't hear that on the tape.

4   Q.  I withdraw that question.

5           We also heard Ms. Wright also commenting about Elyse's

6   other sister Kaitlyn, and what she was doing; right?

7   A.  Yes, that's on the tape.

8   Q.  So you're very comfortable in this conversation giving your

9   grievances to Mr. Snow about his domestic partner and about her

10  sisters, is that fair to say?

11  A.  I didn't hear what you said.  Could you repeat, please.

12  Q.  You are comfortable in your conversations with Mr. Snow to

13  let him know what grievances you had about his domestic

14  partner, Elyse Dula; right?

15  A.  Yes.

16  Q.  And you are comfortable in this conversation with Mr. Snow

17  to let him know what issues you have with Megan Dula; right?

18  A.  Yes.

19  Q.  And also with Kaitlyn; correct?

20  A.  Yes.

21  Q.  Yet, it's your testimony that at any point in time you

22  never raise with Mr. Snow your grievance that you overheard

23  Ms. Dula call you a dirty Jamaican; is that correct?

24  A.  Yeah, I never mentioned it to Mr. Snow.

25  Q.  OK.  And you never mentioned that, hey, I heard Ms. Wright

1   tell me that Elyse Dula called us black bitches.  You never

2   mentioned that had either; right?

3   A.  No, I did not.

4   Q.  And you testified earlier that there was something about a

5   camera in your bedroom in the Hamptons; right?

6   A.  Yes.

7   Q.  And that you believe that that camera was angled towards

8   the bed you were sleeping in and not necessarily on the crib

9   for Child 4; right?

10   A.  Yes, it was directly onto our bed.

11   Q.  So let me just back up a little bit with cameras in the

12   baby nurse nanny's room.  In your experience, is it common

13   practice for a parent of a baby in a crib to have a camera

14   focused on the crib?

15   A.  Yes, it's always on the crib.

16   Q.  And if you are sharing, as the baby nurse, that room with

17   the crib, you know and understand that there is a camera in

18   that room; right?

19   A.  There is a camera in the room, but it's attached on the

20   baby's crib, not above.

21   Q.  But the fact of the camera in the room that you are

22   sleeping in, is something that, as a baby nurse, it's part of

23   your occupation; right?

24   A.  Yes.  It's in the room, but depends on where in the room

25   the camera is.

NAO4FOS3                         Foster - Cross

1    Q.  You said in your testimony that the camera turns; right?

2    A.  I did not say it turns.  I said I'm not sure if it turns

3    but the camera was directly on the bed where we were sleeping,

4    not facing towards the baby's crib.

5    Q.  So the camera was on the wall and you could see it; right?

6    A.  Yes.

7    Q.  And you could reach up to a height with your hand and

8    adjust the angle of the camera with your hand, do you agree?

9    A.  No.

10   Q.  You disagree with that?

11   A.  I could never take my hand and turn the camera, no.

12   Q.  If you stood on a chair?

13   A.  Because Ms. Dula had to climb on a ladder to put the camera

14   up.  So I could not just go stand and use my hand to turn the

15   camera.  I could not do that.

16   Q.  Did you ever see the device that was receiving the image

17   from the camera, whether that would be Ms. Dula's phone or

18   whatever device actually on the receiving end?

19   A.  No.  Ms. Dula was the only one who could review that.  I

20   could not.

21   Q.  You never actually saw the image that Ms. Dula could see

22   that camera was picking up; right?

23   A.  No.

24   Q.  So we established before that you were comfortable with

25   Mr. Snow in airing certain grievances.  Yet, in this

NAO4FOS3                          Foster - Cross

1    conversation on June 14, after you were already in

2    Bridgehampton, you don't bring up with Mr. Snow or any time

3    your grievance that there you believe there is a camera angled

4    on your bed and not in the crib.  Is that fair to say?

5    A.  Yes, I was protecting my job.

6              THE COURT:  You didn't bring it up with him.

7              THE WITNESS:  No, I did not.

8              THE COURT:  OK.

9    Q.  So you chose to sleep on the floor on occasion rather than

10   to say to Mr. Snow, hey, I think we need to adjust the camera

11   angle.  Is that your testimony?

12   A.  Yes, because I know if I --

13             THE COURT:  No, no.  Yes, that's your testimony.

14   Q.  Is it also fair to say after listening to the audio tape

15   that you understood the reasons that Mr. Snow is giving you for

16   the pay cut?  At one point I think you say "that sounds fair."

17   Do you recall that?

18   A.  Yes.

19   Q.  And you also express that quote, "we love you guys the

20   same."  Right, you say that?

21   A.  I did.  I said that.

22   Q.  And when you say we love you guys the same, you are

23   referring to Mr. Snow and Elyse Dula; right?

24   A.  Yes.

25   Q.  And would you agree with me that voicing those sentiments

1   to Mr. Snow in June 14, 2020, is not consistent with your

2   having overheard Ms. Dula call you a dirty Jamaicans just two

3   weeks earlier?

4   A.   I was -- can you repeat the question.

5   Q.   Sure.

6        Would you agree with me that you were expressing to

7   Mr. Snow on June 14, that you loved both him and Elyse Dula is

8   not consistent with your having overheard Ms. Dula refer to you

9   as a dirty Jamaicans just two weeks earlier?

10  A.   I just said that to Mr. Snow, that I love him and Elyse

11  both, that wasn't true.  Because I already know that they have

12  made up their mind, and I was just there to keep my job, so I

13  just have to say what I have to say to him and to protect the

14  kids.

15  Q.   Mr. Snow in the audio we just listened to, on at least one

16  or two occasions says he would understand if this is not

17  acceptable and you wanted to get a new job.  Do you recall

18  that?

19  A.   Yes, that's what he said.

20  Q.   And did you understand that he was referring to your

21  experience as a baby nurse and that you could get another baby

22  nurse position?

23  A.   Yes, but I --

24  Q.   And that baby nurses work at a premium for the pay that's

25  available to nannies, as a general rule, you understand that?

1    A.  Yes.

2    Q.  Now, there is also some discussion on this tape that there

3    is going to be a definition of your roles going forward; right?

4    A.  Yes.

5    Q.  And both you and Ms. Wright raise with Mr. Snow, we need to

6    be defined what's going on forward; right?

7    A.  Yes.

8    Q.  And Mr. Snow says something to the effect that he envisions

9    you will feed Child 4, and put the boys to bed, basically other

10   people will play with the boys during the day.  Is that the

11   gist of it?

12   A.  Yes, that's what Mr. Snow said.  But that did not happen.

13   Q.  So when you believed it didn't happen at any point after

14   this tape, did you ever go to Mr. Snow and say, hey, we had a

15   really constructive conversation on June 14.  You were going to

16   define our roles.  You still haven't done it.  Did you ever

17   have that conversation with Mr. Snow?

18   A.  No, I did not have that conversation with Mr. Snow.

19   Q.  Did you ever have that conversation with Ms. Dula?

20   A.  No, I don't see Ms. Dula.

21   Q.  Well, isn't it true that shortly after this conversation

22   you did, in fact, begin to look for a new job?

23   A.  I was looking around because I know at that point Mr. Snow

24   and Ms. Dula already made up their mind.  They were trying to

25   force us out, but we refused not to leave because of the kids.

NAO4FOS3                          Foster - Cross

1   Q.  OK.  So you refused not to leave because of the kids?

2   A.  Yes, so we stayed on.

3   Q.  Were you looking for another job shortly after this

4   conversation?

5   A.  No.

6   Q.  Could we put up DX-30, please.

7         I'm showing you what we put on the screen as DX-30.

8   And am I correct that that is your text that you've prepared in

9   connection with a job employment application of some sort on

10  June 30, 2020?

11  A.  Yes, that's there.  But I always --

12        THE COURT:  No, no.  It's a yes or no question.

13        THE WITNESS:  Yes.

14        MR. RISO:  You it take it down.

15  Q.  By the way, when you made the recording of the Mr. Snow

16  conversation on June 14, 2020, is it fair to say that you and

17  you alone controlled when the recording would begin and when

18  the recording would end?

19  A.  Yes.  I didn't tell Ms. Wright that I was recording.

20  Q.  And did you use this clock camera, secret recording device

21  that there was some testimony about to make this recording?

22  A.  No.

23  Q.  What did you use?

24  A.  I used my cell phone.

25  Q.  OK.  But during this period of time, you did have a hidden

1  wifi camera that you purchased a couple years earlier?

2  A.  I had a camera, but it wasn't connected and that was in the

3  New York City apartment.

4  Q.  Did you testify -- strike that.

5          Did you ever bring the camera to the Hamptons?

6  A.  No.

7  Q.  Do you recall at your deposition testifying differently?

8  A.  I can't recall that.

9  Q.  You can or can't?

10  A.  I can't recall that.

11  Q.  Do you recall being asked the following questions and be

12  given the following answer, this is page 233.

13  "Q.  You said it wasn't installed.  I got that.  I'm asking you

14  where was this clock itself?

15  "A.  I know it was in the Hamptons.  I think it was on the

16  bedside table.

17  Q.  Do you recall being asked that question and giving that

18  answer?

19  A.  I know that --

20          THE COURT:  Ma'am, were you asked that question --

21          THE WITNESS:  I don't recall.  I don't remember.

22          THE COURT:  She can't recall if she did or not.

23  Q.  Now, where in the New York City apartment did you have this

24  secret wifi clock radio?

25  A.  It was in the bedroom that I was staying.

NAO4FOS3                    Foster - Cross

1    Q.  And where in the bedroom did you have it?

2    A.  On the bedside table.

3    Q.  How many bedside tables were in that bedroom?

4    A.  Two.

5    Q.  So one on either side of the bed?

6    A.  Yes.

7    Q.  And this would be the same bed at the New York City

8    apartment that you would share with Ms. Wright on a rotating

9    basis; right?

10   A.  Yes.

11   Q.  And was that clock radio on that night table while you were

12   living in the New York City apartment?

13   A.  I didn't -- could you repeat your question.

14   Q.  You left it on the night table; right?

15   A.  Yes, it was on the night table.

16   Q.  And did it remain on the night table for a period of time

17   as far as you know?

18   A.  Yes.

19   Q.  So after your shift would end, for example --

20   A.  Yes.

21   Q.  -- you would go home and Ms. Wright would come, it would

22   still be on the night table; right?

23   A.  Yes.

24   Q.  How long do you recall this was continuously on this night

25   table?

NAO4FOS3                    Foster - Cross

1    A.  I can't recall.  I don't remember.

2    Q.  Would it be for a period of about a year?  I'm just trying

3    to get a sense, two years?

4    A.  I just don't remember.

5             THE COURT:  Well, can I ask a question?

6             MR. RISO:  Sure.  Yes, your Honor.

7             THE COURT:  It was still there in 2020 when you were

8    in the Hamptons?

9             THE WITNESS:  No, no, no.

10            THE COURT:  By that time it was no longer there.

11            THE WITNESS:  Yes.

12   Q.  At what point in time do you recall it not being in the New

13   York City apartment?

14   A.  We leave -- because we keep going to the Hamptons, going to

15   California for the birth.  So I can't recall the exact time.

16   But I know it wasn't there in 2019 or 2020.

17   Q.  So what would -- what would going to the Hamptons have to

18   do with having it unless you were taking it with you to the

19   Hamptons?

20            THE COURT:  Sorry.  Can you ask a more straightforward

21   question.

22            There came a time when it was no longer on your

23   bedside in New York City, where did you take it?

24            THE WITNESS:  I just put it away.

25            THE COURT:  What does that mean, you put it away?

NAO4FOS3                         Foster - Cross

 1              THE WITNESS:  Like, it wasn't on the nightstand

 2     because if we were going to the Hamptons -- I know I had it in

 3     a box.

 4              THE COURT:  Where was the box?

 5              THE WITNESS:  It was on the nightstand.

 6              THE COURT:  OK.  I thought you said you took it off

 7     the nightstand.

 8              THE WITNESS:  No.  I mean, when we were leaving it

 9     wasn't on the nightstand anymore.

10              THE COURT:  Did you ever remove that clock from the

11     bedroom in New York City?

12              THE WITNESS:  Yes.

13              THE COURT:  You did.

14              THE WITNESS:  Yes.

15              THE COURT:  Where did you take it?

16              THE WITNESS:  I didn't take it to the Hamptons.  I

17     think I put it in the bathroom room, under the bathroom in the

18     cupboard, if I can recall.

19     Q.  Where?  In New York City?

20     A.  Yes.

21     Q.  And when did you remove it from the bathroom cupboard in

22     New York City?

23     A.  We -- I don't recall because we had a lot of -- I had my

24     stuff still in the New York City apartment.  We did not get to

25     move our clothes or anything from the New York City apartment.